# District Court Orders being appealed

1. Final order. June 26, 2014.

2. Transcript of Dec. 19, 2013, hearing. Allowing 11 Sheriffs, in their individual capacities, to re-enter the case with an amended complaint. Not allowing 44 other Sheriffs to do so.

3. Order denying Plaintiffs' unopposed Fed. R. Civ. Pro. 59(e) motion to alter/amend the Order in item 4. Dec. 12, 2013.

4. Order granting Defendant's Motion "To Dismiss Sheriffs As Plaintiffs Acting In Their Official Capacity." Nov. 27, 2013.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Chief Judge Marcia S. Krieger

**Civil Action No. 13-cv-01300-MSK-MJW**

**COLORADO OUTFITTERS ASSOCIATION;**
**COLORADO FARM BUREAU;**
**NATIONAL SHOOTING SPORTS FOUNDATION;**
**MAGPUL INDUSTRIES;**
**COLORADO YOUTH OUTDOORS;**
**USA LIBERTY ARMS;**
**OUTDOOR BUDDIES, INC.;**
**WOMEN FOR CONCEALED CARRY;**
**COLORADO STATE SHOOTING ASSOCIATION;**
**HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER AT**
**CHERRY CREEK COLORADO PARK;**
**DAVID STRUMILLO;**
**DAVID BAYNE;**
**DYLAN HARRELL;**
**ROCKY MOUNTAIN SHOOTERS SUPPLY;**
**2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;**
**BURRUD ARMS INC. D/B/A JENSEN ARMS;**
**GREEN MOUNTAIN GUNS;**
**JERRY'S OUTDOOR SPORTS;**
**SPECIALTY SPORTS & SUPPLY;**
**GOODS FOR THE WOODS;**
**JOHN B. COOKE;**
**KEN PUTNAM;**
**JAMES FAULL;**
**LARRY KUNTZ;**
**FRED JOBE;**
**DONALD KRUEGER;**
**DAVE STRONG;**
**PETER GONZALEZ;**
**SUE KURTZ; and**
**DOUGLAS N. DARR,**

      **Plaintiffs,**

**v.**

**JOHN W. HICKENLOOPER, Governor of the State of Colorado,**

      **Defendant.**

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

---

**THIS MATTER** comes before the Court following a bench trial on the Plaintiffs' claims under the Second and Fourteenth Amendments to the United States Constitution, and under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131 *et seq.*  Having considered the evidence presented and the parties' arguments, the Court finds and concludes as follows.

### I. Factual Background

In 2013, in the wake of a mass shooting at a movie theater in Aurora, Colorado, the Colorado General Assembly enacted gun control legislation that included two new criminal statutes: (1) C.R.S. § 18-12-302, banning the sale, possession, and transfer of "large-capacity magazines," as that term is statutorily-defined; and (2) C.R.S. § 18-12-112, expanding mandatory background checks to recipients of firearms in some private transfers.

This action was initiated before the statutes became effective.  The Plaintiffs — individuals who own guns, associations and organizations of gun owners and advocates, and businesses that manufacture or sell magazines and/or firearms — challenge these statutes and seek to permanently enjoin their enforcement.  Many of the Plaintiffs opposed the legislation before the General Assembly, and iterate the arguments they made during the legislative process here.  The named Defendant is the Governor of the State of Colorado, sued in his official capacity.[1]  Thus, all future references to the Defendant will be to Colorado.[2]

---

[1]     *See Kentucky v. Graham*, 473 U.S. 166 (1985).

[2]     Generally, the Eleventh Amendment to the United States Constitution shelters a state from private suits brought without its consent under the doctrine of sovereign immunity.  *Ellis v. Univ. of Kansas Medical Center*, 163 F.3d 1186, 1195 (10th Cir. 1998).  However, in *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized a narrow "exception" to states' sovereign immunity to allow private litigants to seek an injunction in federal court against a state

A number of claims were dismissed prior to trial.  The issues at trial were: (1) whether § 18-12-302 and § 18-12-112 violate the Second Amendment[3] of the United States Constitution, which guarantees the people's right to "keep and bear arms;" (2) whether the phrase "continuous possession" in the grandfather clause of § 18-12-302 is so vague as to violate the people's right to Due Process under the Fourteenth Amendment of the United States Constitution; and (3) whether the statutes violate Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132.[4]

## II.  The Scope of this Decision

The issue of gun control is controversial.  It is the subject of vigorous and passionate debate in legislatures, the media, and innumerable public and private discussions across the

---

official, in order to prohibit the official from enforcing a state statute claimed to violate federal law.  *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011).  The doctrine rests on the premise — or rather, legal fiction — that when a federal court commands a state official to do nothing more than refrain from violating federal law, the official is not the state for sovereign-immunity purposes.  *Virginia Office for Protection and Advocacy v. Stewart*, 131 S.Ct. 1632, 1638 (2011).  In other words, such a suit is not technically against the state, but rather against an individual who has been "stripped of his official or representative character" because of his unlawful conduct.  *Ex parte Young*, 209 U.S. at 159-60.  For such exception to apply, the named state official must have a duty to "enforce" the statute in question and have demonstrated a willingness to exercise that duty.  *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007).  Given the duties of the Governor of Colorado to ensure that the laws of Colorado are enforced, Colo. Const. art IV, § 2, the Court finds that the *Ex parte Young* exception applies here.

[3]     By inference, the Plaintiffs also invoke the Fourteenth Amendment, which makes the Second Amendment applicable to the states.

[4]     Also pending before the Court are the parties' Joint Motion to Strike Expert Opinions Per Fed. R. Evid. 702 (**#118**) and the Defendant's second Motion to Dismiss (**#133**).  The Court's findings of fact and conclusions of law set forth herein implicitly adjudicate the Rule 702 motion, and the Court will not otherwise address it separately.  The Court's ruling on the Motion to Dismiss is incorporated into this opinion.

country.  The subject triggers both fear[5] and deeply-held societal values that conflict in varying degrees: the desire for physical safety, concerns about government intrusion into matters of individual liberty, the availability of mental health treatment for those disposed to violence, the effectiveness of existing law enforcement protection, and so on.  In crafting gun control laws, it is the role of the legislature to carefully examine each of these concerns, to weigh them against each other, and to create social policy in the form of legislation (or, indeed, to elect not to do so).

When the constitutionality of a state law is challenged, however, a court does not engage in the same process.  Judicial review of laws for constitutional compliance focuses on only a small sliver of the issues that the legislature considers.  A court does not act as a super-legislature to determine the wisdom or workability of legislation.  Instead, it determines only whether legislation is constitutionally permissible.  A law may be constitutional, but nevertheless foolish, ineffective, or cumbersome to enforce.

The limited role of the court grows out of the separation of powers among the executive, legislative, and judicial branches of government.  A legislature, being a body directly elected by the citizenry, is granted the broadest power to act for and by the people.  The judiciary acts only as a check on the exercise of that collective power, not by substitution of the personal opinion of a judge as to what he or she believes public policy should be.  The judge must only compare the public policy adopted by the legislature against the constitutional minimums that protect individual rights.

Constitutionality is a binary determination: either a law is constitutional, or it is not.  This Court will not express a qualitative opinion as to whether a law is "good" or "bad," "wise" or

---

[5]     Mass shootings are particularly frightening because they are unpredictable, occur in places one ordinarily expects to be safe, are horrendously violent, and there is no general consensus as to how to prevent them.

"unwise," "sound policy" or a "hastily-considered overreaction." Similarly, this Court will not assess what alternatives the legislature could have chosen, nor determine whether the enacted laws were the best alternative. Such decisions belong to the people acting through their legislature. Put another way, in determining whether a law is constitutional, this decision does not determine whether either law is "good," only whether it is constitutionally permissible.

### III. The Laws at Issue

#### A. Prohibition of Large-Capacity Magazines

Colorado Revised Statute § 18-12-302(1) makes it a crime for a person to possess or transfer a large-capacity magazine after July 1, 2013. The statute defines a "large-capacity magazine" as including, "a fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, or that is designed to be readily converted to accept, more than fifteen rounds of ammunition." C.R.S. § 18-12-301(2)(a)(I). Persons who possessed such magazines on July 1, 2013 may be protected by a so-called "grandfather clause," which states that a person can possess large-capacity magazines if: (1) the magazines were acquired before July 1, 2013, and (2) if the person has maintained (and continues to maintain) "continuous possession" of the magazines. C.R.S. § 18-12-302(2)(a). The statute also contains a handful of specifically-defined exceptions permitting the possession of large-capacity magazines by, among others, certain narrow classes of firearm manufacturers, firearm dealers, and government officials who carry weapons as part of their official duties.

#### B. Mandatory Background Checks for Private Firearm Transfers

Colorado has long required background checks for those acquiring firearms at gun shows or from firearm dealers.[6] Such background checks must be performed by a licensed gun dealer

---

[6]   *See* C.R.S. § 24-33.5-424 (firearm sales), and C.R.S. § 12-26.1-101 (gun shows).

as defined in C.R.S. § 12-26.1-106(6).  Prior to transfer of the firearm, a search must be

performed by, and approval obtained from, the Colorado Bureau of Investigation in accordance

with C.R.S. § 24-33.5-424.

The 2013 law, Colorado Revised Statute § 18-12-112, expands the background check

requirement to certain private transfers of firearms.  It makes it a crime for both the person

transferring possession (the transferor) and person taking possession of a firearm (the transferee)

to transfer possession of the firearm in a private transfer without first obtaining a background

check for the transferee.  In addition, the statute makes the transferor liable for any injury caused

by the transferee's use of the firearm if no background check was obtained.  C.R.S. § 18-12-

112(5).  The process for obtaining the background check is the same as that required for retail

sales, but the fee that can be charged by the gun dealer performing the check is limited to ten

dollars.  C.R.S. § 18-12-112(2)(d).  If the firearm is transferred to an entity rather than a living

person, then a background check is required for each living person who will possess it.  C.R.S. §

18-12-112(1)(b).

The statute specifies certain types of private transfers for which no background check is

required, including, among others: (1) gifts or loans between certain specifically-identified

family members; (2) temporary transfers, made in the transferee's home, when the transferee

reasonably believes that possession is necessary to prevent his or her imminent death or serious

bodily injury; (3) temporary transfers of possession at shooting ranges, during target firearm

shooting competitions, or while legally hunting, fishing, target shooting, or trapping; and (4)

temporary transfers for no longer than seventy-two hours.  C.R.S. § 18-12-112(6).

## IV.  Jurisdiction

The Plaintiffs invoke the Court's jurisdiction under 28 U.S.C. § 1331.  Colorado, however, contends that the Court lacks jurisdiction to determine the constitutionality of either statute because no Plaintiff has shown standing to assert such claim.

The Plaintiffs' standing has been a persistent and problematic issue in this case. Colorado filed two motions seeking to dismiss claims on that basis.  In ruling on Colorado's first Motion to Dismiss (**#96**), the Court set out the legal standards that guided its analysis.[7]  The Court adopts that explication as if fully set out herein, but expands its reasoning in this ruling, as necessary.

Summarized briefly, for a federal Article III court to have jurisdiction to determine a matter, there must be a "claim or controversy" that is "justiciable."  For a claim or controversy to be justiciable, at least one plaintiff must have standing to assert the claim.  To have standing, a plaintiff must show that he, she, or it has been or is being injured, that the challenged law causes the injury, and that the lawsuit will provide relief for the injury.  *See Lujan v. Defenders of*

---

[7]       Colorado's Second Motion to Dismiss (**#133**), was filed shortly before trial.  It seeks dismissal of the challenge to the constitutionality of C.R.S. § 18-12-302 arguing that no Plaintiff has shown standing.  Alternatively, it seeks dismissal of claims by certain Plaintiffs.  As to § 18-12-112, it addresses standing in a footnote, "maintaining that [the claims] are not justiciable," but not expressly "re-raising arguments" it previously made in its first Motion to Dismiss.  Both this Motion and the Plaintiffs' Response at (**#134**) rely on discovery responses and other documents prepared before trial.  The Court has an independent duty to assure that jurisdiction is secure, and therefore this opinion will not necessarily follow the arguments of the parties.  *See United States v. Colo. Supreme Court*, 87 F.3d 1161, 1166 (10th Cir. 1996); *PeTA v. Rasmussen*, 298 F3d 1198, 1202 (10th Cir. 2002); *Essence, Inc. v. City of Federal Heights*, 285 F.3d 1272, 1280 (10th Cir. 2002); *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).  In addition, because standing is determined in conjunction with the trial in this matter, the Court limits its consideration to the evidence presented at trial, rather than using the standard for pre-trial consideration of standing issues that indulges "well-pled" allegations and affidavits with the presumption that the facts contained therein will ultimately be proven.  *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997).

*Wildlife*, 504 U.S. 555, 560-61 (1992).  The injury must be actual and concrete, rather than anticipated, hypothetical, or speculative.

When a plaintiff seeks to enjoin the enforcement of a criminal statute on grounds that it abridges a constitutional right, it is not necessary for the plaintiff to violate the statute in order to show an injury.  Instead, the law recognizes that the mere existence of a criminal statute can prevent or chill a plaintiff's desire to exercise conflicting constitutional rights.  *See Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997).  Thus, the law deems a plaintiff to suffer a continuing injury sufficient for standing if it can be shown that: (1) the plaintiff genuinely intends to engage in a course of conduct that is constitutionally protected but is proscribed by the challenged statute, and (2) if the plaintiff engaged in such conduct, there exists "a credible threat" that the plaintiff would be prosecuted under the statute.  *See Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298-299 (1979); *Dias v. City and County of Denver*, 567 F.3d 1169, 1176-77 (10th Cir. 2009) (citing *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003)).  To be "credible," the threat of prosecution must be more than imaginary or speculative.  *Younger v. Harris*, 401 U.S. 37, 42 (1971); *Golden v. Zwickler*, 394 U.S. 103 (1969).

Both § 18-12-302 and § 18-12-112 are criminal statutes.  No Plaintiff has been charged with violating either statute nor specifically threatened with prosecution.  Thus, no Plaintiff has suffered an actual past injury.  Instead, the Plaintiffs bring facial challenges to these statutes[8] and seek prospective injunctive relief.  For these claims to be justiciable, the evidence at trial must show that at least one Plaintiff intends to engage in a course of constitutionally protected conduct

---

[8]     Challenges to the constitutionality of statutes can take two forms.  There can be a challenge as to how the law has actually been applied to a plaintiff (an "as-applied" challenge) or, there can be a challenge based solely on its language and anticipated applications (a "facial" challenge).  Here, because the statutes have not been enforced against any Plaintiff, only facial challenges have been asserted.

that would violate the statute and that there is a "credible threat" of prosecution should the Plaintiff do so.  *See United States v. Colo. Supreme Court*, 87 F.3d 1161, 1166 (10th Cir. 1996).

### A.  Standing for Challenges to § 18-12-302

The Plaintiffs challenge this statute on two grounds: (1) that it violates rights protected by the Second (and by inference, the Fourteenth) Amendment to the United States Constitution; and (2) that the "grandfather clause" is so vague that it denies due process under the Fourteenth Amendment to the United States Constitution.  For these claims to be justiciable, the evidence must show that at least one Plaintiff[9] either: (1) possesses a large-capacity magazine that he or she acquired after July 1, 2013, in violation of the statute (in other words, not subject to any of the statutory exceptions); (2) intends to acquire a new large-capacity magazine in violation of the statute; or (3) intends to transfer or sell a large-capacity magazine, owned as of July 1, 2013, in violation of the statute.  In addition, such Plaintiff must show that there is a "credible threat of prosecution" for such violations.

### 1.  Individual Plaintiffs

The Court turns first to the individual Plaintiffs.  At trial, evidence was presented only as to three individual Plaintiffs — David Bayne, Dylan Harrell, and John Cooke.  No evidence shows that any of these Plaintiffs meet the requirements of standing discussed above.

Mr. Bayne lived in Thornton, Colorado when this action was initiated, but has since moved to Georgia.  He did not testify that he intends to return to Colorado, much less that he

---

[9]     No evidence was presented to demonstrate the standing of the following Plaintiffs: National Shooting Sports Foundation; USA Liberty Arms; 2nd Amendment Gunsmith & Shooter Supply, LLC; Green Mountain Guns; Jerry's Outdoor Sports; specialty Sports & Supply; Goods for the Woods; David Strumillo; Ken Putnam; James Faull; Larry Kuntz; Fred Jobe; Donald Krueger; Dave Strong; Peter Gonzalez; Sue Kurtz; and Douglas N. Darr.

would return with his large-capacity magazines.  Thus, there is no evidence that he is likely to be subject to the statute in the future.

Mr. Harrell owns large-capacity magazines that were purchased before July 1, 2013.  There is no evidence that suggests that Mr. Harrell's continued possession would not be protected by the grandfather clause, thus he is not currently in violation of the statute or subject to a risk of prosecution.  Mr. Harrell did not testify about any intention to acquire additional large-capacity magazines in the future, nor did he express an intention to transfer the large-capacity magazines currently in his possession, nor otherwise testify about future conduct that would place him at risk of prosecution.  Accordingly, Mr. Harrell lacks standing to challenge the statute.

Mr. Cooke currently serves as the Sheriff of Weld County and will be retiring in 2015.  There was no evidence as to whether he currently possesses large-capacity magazines.  His testimony strictly related to a "survey" he conducted of his employees (none of whom are Plaintiffs).  Even assuming that Mr. Cooke does possess large-capacity magazines, his current possession is exempted from the prohibition (due to his status as a law enforcement employee), and there was no testimony that, upon his retirement, he intends to transfer such magazines or intends to acquire more in violation of the statute.  Thus, on this record, the Court finds that no individual Plaintiff has shown standing to challenge § 18-12-302.

### 2.  Plaintiffs that are Entities

The Court then turns to the Plaintiffs that are entities.  They fall roughly into two groups: associations of gun enthusiasts/advocates and firearm businesses.  The associations are Colorado Youth Outdoors, Women for Concealed Carry, Outdoor Buddies, Colorado State Shooting Association, Colorado Farm Bureau, and Colorado Outfitters Association.  The firearm

Appellate Case: 14-1292   Document: 01019371804   Date Filed: 01/16/2015   Page: 12

businesses are Rocky Mountain Shooter Supply and Burrud Arms, Inc. (both licensed firearm

dealers), Hamilton Family Enterprises, Inc. (a shooting range operator), and Magpul Industries (a

manufactures of magazines).

As to the associational entities, the Court begins by examining whether these entities can

assert associational standing on behalf of their members.  "Associational standing" is recognized

if an organization can establish that: (1) its members would otherwise have standing to sue in

their own right; (2) the members' interests that the association seeks to protect are germane to the

organization's purpose; and (3) neither the claim asserted nor the relief requested requires the

participation of the individual members in the lawsuit.  *Chamber of Commerce of U.S. v.*

*Edmondson*, 594 F.3d 742, 756 (10th Cir. 2010).  With regard to the first element, the entity

Plaintiffs must show, through specific facts, that at least one of its members would be directly

affected by the statute.  *See Lujan*, 504 U.S. at 563 (citing *Sierra Club v. Morton*, 405 U.S. 727,

735, 739 (1972), and *Hunt v. Washington Colorado Apple Advertising Comm'n*, 432 U.S. 333,

343 (1977)).

At trial, Elisa Dahlberg, a member of Women for Concealed Carry, testified that Women

for Concealed Carry is a nonprofit organization committed to providing information to women

who choose to carry a concealed weapon as a form of self-defense.  She further testified that she

owns two semiautomatic carbine-style rifles and a 9mm semiautomatic handgun, each of which

are equipped with a large-capacity magazine.  She testified that she uses these firearms for home

defense and target shooting, among other things.  It appears to be undisputed that Ms. Dahlberg's

current possession of large-capacity magazines is permitted by the statute's grandfather clause,

and the parties agree that all large-capacity magazines will wear out or become unusable at some

point in time.  Considering this, Ms. Dahlberg stated that, due to § 18-12-302, she will be unable to replace her large-capacity magazines once they no longer function.

The question of whether Ms. Dahlberg is suffering a continuing injury is a close one, because it is not clear when Ms. Dahlberg's magazines are likely to need replacement and whether, at that indeterminate point in future, she will desire to replace them with magazines of similar type.  Notwithstanding her current interests, with the passage of time, Ms. Dahlberg's desire to carry large-capacity magazines may change.[10]  If that happened, this statute would not affect her.

Nevertheless, in an attempt to find standing for some Plaintiff, the Court will assume that, in the absence of evidence as to the age of Ms. Dahlberg's existing large-capacity magazines and the functioning life of those magazines, Ms. Dahlberg may need to replace a large-capacity magazine in the very near future and that she will desire to replace it with another large-capacity magazine.  If that were the case, the restrictions of § 18-12-302 would nevertheless prevent her from acquiring and possessing the replacement large-capacity magazine.  Thus, the first element necessary for associational standing for Women for Concealed Carry is, arguably, satisfied.

The second element is also satisfied because the interests that Women for Concealed Carry ostensibly seek to protect — providing information to and engaging in advocacy on behalf of women who are interested in carrying concealed weapons for self-defense purposes — are "germane" to the interests that Ms. Dahlberg could assert on her own behalf.

Finally, because this claim is a facial challenge and the relief requested is prospective, it does not require the personal participation of the individual members of Women for Concealed

---

[10]    The inability to predict *when* Ms. Dahlberg may need to replace magazines and *what* her desires might be at that time is illustrative of how speculative a pre-enforcement, facial challenge to a criminal statute can be.

Carry in the lawsuit. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975). Whether the statute violates constitutional standards turns on the statute's plain language and its general operation, not on the particular circumstances for which Ms. Dahlberg or a specific member of Women for Concealed Carry possesses large-capacity magazines. Thus, the personal participation of Women for Concealed Carry's members is not essential.

Accordingly, with the benefit of some generous assumptions, the Court finds that Women for Concealed Carry has associational standing to assert the Second Amendment challenge to § 18-12-302.[11] Accordingly, the Court has jurisdiction to determine these challenges to the statute on their merits. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977); *Colorado of Utah v. Babbitt*, 137 F.3d 1193, 1215 n.36 (10th Cir. 1998).

### B. Standing for the Challenge to § 18-12-112

The Plaintiffs assert a single challenge to § 18-12-112: that it violates the Second (and by inference, the Fourteenth) Amendment to the United States Constitution. Following the same analytical pattern used with regard to § 18-12-302, in order for the Court to consider this claim, at least one Plaintiff must establish a continuing injury by showing that he or she intends to engage in conduct protected by the Second Amendment but which violates § 18-12-112, and that if the Plaintiff engaged in such conduct, there is a credible threat that he or she would be prosecuted.

---

[11]   The status of Women For Concealed Carry's standing to assert a vagueness challenge with regard to the "grandfather clause" of § 18-12-302 is a bit more murky, as it is not clear that Ms. Dahlberg's current possession of her grandfathered large-capacity magazines subjects her to a risk of future prosecution, nor that other members of Women For Concealed Carry similarly face such a risk. Nevertheless, for purposes of completeness of the Court's decision, the Court will assume that Women for Concealed Carry has associational standing to pursue this claim as well.

As noted above, § 18-12-112 requires that a background check be performed on the individual transferee(s) who take possession of a firearm through certain private transfers. The statute requires a licensed gun dealer to perform certain actions, retain certain records, and charge no more than ten dollars for the background check. The failure to obtain such a background check exposes both the transferor and transferee to criminal liability.

To establish a continuing injury sufficient to challenge § 18-12-112, the evidence must show either: (1) a Plaintiff intends to transfer or acquire a firearm, through a private sale not otherwise exempt under the statute, without first conducting a background check on the transferee; or (2) a Plaintiff who is a licensed gun dealer intends not to comply with the requirements for conducting the background check or other specified responsibilities. Further, either types of Plaintiff must also show that there is a "credible threat of prosecution" for this conduct.

### 1. Individual Plaintiffs

The Court begins its analysis of standing with the same three individual Plaintiffs discussed above, finding that none have demonstrated a continuing injury.

Mr. Bayne is not subject to prosecution under § 18-12-112 because he no longer lives in Colorado and does not intend to return.

Mr. Cooke did not provide any testimony with regard to his personal firearms, much less his intention to transfer them to others or to acquire new ones via private transfer, with or without a background check.

Mr. Harrell's circumstances are bit more complicated. He testified that, in the past, he has installed scopes on, or "sighted," firearms for friends and neighbors. On occasion, he kept the firearm for longer than 72 hours. Initially, the Court has some doubt that a person's taking

temporary possession of another person's firearm for the purpose of installing a scope or "sighting" it is within the Second Amendment's protection of an individual right to "keep and bear arms" for the purpose of self-defense.  But, assuming (without deciding), that it is, there is no evidence that the transfer to Mr. Harrell is a private transfer requiring a background check. Temporary transfers for up to 72 hours are exempt from the background check requirement, and although there was testimony that Mr. Harrell sometimes retained the firearm for more than 72 hours, it was not clear that he did so out of necessity rather than convenience.  Assuming Mr. Harrell could regularly perform the scoping or sighting of the firearm within the 72-hour period and return the weapon, he would suffer no injury from the operation of the statute.  In addition, assuming that he kept a firearm for longer than 72 hours with the owner's permission while performing maintenance duties on it, he has not shown any credible threat that he would be prosecuted for not first obtaining a background check.  Accordingly, the evidence does not establish Mr. Harrell's standing.

### 2. Plaintiffs that are Entities

As noted earlier, there are two groups of entity Plaintiffs.  With regard to this statute, the Court begins with the firearm businesses — Rocky Mountain Shooter Supply, Burrud Arms, Hamilton Family Enterprises, Inc., and Magpul Industries.

The Court has some doubt that these entities can have standing to bring a Second Amendment challenge.  As discussed in greater detail below, rights granted under the Second Amendment are *individual* rights premised upon an inherent natural right of self-defense.

Although businesses such as these might have standing to challenge a statute under some other constitutional theory, it does not appear that they are protected by the Second Amendment.[12]

Assuming, however, that a business entity *could* assert a Second Amendment challenge, the trial record does not show evidence of continuing injury to any of the Plaintiff business entities. Rocky Mountain Shooter Supply and Burrud Arms are licensed firearm dealers. Transfers by these Plaintiffs are not governed by § 18-12-112, and neither of these parties perform private background checks subject to the statute. Hamilton Family Enterprises, Inc. operates a shooting range and lends firearms to those who use the range. It sells firearm accessories including magazines, but does not sell firearms themselves, nor is it a licensed firearm dealer. It appears that the only transfers made by Hamilton Family Enterprises are in the nature of loans that do not exceed 72 hours and are for the purpose of target shooting. Such transfers are expressly exempt from the statute's requirements. According to the parties' stipulated facts, Magpul Industries designs and manufactures high-quality magazines and magazine accessories. There is no evidence that it intends to be a transferor or transferee of a firearm in private sales, nor a licensed firearm dealer subject to § 18-12-112.

Next, the Court looks to the Plaintiff associations: Outdoor Buddies, Colorado Farm Bureau, Colorado Outfitters Association, Women for Concealed Carry, Colorado Youth Outdoors, and Colorado State Shooting Association. Based on the evidence presented, it does not appear that any of these entities can bring a Second Amendment claim based on associational standing.

---

[12]     *Cf. United States v. Chafin*, 423 Fed.Appx. 342, 344 (4th Cir. 2011) (finding no authority to suggest that the Second Amendment protects a right to sell a firearm); *Mont. Shooting Sports Ass'n v. Holder*, 2010 WL 3926029, *21 (D.Mont. 2010) (recognizing that *Heller* did not extend Second Amendment protection to manufacturers and dealers seeking to sell firearms); *Teixeira v. Cnty. of Alameda*, 2013 WL 4804756, *6 (N.D.Cal. 2013) (same).

Outdoor Buddies is a non-profit organization with over 800 members, a third of whom are disabled. Its mission is to "get disabled individuals active in the outdoors." It lends highly specialized firearms to members for 3-day hunts. Because these transfers are temporary and incident to legal hunting activities, they are exempt under § 18-12-112. The evidence reflects that, sometimes, transferees keep a firearm for a period before or after the hunt, which time might exceed 72 hours. But the record does not clearly establish that this is necessary (as opposed to convenient), or that any member would decline to participate if he or she could not retain the firearm for more than 72 hours beyond the time of a hunt. As a consequence, the record does not reflect that either Outdoor Buddies or its members are at risk of prosecution under § 18-12-112.

The Colorado Farm Bureau (CFB) is a federation with 24,000 members, 5,800 of whom are active farmers and ranchers. Its mission is to promote agriculture and protect agricultural values. Nicholas Colgazier testified as its Director of Public Policy, and Michele Eichler testified as a member. Mr. Colgazier works as an in-house lobbyist who brings pending legislation to the attention of the "board" for development of policy positions. He did so with regard to § 18-12-112, then lobbied against it based on the requests of some members who opposed the background check requirement due to inconvenience and expense. He did not offer testimony as to whether or how many of the CFB members would be transferors (or, arguably, transferees) in transfers subject to the statute, whether any would forego such transfers or intended to ignore the background check requirement, or otherwise testify as to facts demonstrating any "credible threat of prosecution." Ms. Eichler testified that it would be inconvenient to have to obtain a background check in order to transfer a firearm to a ranch or farm hand. She particularly worried that the gun kept in her farm truck (for predator control)

would inadvertently be in the possession of a ranch hand if the family left town for longer than 72 hours. However, she acknowledged that there had never been an occasion when her ranch hand had possession of the gun for longer than 72 hours. The Court finds that the evidence as to potential violations of the statute by CFB members to be speculative. Moreover, even assuming that CFB's members would themselves have standing to challenge the statute, it is not clear that challenging firearms laws is within the scope of CFB's mission of promoting "agricultural values." Finally, the Court finds that CFB has not shown that there is a "credible threat of prosecution" of its members for the conduct described at trial.

Ms. Eichler also testified as a member of Colorado Outfitters, but offered no evidence as to that association's organization, membership, or mission. She testified that she and her husband run an outfitting business that takes between 100-150 clients on hunts each year. In the past, if a client did not have a firearm, the Eichlers would loan the client one of their personal firearms for use during the hunt. Hunts are usually five days, but may last longer if successful. It would appear that the type of transfers described by Ms. Eichler would be exempt under C.R.S. § 18-12-112(6)(e)(III). But in any event, the lack of evidence about Colorado Outfitter's membership or mission requires a conclusion that it has not shown the requirements for associational standing.

Three associations — Women for Concealed Carry, Colorado Youth Outdoors, and Colorado State Shooting Association — each testified (through representatives) that they regularly "loan" firearms to their members for various purposes, sometimes for longer than 72 hours, without conducting background checks. If these associations were individuals, with

clearly established Second Amendment rights,[13] they might have standing to assert a Second Amendment challenge to the statute.[14]  However, because they are entities rather than human beings, the question of whether they are protected by the Second Amendment is less than clear. As noted, the Second Amendment protects a fundamental *individual* right, and it is not clear that entities have any rights protected by the Second Amendment.  Such questions stretch the outer boundaries of current Second Amendment jurisprudence, and the parties have not specifically addressed these issues.

Thus, although the Court has profound reservations as to whether any Plaintiff has standing to challenge § 18-12-112, in the interests of providing a complete ruling, both for the guidance of the parties and the inevitable review by the Court of Appeals, the Court will assume that Women for Concealed Carry, Colorado Youth Outdoors, or the Colorado State Shooting Association have standing, in their own right, to challenge § 18-12-112 under the Second Amendment.

## V.  Analysis

### A.  History and Analytical Framework for Second Amendment Challenges

The Second Amendment to the United States Constitution provides**:**

> A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

---

[13]      It is not necessarily evident that that the Second Amendment's guarantee of a "right to keep and bear arms" extends to also guarantee the right of an owner of a firearm to lend that weapon to another (or to guarantee the right of a non-owner to borrow a firearm).  The parties have not addressed this question, and the Court does not consider it.

[14]      The Court rejects the notion that these associations have associational standing to bring claims on behalf of their members who might wish to engage in private transfers without conducting background checks.  The testimony by the representatives of these associations focused on the transfer of weapons ostensibly belonging to the associations themselves, not on private transfers that individual members intended to make involving their own, personally-owned weapons.

Until 2008, most courts did not construe the Second Amendment to protect an individual's right to possess and use firearms.  Courts were guided by the Supreme Court's decision in *United States v. Miller*, 307 U.S. 174, 179 (1939), which held that a right protected by the Second Amendment required "some reasonable relationship to the preservation or efficiency of a well regulated militia."  *See, e.g., United States v. Haney*, 264 F.3d 1161, 1164-66 (10th Cir. 2001); *Gillespie v. Indianapolis*, 185 F.3d 693, 710-11 (7th Cir. 1999); *Stevens v. United States*, 440 F.2d 144, 149 (6th Cir. 1971); *but see United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001).

In 2008, the legal landscape with regard to the Second Amendment shifted.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court considered a District of Columbia ban on the possession of usable handguns.  The Court concluded that the Second Amendment "confer[s] an individual right to keep and bear arms."  554 U.S. at 595.  To reach that conclusion, it de-linked the Second Amendment's prefatory clause — "a well regulated militia, being necessary to the security of a free state" — from its operative clause — "the right of the people to keep and bear Arms, shall not be infringed" — and explained that although the prefatory clause states the purpose for the right, it does not limit the right to own or use firearms to circumstances of militia service.[15]  *Id.* at 577.  Instead, the Court identified the core Second Amendment right as "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," and defined the right to "keep and bear arms" as the ability to acquire, use, possess, or carry lawful firearms for *the purpose of self-defense.  See, e.g.*, *id.* at 599 ("self-

---

[15]    This reasoning was extended to state statutes by virtue of the Fourteenth Amendment in *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010).

defense . . . was the *central component* of the right itself") (emphasis in original), at 628 ("the inherent right of self-defense has been central to the Second Amendment right").

As profound as *Heller* is, it does not stand for the proposition that there can be no permissible regulation of firearms or their use. To the contrary, the Court explained that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever for whatever purpose." *Id.* at 626. And the Court emphasized that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," among others. *Id.* at 626-27 & n.26.

The Supreme Court did not specify in *Heller* what analytical framework should be used in testing laws challenged under the Second Amendment. This was, in part, because it found that that the ban it was considering (a law effectively prohibiting the possession of functional handguns inside or outside of the home) would fail all recognized tests for constitutionality. *Id.* at 628. Since *Heller*, Second Amendment jurisprudence has continued to evolve, particularly with regard to the analytical standards to be applied. Many Circuit Courts of Appeal, including the Tenth Circuit, have adopted a two-step approach. *See United States v. Reese*, 627 F.3d 792 (10th Cir. 2010);[16] *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010); *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011); *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013);

---

[16]    The two-step process was also applied in *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012), and in *Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013).

*Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244 (D.C. Cir. 2011); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010).

In the two-step approach, a court must make a threshold determination of whether the challenged law burdens conduct falling within the Second Amendment's protection.  As part of this determination, the Court may consider whether the challenged law impacts firearms or firearm use, whether the affected firearms are currently in "common use," whether the affected firearms are used for self-defense inside or outside of the home, and whether the restriction is akin to restrictions that were historically imposed and customarily accepted.[17]  If the challenged law does not burden a right or conduct protected by the Second Amendment, then the inquiry is over.

If the challenged law burdens conduct protected by the Second Amendment, then a court must determine what level of constitutional scrutiny to apply.  Generally, constitutional scrutiny takes one of three forms.  *See United States v. Carolene Prods. Co*., 304 U.S. 144 (1938).  The least rigorous and most deferential standard is the "rational basis" test, which is used when a local, commercial, or economic right, rather than a fundamental individual constitutional right, is infringed.  *See Armour v. City of Indianapolis, Ind*., 132 S.Ct. 2073, 2080 (2012).  More rigorous

---

[17]     Although this is a threshold determination, some circumstances may require a comparison of the burden imposed to "longstanding prohibitions" that have been generally accepted.  These include, but are not limited to: the possession of firearms by felons and the mentally ill; laws forbidding the carrying of firearms in sensitive places, such as schools and government buildings; or laws imposing conditions and qualifications on the commercial sale of arms.  *Heller*, 554 U.S. at 625 & 627 n.26; *see also Jackson v. City and Cnty. of San Francisco*, 2014 WL 1193434, *4 (9th Cir. 2014).  In *Peterson*, the Tenth Circuit held that the Second Amendment did not confer a right to carry concealed weapons because such bans were long-standing.  *Peterson*, 707 F.3d at 1197.  In *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009), Judge Tymkovich presaged the possibility that reliance on the long-standing restriction exception to categorically exclude certain conduct from protection under the Second Amendment might circumvent constitutional scrutiny of current restrictions.

is "intermediate scrutiny" review, which applies to laws that infringe upon, but do not substantially burden, fundamental individual rights, such as content-neutral restrictions on speech. For a challenged law to satisfy intermediate scrutiny, it must be substantially related to an important governmental interest. *Reese*, 678 F.3d at 802 (citing *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010)); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012). Laws that substantially burden fundamental individual rights (*e.g.*, laws embodying racial discrimination or content-based restrictions on speech) are subject to "strict scrutiny." To satisfy strict scrutiny, a law must be narrowly-tailored to further a compelling government interest. *See Chandler v. City of Arvada*, 292 F.3d 1236, 1241 (10th Cir. 2002).

Recognizing that the Second Amendment protects fundamental individual rights, *Heller* instructed that the rational basis test should not be applied,[18] but it gave no instruction as what heightened level of scrutiny — intermediate, strict, or something in between — should apply. In subsequent cases, courts have analogized conduct protected under the Second Amendment to other fundamental individual rights such as those protected by the First Amendment (speech, religion, assembly, and petition).[19] Most courts have concluded that no single standard is applicable to all challenges under the Second Amendment. Rather, the level of scrutiny to be

---

[18]      *See* 554 U.S. at 628 n.27.

[19]      In free-speech cases, the standard of judicial review depends on the nature and degree of governmental burden on the First Amendment Right. For example, content-based regulations and laws that burden political speech are subject to strict scrutiny, whereas "time, place, and manner" regulations need only be "reasonable" and "justified without reference to the content of the regulated speech." *See Ezell*, 651 F.3d at 706-08 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010), and *Ward v. Rock Against Racism*, 491 U.S. 781 (1989)); *Chovan*, 735 F.3d at 1138. Firearm regulations that leave open alternative channels for self-defense are less likely to severely burden the Second Amendment right than those that do not. *See Jackson*, WL 1193434 at *4; *see also Marzzarella*, 614 F.3d at 97.

applied depends, in part, on the type of restriction being challenged and the severity of its burden on the "core" Second Amendment right. *See, e.g., Marzzarella*, 614 F.3d at 96-97; *Reese*, 627 F.3d at 802; *Ezell*, 651 F.3d at 703; *Chovan*, 735 F.3d at 1138. The Tenth Circuit has joined many other courts in applying intermediate scrutiny to Second Amendment challenges. *See, e.g.*, *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010); *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012).[20]

### B. Application to § 18-12-302

Under the two-step test, the first question is whether § 18-12-302 impacts a right or conduct protected by the Second Amendment. The Plaintiffs argue that by limiting magazines to 15 rounds or less, this statute impairs an individual's Second Amendment "right of self-defense." Colorado reflexively responds that because people can still defend themselves, no Second Amendment right is impaired.

Both positions are slightly off-base. They reflect a common confusion between the right that is protected by the Second Amendment — that is, "to keep and bear arms" — and the

---

[20]      In *Reese* and *Huitron-Guizar*, the court applied the standard intermediate scrutiny test, and *Reese* expressly declined to impose a strict scrutiny standard. *See Reese*, 627 F.3d at 804 n.4. It appears that the Tenth Circuit relied heavily on a Seventh Circuit line of cases, beginning with *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010). In *Skoien*, the Seventh Circuit determined that another federal gun restriction, 18 U.S.C. § 922(g)(9), was constitutional based upon a "strong showing" that the statute was substantially related to an important government interest. *Id.* at 641. In selecting that test, the Seventh Circuit cited both to a First Amendment case, *Buckley v. American Constitutional Law Found., Inc.*, 525 U.S. 182, 202-04 (1999), and to a gender-classification equal protection case, *Heckler v. Mathews*, 465 U.S. 728, 744-51 (1984). Interestingly, some courts that analogize Second Amendment rights to First Amendment rights apply a more rigorous test than that adopted in *Skoien*, *Reese*, and *Huitron-Guizar*. Some have required a showing of a "tight fit" between the means and the ends, meaning that the statute is "narrowly tailored" to achieve the desired objective. *See, e.g., Heller II*, 670 F.3d at 1258 (citing *Bd. of Trustees v. Fox*, 492 U.S. 469 (1989), and *Ward v. Rock Against Racism*, 491 U.S. 781(1989)); *see also Marzzarella*, 614 F.3d at 97-98. Because it falls between the standard intermediate scrutiny and strict scrutiny, one might call it "intermediate scrutiny plus."

purpose of that right — "for defense of self and home."  Although *Heller* sometimes uses shorthand phrases such as "a natural right of self-defense," 554 U.S. at 612, or the "inherent right of self- defense," 554 U.S. at 612, it is clear that *Heller* does not extend the boundaries of the Second Amendment to guarantee "self-defense" as a right in and of itself.  Nothing in *Heller* can be read to guarantee an individual right to possess whatever firearm he or she subjectively perceives to be necessary or useful for self-defense, nor any firearm for a purpose other than self-defense.  To the contrary, the Supreme Court expressly stated that the rights embodied by the Second Amendment have not historically been understood to be "a right to keep and carry any weapon whatsoever." *Id.* at 626.  And the Supreme Court conceded that its interpretation of the Second Amendment could authorize the prohibition of civilian possession of certain weapons commonly used in military service, such as "M-16 rifles[21] and the like." *Id.* at 628.  *Heller* also acknowledged the historical validity of "prohibitions on carrying concealed weapons." *Id.* at 626.  Such comments illustrate that the Supreme Court does not equate the Second Amendment "right to keep and bear arms" to guarantee an individual the "right to use any firearm one chooses for self-defense."

Instead, *Heller* describes the Second Amendment "right to keep and bear arms" rather narrowly: the right to possess those weapons that are "in common use" for "self-defense" purposes.  *See id.* at 624-25 ("the Second Amendment's operative clause furthers the purpose announced in its preface" by guaranteeing access to the type of arms "in common use at the time for lawful purposes like self-defense"), at 627 ("the sorts of weapons protected were those in

---

[21]     The M-16 rifle mentioned by the Court is a military version of the AR-15 rifle, a rifle that several witnesses in this case testified that they possess for their own self-defense purposes.  If, as *Heller* implies, the M-16 rifle can legally be prohibited without violating the Second Amendment, it seems to follow that other weapons such as the AR-15 may also be prohibited, notwithstanding the fact that some individuals believe that such weapon is important, or even essential, to their self-defense.

common use at the time"). *Heller* concluded that handguns were in common use because they are a "class of arms that is overwhelmingly chosen by American society for that lawful purpose [of self-defense]" and they are "the quintessential self-defense weapon." *Id.* at 628-29. Thus, the Court's first inquiry is whether § 18-12-302 burdens the right of individuals to possess commonly-used weapons, such as handguns, for self-defense.

Section 18-12-302 is interesting in that it does not directly regulate firearms at all; it regulates only the size of a magazine. Simply put, a "magazine" is nothing more than a container that holds multiple rounds of ammunition. Magazines are designed to feed a bullet into the firing chamber of a firearm with each cycle of the action, allowing multiple shots to be fired rapidly, either semi-automatically (that is, with a single shot fired each time the trigger is pulled) or automatically (with shots being fired continually so long as the trigger is held).[22] Here, the Plaintiffs are concerned primarily with semiautomatic firearms. Such firearms can operate without a magazine, but each round must be individually loaded.

The capacity of the magazine determines how frequently a firearm must be reloaded if the shooter wishes to keep firing. For example, a handgun or rifle using a 15-round magazine must be reloaded twice as frequently as one using a 30-round magazine. Because § 18-12-302 regulates only the number of rounds in a magazine, it does not affect whether the semiautomatic

---

[22]    Certain firearms are not designed to use magazines at all. Single-shot firearms, including bolt-action and muzzle-loading rifles, shotguns, and some handguns, require the user to manually load each new round. Other firearms, such as revolvers, use a cylinder, rather than a magazine, to load each round.
    Magazines may be integral to a weapon or, more commonly in modern weapons, detachable. Detachable magazines allow a user to pre-load and carry multiple magazines, making it possible for the user to quickly swap out an empty magazine from the weapon and replace it with a full one. For all practical purposes, the discussion of "magazines" in this case refers to detachable magazines.

firearm can be used, or even whether it can be used in a semiautomatic mode.  It only affects how often it must be reloaded.

The parties agree that semiautomatic firearms are numerous and widespread.  They stipulate that lawfully owned semiautomatic firearms using a magazine with the capacity of greater than 15 rounds number in the tens of millions, although the exact number subject to regulation in Colorado is unknown.  They also agree that semiautomatic firearms are commonly used for multiple lawful purposes, including self-defense.  Because § 18-12-302 affects the use of firearms that are both widespread and commonly used for self-defense, the Court concludes that, at the first step of the analysis, the statute burdens the core right protected by the Second Amendment.

The second analytical step requires that the Court to determine the level of constitutional scrutiny to apply.  Similar to their prior arguments, the Plaintiffs argue that the Court should apply strict scrutiny because the statute severely restricts a person's "right to self-defense," which the Court understands to be the ability to successfully defend him or herself.  Colorado contends that the impact is not severe because, despite the magazine size limitation, people can adequately defend themselves.

As noted, § 18-12-302 bans possession of all magazines capable of holding more than 15 rounds (except for magazines subject to the grandfather clause).  Other than those specifically excepted in the statute, this ban applies to every person in Colorado, in every venue, and for every use, including self-defense inside and outside of the home.  It impacts a large number of semiautomatic firearms, both handguns and rifles.  Viewed in this light, the *scope* of the statute is broad, and it touches the *core* of an individual right guaranteed by Second Amendment — the right to keep and bear (use) firearms for the purpose of self and home defense.

Despite such broad scope, however, the statute's impact on a person's ability to keep and bear (use) firearms for the *purpose* of self-defense is not severe.  Unlike the restriction considered in *Heller*, this statute does not ban any firearm nor does it render any firearm useless.  Semiautomatic weapons can be used for self-defense in and outside of the home. The parties agree that semiautomatic weapons that use large-capacity magazines will also accept compliant magazines (*i.e.*, 15 rounds or fewer), and that compliant magazines can be obtained from manufacturers of large-capacity magazines.  Thus, this statute does not prevent the people of Colorado from possessing semiautomatic weapons for self-defense, or from using those weapons as they are designed to function.  The only limitation imposed is how frequently they must reload their weapons.

By requiring users to reload every 15 rounds, the statute impacts both the "offensive" and "defensive" use of semiautomatic weapons.  Most of the time when a weapon is used "offensively," it is for unlawful purposes — *i.e.* the mass shooting scenario.  (The significance of the statute with regard to offensive firearm use is discussed below.  Needless to say, no party here is complaining of the effects of the challenged statute on the offensive use of large-capacity magazines.)  The Plaintiffs' primary concern here focuses on the "defensive" use of a firearm — that is, to protect the user or others against an attacker.  The effect of magazine size limitations on defensive use of a weapon is important in assessing whether and to what degree a citizen's lawful ability to defend him or herself is compromised.

No evidence presented here suggests that the general ability of a person to defend him or herself is seriously diminished if magazines are limited to 15 rounds.  Despite more than 40 years instructing individuals and law enforcement in defensive firearm use, the Plaintiffs' expert witness, Massad Ayoob, identified only three anecdotal instances in which individuals engaging

in defensive use of firearms fired more than 15 rounds, and not all of these successful defensive actions involved semiautomatic weapons.[23]  Of the many law enforcement officials called to testify, none were able to identify a single instance in which they were involved where a single civilian fired more than 15 shots in self-defense.[24]  (Indeed, the record reflects that many law enforcement agencies, including the Colorado State Patrol, the Federal Bureau of Investigation, and the New York City Police Department equip their officers with 15-round or smaller

---

[23]    The first incident involved a gun shop owner who lived next door to the shop.  One night, carloads of people drove through his storefront to steal guns.  In defending his property, the shop owner used a fully automatic M-16 and a fully automatic 9mm submachine gun to fire over 100 rounds.  One perpetrator was killed, others were injured, and all were captured and convicted.  The second incident involved a man who owned a watch shop in Los Angeles and who had been involved in a series of "gun fights."  (Presumably, he had been robbed repeatedly.)  The shop owner began keeping multiple pistols hidden in his shop.  Mr. Ayoob recalled that at least one of the gun fights "went beyond" 17 or 19 shots before the last of the multiple perpetrators was down or had fled.  The third incident involved a Virginia jewelry store that was robbed by "two old gangster type guys."  The two brothers who owned the store successfully defended themselves and their property using multiple revolvers (not semiautomatic weapons) that were kept behind the counter.  Mr. Ayoob did not specify how many rounds were fired in that incident.

[24]    These witnesses include John Cerar, Douglas Fuchs, Lorne Kramer, and Daniel Montgomery.  Mr. Cerar spent 26 years with the New York City Police Department, beginning in 1973.  Over the course of his career, he was responsible for training NYC police officers in firearms and tactics, and also oversaw the evaluation and testing of firearms, ammunition, armor, and police equipment in order to determine appropriateness of use for the department.  He also served on the firearms discharge review board, which reviews all police involved shootings in New York.  Mr. Cerar currently serves as a consultant to various police agencies where high profile shootings have taken place.

Mr. Fuchs currently serves as the Chief of Police in Redding, Connecticut.  He has served in that role for the past 12 years, following lengthy periods in other police agencies.  Throughout his career, Mr. Fuchs has received thousands of hours of training in law, defensive tactics, firearms, and practical skills, such as magazine reloading and tactical reloading.

Mr. Kramer joined the Los Angeles Police Department in 1963 and served there for nearly 28 years.  In 1991, he became the Chief of Police in Colorado Springs, Colorado, where he served for 11 years.

Mr. Montgomery began his law enforcement career in 1962 in California.  In 1971, he was recruited to the police department in Lakewood, Colorado, where he served for 12 years and attained the rank of captain.  In 1982, he became the Chief of Police in Westminster, Colorado, a role in which he served until his retirement in 2007.

magazines.)  Anecdotal testimony from the Plaintiff's lay witnesses was corroborative.

Although they possessed large-capacity magazines, none had ever had the occasion to fire more

than 15 rounds in an instance of self-defense.

There are myriad reasons for this phenomenon.  First, the defensive purpose of firearms

is often achieved without shots being fired whatsoever.  Mr. Avoob testified that, often, merely

the defensive display of a firearm is sufficient to defuse the threat.  Similarly, when shots are

fired in self-defense, the deterrent purpose is often achieved simply by the firing of a round or

two, regardless of whether those shots find their target (in other words, a "warning shot,"

intentional or otherwise, is often sufficient to deter the attacker).  In these types of circumstances,

a restriction on magazine size in no way diminishes the ability of the firearm user to defend him

or herself.

Circumstances in which an attack is halted by a defensively-shooting civilian disabling

the attacker are comparatively rare.  Even then, the purpose is not to fire as many shots as

possible, only as many shots as necessary.  The detrimental effect of a limitation on magazine

capacity in such situations is very difficult to measure because it is affected by a wide array of

external variables: the nature and characteristics of the attacker(s), the competence of the

defensive user, environmental circumstances, the timeliness of intervention by others or by law

enforcement, etc.  For example, a highly-trained firearm user might be able to disable an attacker

by firing only a relatively small number of rounds.  For these users, the statute poses no

impediment to effective self-defense.[25]  Adverse environmental circumstances that may be

---

[25]     There is a curious paradox here: the more competent the defensive firearm user, the more
likely he or she is to hit her target with fewer shots, and thus, the less likely that user is to need a
large-capacity magazine for defensive purposes.  By contrast, the less competent or confident the
user, the greater the number of rounds the user perceives he or she needs.  One wonders how

common in mass shootings — large numbers of bystanders, poor lines of sight, or darkness, for example — or circumstances where a law enforcement response is imminent, may make the firing of large numbers of defensive rounds by a civilian ill-advised.  In these instances, the restriction on magazine size again poses no discrete impairment to the ability of effective self-defense.

Even in the relatively rare scenario where the conditions are "ideal" for defensive firing, there is no showing of a severe effect on the defensive shooter.  As previously stated, the limitation on the size of magazines merely affects how many rounds can be fired before a reload is necessary.  Assuming that the defensive firearm user has fired all 15 rounds in his or her initial magazine, and yet failed to neutralize the threat, the user need simply replace his or her magazine or firearm to resume firing.  Admittedly, the defensive user cannot fire during the time it takes to complete a reload or access another weapon, but the length of that period, again, varies greatly with the circumstances, such as the defensive user's preparation and skills.  The testimony at trial was that persons skilled in firearms use can replace a magazine in a matter of a few seconds, whereas less skilled users may take longer periods of time.  At most, then, the statute's burden on the exercise of self-defense is this: in the relatively rare circumstances in which sustained defensive fire is appropriate, the statute forces a brief pause to reload or access another weapon. The evidence presented does not establish that such circumstances occur frequently, affect very many, or that the pause to reload adversely affects one's success in self-defense.[26]  On the record

---

these perceptions are affected by exposure to military grade weaponry in news and entertainment.

[26]     The Plaintiffs make a secondary argument that magazines with no more than 15 rounds are generally less reliable than large capacity magazines.  Although some witnesses testified about their dislike of certain compliant magazines, there was no evidence as to general unreliability of such magazines, particular as compared to large-capacity magazines.  Indeed, the

presented, the Court finds that although § 18-12-302 burdens the operation of semiautomatic weapons, the burden is not severe because it does not materially reduce the ability of a person to use a semiautomatic firearm for self-defense, nor does it reduce the effectiveness of self-defensive efforts.  As a result, the Court will examine the statute under the intermediate scrutiny test.

For § 18-12-302 to survive intermediate scrutiny, Colorado must prove that its objective in enacting § 18-12-302 was "important" — that is, that that the statute was based on "reasoned analysis," *Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003) — and that the provisions of § 18-12-302 are "substantially related" to its stated objective.[27]

According to Colorado, the General Assembly's objective in passing § 18-12-302 was to reduce the number and magnitude of injuries caused by gun violence, specifically in mass shootings.  The legislative record reflects that members of the General Assembly were acutely aware of the Aurora Theater shooting in 2012, as well as other mass shootings inside and outside Colorado.  The General Assembly considered evidence that mass shootings occur with alarming frequency and often involve use of large-capacity magazines.  It considered testimony that when a shooter using a large-capacity magazine intends to kill, the shooter usually fires continuously until he runs out of ammunition, which leads to greater numbers of injuries and deaths.  With regard to general gun violence, the General Assembly also considered statistics drawn from several cities that large-capacity magazines were used in 14-26% of all gun crimes and in 31-

---

parties stipulated that 10-round magazines produced by Plaintiff Magpul are just as functional and reliable as Magpul's higher-capacity magazines.

[27]     The Plaintiffs urge the Court to limit its consideration of the evidence to the legislative history for § 18-12-302.  As to a determination of the General Assembly's objective and whether it is important, the Court has done so.

41% of fatal police shootings. This legislative history demonstrates that the General Assembly considered relevant evidence in determining that the use of large-capacity magazines in gun violence poses a serious threat to public safety. To prevent the effects caused by the use of large-capacity magazines is undoubtedly an important governmental purpose.

Even with an important purpose, however, Colorado must prove that the 15-round limitation in § 18-12-302 is substantially related to an anticipated reduction in the number and magnitude of injuries caused by the use of large-capacity magazines. *See Peterson v. Martinez*, 707 F.3d 1197, 1222 (10th Cir. 2013) (Lucero, J., concurring) (citing *Michael M. v. Superior Court*, 450 U.S. 464, 473 (1981) (plurality opinion)). The Court finds that Colorado has demonstrated this relationship.

The evidence[28] shows that large-capacity magazines are frequently used in gun violence and mass shootings, and that often a shooter will shoot continuously until a weapon jams or the shooter runs out of ammunition. Interestingly, most experts agree that the size of a magazine correlates to the number of rounds that are fired in both an offensive and defensive capacity. Dr. Jeffery Zax testified that there is a direct positive correlation between the firearm ammunition capacity and the average number of shots fired during criminal aggression. Mr. Ayoob agreed that this is true in defense, as well. He testified that when training individuals to use high-capacity semiautomatic weapons, his students frequently feel the need to "spray and pray," meaning that they believe that they should fire all of their rounds in the hope that at least one shot will hit the intended target. Mr. Ayoob sees his job as training them not to empty their

---

[28] In determining whether there is a substantial relation between the statute and the Colorado's asserted purpose, the Court does not limit itself to the legislative history. *See Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 36 F.3d 1513, 1521 (10th Cir. 1994) (citing *Contractors Ass'n v. Philadelphia*, 6 F.3d 990, 1003-04 (3d Cir. 1993)).

magazines, and instead to shoot as if they were using a magazine with fewer rounds.  Mr. Cerar testified to having a similar experience in training New York City Police Department Officers.

There is no dispute that when a shooter pauses to reload a weapon or shift to another weapon, there is pause.  Mr. Cerar and Mr. Fuchs call this the "critical pause" because it gives potential victims an opportunity to hide, escape, or attack the shooter.  This pause also gives law enforcement or other armed individuals an opportunity to act.  They point to several shooting incidents, including those that took place at the Aurora theater, at a Safeway in Tucson, Arizona, and at an elementary school in Sandy Hook, Connecticut, when a pause allowed a shooter to be overcome, law enforcement to intercede, or potential victims to flee.  In each incident, the pause was created either by the shooter reloading their weapon, or there being a malfunction of their firearm.

Plaintiffs accurately observe that a weapon malfunction or jam can be as effective as mandatory reloading in creating a critical pause.  However, one cannot predict whether or when a firearm will malfunction.  The limitation on magazine size makes the critical pause mandatory because continued use of the gun requires reloading or switching to another gun.

Plaintiffs also accurately observe that skilled shooters can reload more quickly than can unskilled shooters, which would reduce the duration of the critical pause.  That is undoubtedly true, but also largely irrelevant.  A pause, of any duration, imposed on the offensive shooter can only be beneficial, allowing some period of time for victims to escape, victims to attack, or law enforcement to intervene.  The pause compelled by the limitation on magazines also could temporarily impair a defensive shooter, but beyond acknowledging that fact, there are too many external variables to permit a conclusion that pauses effectively compelled on both sides are necessarily better or worse than having no such pauses on either side.  In cases involving skilled

defensive shooters and inexperienced offensive shooters, the pause is necessarily favorable. Where the situation is reversed, it may be that the offensive shooter gains an advantage, or it may be that the asymmetry of the offensive shooter and defensive shooter's goals nevertheless negate some or all of that advantage.  The mere fact that the legislature's decision might raise the risk of harm to the public in some circumstances, while clearly diminishing it in others does not defeat the conclusion that the legislature's decision was substantially related to an important governmental interest.

Finally, the Plaintiffs argue that criminals who are intent on committing gun violence will not obey the magazine restriction and will nevertheless unlawfully obtain large-capacity magazines.  Hypothetically, this may be true, but the Court declines to speculate about the subjective intentions and means of unspecified criminals involved in unspecified gun violence. The Court accepts the unrebutted opinion of Dr. Zax, who testified that the magazine size restriction will reduce the overall number of large-capacity magazines available in Colorado and his testimony about the effects of federal firearms regulation in Virginia.  Thus, although it may be impossible to completely eliminate access to large-capacity magazines, it is reasonable to infer that the restriction will, at a minimum, reduce the ready availability of large-capacity magazines to both criminals and law-abiding citizens.

It is clear from the legislative history that the General Assembly adopted the 15-round restriction in the effort to balance the ability of individuals to lawfully use semiautomatic weapons in self-defense, while limiting the capability of unlawful shooters to fire repeatedly.  It considered a more restrictive limit of 12 rounds, but rejected that at the request of citizens and law enforcement officials.  Instead, it chose the 15-round limit based on evidence that officers of

the numerous state and federal law enforcement agencies all successfully use magazines with 15 or fewer rounds.

Whether adoption of a fifteen-round magazine limit is a sound public policy or a perfect fit with the General Assembly's objective to improve public safety is not the question before this Court. The fit may not be perfect, but the evidence establishes both an important governmental policy and a substantial relationship between that policy and the restriction of § 18-12-302. The provisions of § 18-12-302 are permissible under the Second Amendment.

### C. Application to § 18-12-112

Subject to multiple exceptions, § 18-12-112 extends the mandatory background check required in gun sales by dealers and at gun shows to transferees who take possession of a firearm in a private transfer. Plaintiffs do not argue that requiring background checks for the private sale of firearms is unconstitutional. Rather, they focus their challenge on the effect of the statute on *temporary* transfers, when ownership of the firearm does not change. Essentially, they argue that the Second Amendment protects an individual's right to borrow a firearm for lawful purposes, including for self-defense, and that such right is infringed by the statute's requirements.

First, the Court must determine whether § 18-12-112 impacts conduct protected by the Second Amendment. As repeatedly noted, the Second Amendment guarantees an individual's right to keep and bear arms for the core purpose of defense of self and home. However, it is not at all clear that the Second Amendment prevents the government from restricting the ability of persons to acquire firearms via temporary loans from others. Notably, *Heller* acknowledged the historical permissibility of "laws imposing conditions and qualifications on the commercial sale of arms." 544 U.S. at 626-27. Logically, if the government can lawfully regulate the ability of persons to obtain firearms from commercial dealers, that same power to regulate should extend

to non-commercial transactions, lest the loophole swallow the regulatory purpose.  Thus, the

Court has grave doubt that a law regulating (as opposed to prohibiting) temporary private

transfers of firearms implicates the Second Amendment's guarantee at all.

Nevertheless, the Court will assume that, arguably, the right to "keep and bear" firearms

implies some protection of the right to acquire firearms in the first place.  *Cf. Ezell*, 651 F.3d at

704.  And the Court will assume that, if the acquisition of firearms is protected to some extent,

that protection will include acquisition via loan.  Thus, if the Court were to conclude that the

Second Amendment protects an individual's right to acquire firearms for the purpose of self-

defense by temporarily borrowing them, the Court would find that § 18-12-112 impacts that right

by requiring a background check before such transfer can occur.[29]

Contrary to the Plaintiffs' position, however, the burden imposed on the right is no more

severe than the law already provides with regard to firearm sales.  Colorado already requires a

background check to be conducted on the buyer in a commercial firearm sale, and thus, the

operation of § 18-12-112 does nothing more than impose the same restrictions on acquisition by

loan.  It does not prevent a person otherwise permitted to obtain a firearm from acquiring one,

nor subject that person to any greater burdens than he or she would face if acquiring the weapon

commercially.  Nothing in the Second Amendment can be read to suggest that a permissible

burden on commercial sales of firearms cannot similarly be extended to apply to those acquiring

firearms by loan.

---

[29]     Arguably, however, a Second Amendment right focused on acquisition of a firearm
would extend only to the transferee of the firearm.  It is difficult to imagine how a firearm
owner's Second Amendment rights are impaired by prohibiting him or her from loaning a
firearm to another.  However, as the preceding discussion concerning standing observes, the
Plaintiffs here are the parties intending to *lend* the weapons, not the parties borrowing them.
This further highlights the dubious issue of standing in this case.

The Plaintiffs argue that the burden is severe because it will be difficult for individuals to actually obtain the background checks from a federally licensed firearms dealer. They argue that firearm dealers may be unavailable in areas where individuals need background checks, that the checks could take a long time, or that the dealers may be unwilling to perform the checks due to the limit on fees they can charge.

The evidence presented does not entirely support the Plaintiffs' argument. Plaintiffs' witnesses provided anecdotal evidence of experiences they have had where a dealer refused to perform a background check for one reason or another. They also testified as to how it would be inconvenient for them to locate a dealer and obtain a check before the need to execute a transfer. However, there is no evidence that all, or even most, firearms dealers refuse to perform private background checks, or that it would be impossible for many, or most, who would receive a weapon to obtain a background check. Rather, the evidence shows that there are more than 600 firearms dealers in Colorado that are actively performing private checks, and that, currently, it takes an average of less than fifteen minutes for a check to be processed by the Colorado Bureau of Investigation. Although the statute may result in logistical difficulties or inconveniences for some individuals who want to privately borrow a firearm for more than 72 hours, it does not facially infringe their Second Amendment right to do so.[30] In the context of the facial challenge presented here, the Court finds that § 18-12-112 does not severely impact the Second Amendment right. Accordingly, intermediate scrutiny is appropriate.

The Court first looks to Colorado's asserted objective in passing § 18-12-112. Colorado asserts that the objective in passing the statute was to ensure public safety and aid in crime

---

[30]   This is not to say that there may be instances where individuals do not comply with the requirement for a background check and are prosecuted for their noncompliance. Such circumstances can be addressed through an as-applied challenge.

prevention by closing a loophole in the background check statutes applicable to gun sales by dealers and at gun shows.  The General Assembly considered evidence that almost 40% of gun purchases are made through private sales, in person or over the internet; 62% of private sellers on the internet agree to sell to buyers who are known not to be able to pass a background check; and 80% of criminals who use guns in crime acquired one through a private sale.  The General Assembly also considered evidence that a high percentage of gun crimes are committed by individuals with prior arrests or convictions, which would trigger a denial in a background check, and that closure of the loophole would reduce the number of firearms that are easily passed into the trafficking market and made more accessible for use in crime.  The Court finds that the General Assembly used reasoned analysis in concluding that it was necessary and beneficial to require background checks for private transfers of firearms to help prevent crime and improve public safety, both important governmental interests.

The next question is whether the provisions of § 18-12-112 are substantially related to these objectives.  Colorado presented evidence showing that private background checks will make it more difficult for prohibited individuals to acquire firearms, reduce the rate of diversion of firearms from legal commerce into the trafficking market, and reduce the firearm homicide rate.  Dr. Daniel Webster testified that most firearms used in crime are obtained from a dishonest licensed dealer or from a trusted friend or family member.  Ronald Sloan, the Director of the Colorado Bureau of Investigation, testified that background checks on private transfers are denied at a rate as high as, if not higher than, the denial rate of sales at retail or gun shows.  Further, Dr. Webster opined that imposition of accountability on law-abiding citizens who are tempted to transfer a firearm to a prohibited individual deters diversion of firearms into the trafficking market.  Decreasing diversion ultimately impacts the availability of firearms to

criminals.  Dr. Webster also testified that, based on his research and studies, when measures of accountability for private transfers are taken away, the rates of firearm homicide grow substantially.  Thus, by imposing such measures, the General Assembly could reasonably expect the rates of criminal gun trafficking and use to decrease.

Plaintiffs argue that the evidence shows that private background checks are not happening at the frequency expected, and thus the public interest is not actually being served.  However, for purposes of determining constitutionality — particularly via facial challenge — arguments about whether the statute has been successful are not relevant.  Colorado is not required to show that the statute has already achieved success if its rationale for imposing the law is substantially related to an important purpose.

In addition, Plaintiffs argue that the 72-hour exemption to the background check requirement is unreasonable.  They contend that there was no basis for limiting the exemption to 72 hours, and that more reasonable options include extending the exemption to thirty days, allowing an exemption for individuals with concealed carry permits, or implementing a system that would not require parties to a transfer to physically go to a firearms dealer.

The Court perceives this argument to be one of preferred policy.  The Court's role in this case is to determine whether § 18-12-112 impermissibly burdens protected Second Amendment rights.  What the legislature chooses to *exempt* from the statute's requirements is a determination that is left solely to the legislature.  The legislature was free to conclude, as it did, that 72 hours would be an adequate period of time to permit transfers without background checks while ensuring that sham loans would not occur beyond that timeframe.  Whether or not the legislature's policy decision was wise or warranted is not a question properly presented to this Court.

Accordingly, the Court concludes that § 18-12-112 is constitutionally permissible under the Second Amendment.

## VI. Vagueness Challenge

Returning to § 18-12-302, the Court considers the Plaintiffs' challenge to the statute's grandfather clause as being unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment. Section 18-12-302(2)(a) provides that a person may possess a large-capacity magazine if he or she: (1) owned the large-capacity magazine on July 1, 2013, and (2) has maintained "continuous possession" of the magazine since that date. The Plaintiffs seek to invalidate the second requirement, arguing that because the phrase "continuous possession" is undefined in the statute, it fails to put the public on notice of prohibited conduct or provide any enforcement standards.

A law runs afoul of the Due Process Clause if it is "so vague and standardless that it leaves the public uncertain as to the conduct it prohibits." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (citation omitted). The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Dias v. City and Cnty. of Denver*, 567 F.3d 1169, 1179 (10th Cir. 2009) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). This means that a statute can be impermissibly vague for either of two independent reasons: (1) if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, or (2) if it authorizes or even encourages arbitrary and discriminatory enforcement. *Ward v. Utah*, 398 F.3d 1239, 1251 (10th Cir. 2005). In this case, the Plaintiffs challenge the statute on both grounds.

41

In assessing the sufficiency of statutory language, the court is guided by venerated authority that "we can never expect mathematical certainty from our language" and that a statute's terms may be "marked by flexibility and reasonable breadth, rather than meticulous specificity." *See Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).  Thus, a statute is not vague if it is clear what the statute as a whole prohibits.  *Id.*

As a preliminary matter, Colorado contends that the Court should not reach the merits of this claim.  Relying on *United States v. Reed*, 114 F.3d 1067 (10th Cir. 1997), and *United States v. Michel*, 446 F.3d 1122 (10th Cir. 2006), Colorado argues that facial vagueness claims are permitted only when the challenged statute prohibits protected First Amendment activity.  The Court rejects that argument, as these cases are not analogous.  Both actions sought post-enforcement review of the statute under which the individuals were prosecuted.  *See Reed*, 114 F.3d at 1070; *Michel*, 446 F.3d at 1135.

The Tenth Circuit has held that facial vagueness challenges are proper in two circumstances.  First, when an individual has been prosecuted under an arguably vague statute, he or she is permitted to facially attack the statute, in addition to bringing an as-applied challenge, if the statute threatens to "chill" constitutionally protected conduct, especially that protected by the First Amendment.  *See Dias,* 567 F.3d at 1179-80; *United States v. Gaudreau*, 860 F.2d 357, 360 (10th Cir. 1988).  The reasoning for permitting a facial challenge in this circumstance is that when a statute is arguably so vague that it can reasonably be interpreted to prohibit constitutionally protected speech, individuals may refrain from speaking rather than risk criminal prosecution.  Thus, when an individual *is* prosecuted under the statute, he or she is permitted to bring a facial challenge in order to vindicate the rights of others who may be chilled from speaking at all.

The second circumstance where a facial challenge is appropriate is upon pre-enforcement review of a statute.  In a declaratory judgment action where no one has been charged under the challenged statute, the court cannot evaluate the statute as applied.  Thus, the only claim to be brought is a facial challenge.  In these circumstances, the challenger may facially attack the statute as "vague in all of its applications."  *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982); *see also Ward v. Utah*, 398 F.3d 1239, 1251 (10th Cir. 2005).  If the statute is vague in all of its applications, then it will necessarily be vague as applied in every case, and the statute is therefore void on its face.  *Gaudreau*, 860 F.2d at 361.

As noted, § 18-12-112 has not been enforced against any Plaintiff.  This is a declaratory judgment action in which the Plaintiffs seek pre-enforcement review of the statute.  Thus, a facial challenge that asserts that the statute is necessarily vague in all of its applications is appropriate.  The Supreme Court has cautioned that "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications."  *Hill v. Colorado*, 530 U.S. 703, 733 (2000).

First, the Plaintiffs argue that a person of ordinary intelligence could not understand whether his or her conduct fell within § 18-12-302(2)(a) because "continuous possession" is not defined.  Pointing to hypothetical situations where § 18-12-302(2)(a) may or may not apply, the Plaintiffs argue that "no one knows with any certainty what 'continuous possession' means." The Plaintiffs further argue that the lack of notice is amplified due to the fact that the statute does not contain a scienter requirement.

The Court is unpersuaded.  Because the statute fails to provide an explicit definition for "continuous possession," it is possible that the "continuous possession" requirement may not be

clear in every application.  However, the existence of close cases does not render the statute

unconstitutionally vague.  Indeed, "[c]lose cases can be imagined under virtually any statute."

*United States v. Williams*, 553 U.S. 285, 306 (2008).  What renders a statute vague is the

inability to determine what the necessary facts *are* under wholly subjective standards.  *Id.*  For

example, the Supreme Court has struck down statutes that tied criminal culpability to whether

the defendant's conduct was "annoying" or "indecent."  *See, e.g.*, *Coates v. Cincinnati*, 402 U.S.

611, 614 (1971); *Reno v. ACLU*, 521 U.S. 844, 870-71 & n.35 (1997).

        Such is not the case here.  The grandfather clause actually is an exception to the law.  It

does not describe criminal conduct, but instead describes conduct that is not criminal.  The two

operative words, "possession" and "continuous" are in common usage and have readily defined

meanings.  *See, e.g.*, Merriam-Webster's Collegiate Dictionary, 10th Ed. at 250 (defining

"continuous" as "marked by uninterrupted extension in space, time, or sequence"), at 906

(defining "possession" as "the act of having or taking into control").  Indeed, it is not difficult to

conceive of many situations where the statute's application would be clear: an owner who loaned

out his or her magazine to another after July 1, 2013 would clearly not have maintained

"possession" of it; a person who pawned a magazine after July 1, 2013, only to redeem and

reacquire it later might currently have possession of the magazine, but that possession has not

been "continuous" since July 1, 2013.  Accordingly, the Court finds that despite the lack of a

precise statutory definition for "continuous possession," it is clear what conduct the statute as a

whole prohibits and permits.

        The Plaintiffs also contend that the grandfather clause is unduly vague because it lacks an

express scienter requirement.  The Tenth Circuit has explained that the presence of a scienter

requirement can save an otherwise vague statute by mitigating a law's vagueness and thus

making the law constitutional. *Ward v. Utah*, 398 f.3d 1239, 1252 (10th Cir. 2005). This

principle does not imply, however, that every statute lacking a scienter requirement is necessarily

vague. *Id.* Because the Court finds that § 18-12-302(2)(a) is not otherwise vague, its lack of an

express scienter requirement does not render the statute unconstitutional.

Plaintiffs also argue that the statute does not contain any enforcement standards and

therefore permits arbitrary and discriminatory enforcement. Again, the Plaintiffs point out that

"continuous possession" is undefined. They argue that, as a result, it will be left open to

interpretation by "individual law enforcement officers, prosecutors, judges, and juries." The

Court disagrees. "As always, enforcement requires the exercise of some degree of police

judgment." *Grayned*, 408 U.S. at 114. The Court finds that the degree of judgment required in

enforcing § 18-12-302(2)(a) is not unacceptably delegated to the whim of individual prosecutors.

Although there may be edge cases where the application of the clause is debatable, the

"continuous possession" requirement as a whole is sufficiently clear that reasonable people can

understand what general types of conduct are authorized.

Further, when evaluating a facial challenge to a Colorado law, a federal court must

"consider any limiting construction that a Colorado court or enforcement agency has proffered."

*Hoffman Estates*, 455 U.S. at 494 n.5; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 795

(1989). Here, the Attorney General has issued two "technical guidance letters" to the Colorado

Department of Public Safety regarding how § 18-12-302(2)(a) should be interpreted and

enforced. The letters provide that "continuous possession" shall be interpreted as "having or

holding property in one's power or the exercise of dominion over property, that is uninterrupted

in time, sequence, substance, or extent." Further, "continuous possession" does not require

"literally continuous physical possession" — instead, "continuous possession" is only lost by a

"voluntary relinquishment of dominion and control." The technical guidance acknowledges that "[r]esponsible maintenance, handling, and gun safety practices . . . dictate that [§ 18-12-302(2)(a)] cannot be reasonably construed as barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual presence of the temporary transferee, unless that temporary transfer is otherwise prohibited by law." The Plaintiffs have not provided any evidence demonstrating a reason to believe that § 18-12-302(2)(a) will not be enforced in accordance with the interpretation provided by the Attorney General. The guidance therefore serves to further limit the discretion of law enforcement officers when applying the grandfather clause. In light of the forgoing, the Court finds that the statute does not authorize or encourage arbitrary or discriminatory enforcement. Because the Plaintiffs have failed to sustain their burden of establishing that § 18-12-302(2)(a) is unconstitutionally vague in all applications, the Court finds the statute permissible under the Fourteenth Amendment to the United States Constitution.

## VII.  Claims under Title II of the ADA

Finally, certain disabled Plaintiffs contend that § 18-12-302 and § 18-12-112 violate 42 U.S.C. § 12132 of the ADA under a disparate impact theory.[31] The Plaintiffs argue that the statutes disproportionately burden disabled individuals in their ability to defend themselves as compared to able-bodied individuals and they are therefore at a greater risk of harm.[32]

---

[31]   In closing argument, the Plaintiffs' counsel appeared to argue that they were also asserting an ADA claim for denial of a request for reasonable accommodation. However, no claim of reasonable accommodation was presented in the final pretrial order (Docket #119). The Court therefore deems such claim to be waived.

[32]   The Court notes that some of the evidence presented with regard to the constitutionality of § 18-12-302 could be construed to suggest that some disabled persons may have greater need for large-capacity magazines for self-defense than more able-bodied persons. Whether there are

Title II of the ADA provides that "[s]ubject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Title II of the ADA seeks to "remedy a broad, comprehensive concept of discrimination against individuals with disabilities, including disparate impact discrimination."  *Chaffin v. Kansas Colorado Fair Bd.*, 348 F.3d 850, 859-60 (10th Cir. 2003) (overruled on other grounds as recognized by *Muscogee (Creek) Nation v. Pruit*, 669 F.3d 1159, 1167 n.4 (10th Cir. 2012)).  To prove a case of disparate impact discrimination, a plaintiff must show that "a specific policy caused a significant disparate effect on a protected group."  *Cinnamon Hills Youth Crisis Center, Inc. v. Saint George City*, 685 F.3d 917, 922 (10th Cir. 2012).  This is generally shown by statistical evidence identifying relevant comparators to the plaintiff group, examining the relative outcomes of the two groups, and establishing a reasonable inference that any disparate effect identified was caused by the challenged policy and not other causal factors.  *Id.* (citation omitted).

Colorado argues that the Plaintiffs' claims under the ADA fail as a matter of law because the Plaintiffs have failed to prove how § 18-12-112 and § 18-12-302 deprive disabled individuals of the "services, programs, or activities of a public entity."  The Plaintiffs respond that Title II is not limited to a denial of government services, programs, or activities.  They argue that the second clause of § 12132, which provides that a qualified individual shall not "be subjected to discrimination by any [public entity]," extends to any and all actions taken by a public entity.  Thus, they argue, by simply enacting statutes that disparately impact disabled individuals, Colorado committed discrimination against disabled individuals in violation of Title II.

---

more viable claims than those brought here to address that concern is a matter upon which the Court does not speculate.

This issue was addressed by the Tenth Circuit in *Elwell v. Oklahoma*, 693 F.3d 1303 (10th Cir. 2012). In *Elwell*, the issue before the Tenth Circuit was whether a governmental employee could bring a claim of employment discrimination against his public employer under Title II of the ADA (rather than under Title I of the ADA, which specifically addresses employment discrimination). In its analysis, the court acknowledged that § 12132 of Title II has two primary clauses. The first clause prevents a qualified individual from being "excluded from participation in or be[ing] denied the benefits of the services, programs, or activities of a public entity." Thus, the question was whether "employment" could be fairly described as a "service, program, or activity" of a public entity. The court held that it could not, explaining that "an agency's services, programs, and activities refer to the 'outputs' it provides some public constituency." 693 F.3d at 1306. Employment, on the other hand, is an "input" required to make an agency's services, programs, and activities possible. *Id.*

The second clause prevents a qualified individual from being "subjected to discrimination by any [public entity]." The plaintiff in *Elwell* argued that this clause is a "catch-all" that prohibits all discrimination by a public entity, regardless of whether it occurs in a service, program, or activity the entity provides or in some other way or function. The Tenth Circuit disagreed, holding that the second clause also refers to discrimination in the context of government-provided services, programs, and activities. *Id.* at 1308-09. The Tenth Circuit explained that § 12132 must be read in concert with the definition of "qualified individual with a disability," 42 U.S.C. § 12131(2), which states that a "qualified individual with a disability" is an "individual with a disability who . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." Thus, the first clause of §12132 precludes an agency from baldly "exclud[ing]" or "deny[ing] benefits" to

qualified individuals, while the second clause does additional work by addressing more subtle (though equally inequitable) acts of discrimination, such as by making it disproportionately more difficult for qualified individuals to participate in programs or activities, unfairly disadvantaging them compared to others, or "otherwise discriminating against them in the manner the agency provides its services, programs, and activities." *Id.* at 1308.

The Tenth Circuit in *Elwell* went onto explain what the terms "services," "programs," and "activities" are understood to mean. "Services" are ordinarily understood as acts done by the government for the benefit of another, whereas the term "program" refers to a government's projects or schemes, such as social security or a foreign exchange program. *Id.* at 1306. The term "activity" has a broader meaning, encompassing all outputs the public entity provides to the public it serves. However, the term does "not necessarily rope in everything the entity does." *Id.* at 1307.

Applying the principles of *Elwell* here, the Court finds that the Plaintiffs have failed to prove that § 18-12-112 and § 18-12-302 disproportionately impact disabled individuals with respect to a Colorado "service, program, or activity." The statutes at issue do not create any governmental "output" which disabled persons are less able to access. Rather, the statutes merely embody a criminal prohibition on conduct generally applicable to all persons. Thus, the Plaintiffs' claims fail to establish a violation of Title II of the ADA.

Assuming, however, that the statutes *did* constitute a government service, program, or activity, the Court would nevertheless find that the evidence is insufficient to establish a disparate impact. The Plaintiffs presented significant evidence tending to show that *some* disabled individuals: (1) feel that large-capacity magazines are necessary for their self-defense because they have decreased mobility and/or ability to reload quickly during confrontation, and

(2) wish to borrow firearms, some of which are specifically equipped to aid their disabilities, from various organizations without having to undergo a background check.  Such anecdotal evidence, in the absence of meaningful statistical analysis comparing the effect of the statute on the Plaintiffs and able-bodied comparators is insufficient to carry the Plaintiffs' burden of demonstrating that the statutes cause any disparate effect.  Accordingly, the Court finds that the Colorado is entitled to judgment in its favor on the Plaintiffs' claims under the ADA.

## VIII.  Conclusion

For the forgoing reasons, the Court **ORDERS** as follows:

- Colorado's Motion to Dismiss (**#133**) is **DENIED**;

- The parties' Joint Motion to Strike Expert Opinions Per FRE 702 (**#118**) is **GRANTED, in part, and DENIED, in part** consistent with the findings contained herein;

- Colorado Revised Statutes § 18-12-112 and § 18-12-302 are compliant with the provisions of the Second and Fourteenth Amendments to the United States Constitution.

- The Clerk of the Court is directed to enter **JUDGMENT IN FAVOR OF THE DEFENDANT** on all claims and to close this case.

Dated this 26th day of June, 2014.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION,
COLORADO FARM BUREAU,
NATIONAL SHOOTING SPORTS FOUNDATION,
MAGPUL INDUSTRIES,
COLORADO YOUTH OUTDOORS,
USA LIBERTY ARMS,
OUTDOOR BUDDIES, INC.,
WOMEN FOR CONCEALED CARRY,
COLORADO STATE SHOOTING ASSOCIATION,
HAMILTON FAMILY ENTERPRISES, INC.,
d/b/a FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK
DAVID STRUMILLO,
DAVID BAYNE,
DYLAN HARRELL,
ROCKY MOUNTAIN SHOOTERS SUPPLY,
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC,
BURRUD ARMS INC. D/B/A JENSEN ARMS,
GREEN MOUNTAIN GUNS,
JERRY'S OUTDOOR SPORTS,
SPECIALTY SPORTS & SUPPLY,
GOODS FOR THE WOODS,
JOHN B. COOKE,
KEN PUTNAM,
JAMES FAULL,
LARRY KUNTZ,
FRED JOBE,
DONALD KRUEGER,
STAN HILKEY,
DAVE STONG,
PETER GONZALEZ,
SUE KURTZ,
DOUGLAS N. DARR,

    Plaintiffs,

vs.

JOHN W. HICKENLOOPER, GOVERNOR OF THE STATE OF COLORADO,

    Defendant.

_____

**REPORTER'S TRANSCRIPT**
LAW AND MOTION HEARING
_____

1        Proceedings before the HONORABLE MARCIA S. KRIEGER,

2   Judge, United States District Court for the District of

3   Colorado, commencing at 3:06 p.m., on the 19th day of December,

4   2013, in Courtroom A901, United States Courthouse, Denver,

5   Colorado.

6

7                            **APPEARANCES**

8        PETER J. KRUMHOLZ, Attorney at Law, Hale Westfall,
    LLP, 1600 Stout Street, Suite 500, Denver, Colorado, 80202,
9   appearing for the Plaintiffs.

10       DOUGLAS ABBOTT, Attorney at Law, Holland & Hart, LLP,
    555 17th Street, Suite 3200, Denver, Colorado, 80202, appearing
11  for the Plaintiffs.

12       JONATHON MICHAEL WATSON, Attorney at Law, Sherman &
    Howard, 633 17th Street, Suite 3000, Denver, Colorado, 80202,
13  appearing for the Plaintiffs.

14       ANTHONY JOHN FABIAN, Attorney at Law, 510 Wilcox
    Street, Castle Rock, Colorado, 80104, appearing for the
15  Plaintiffs.

16       DAVID BENJAMIN KOPEL, Attorney at Law, Independence
    Institute, 727 East 16th Avenue, Denver, Colorado, 80203,
17  appearing for the Plaintiffs.

18       MATTHEW DAVID GROVE, MOLLY ALLEN MOATS, JOHN TIEN YAU
    LEE, KATHLEEN L. SPALDING, and STEPHANIE LINDQUIST SCOVILLE,
19  Assistant Attorneys General, Colorado Attorney General's
    Office, Ralph L. Carr Colorado Judicial Center, 1300 Broadway,
20  Denver, Colorado, 80203, appearing for the Defendant.

21

22

23

24            THERESE LINDBLOM, Official Reporter
             901 19th Street, Denver, Colorado 80294
25        Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Court is convened today in Case No.

 3    13-cv-1300.  This is encaptioned, Colorado Outfitters

 4    Association, et al. v. John W. Hickenlooper.

 5            Could I have entries of appearance, please.

 6            MR. KRUMHOLZ:  Good afternoon, Your Honor.  Peter

 7    Krumholz on behalf of David Bayne, Dylan Harrell, Colorado Farm

 8    Bureau, Colorado Outfitters Association, Colorado Youth

 9    Outdoors, Outdoor Buddies, Inc., and Women for Concealed Carry.

10            THE COURT:  Good afternoon.  Welcome.

11            MR. KOPEL:  Good afternoon, Your Honor.  David Kopel

12    on behalf of David Strumillo and 55 individual law enforcement

13    officers in their personal capacities, who happen to be

14    sheriffs.

15            THE COURT:  Good afternoon and welcome.

16            MR. KOPEL:  Thank you.

17            MR. WATSON:  Good afternoon, Judge.  Jonathon Watson

18    on behalf of the federally licensed firearms dealers.

19            THE COURT:  Good afternoon and welcome.

20            MR. ABBOTT:  Doug Abbott on behalf of Magpul and the

21    National Shooting Sports Foundation.

22            THE COURT:  Good afternoon and welcome.

23            MR. FABIAN:  Good, Your Honor.  Anthony Fabian on

24    behalf of Colorado State Shooting Association and Hamilton

25    Family Enterprises.
```

```
 1              THE COURT:  Good afternoon and welcome.

 2              MR. GROVE:  Matthew Grove, Your Honor.  With me at

 3    counsel table are Molly Moats, John Lee, Kathleen Spalding,

 4    Stephanie Scoville on behalf of the Governor.

 5              THE COURT:  Good afternoon and welcome.

 6              I set this matter down on the law and motion calendar

 7    at the time that Docket No. 97, motion for extension of time to

 8    file dispositive motions, was filed; and there has been a lot

 9    of activity since the filing of that particular motion.  In

10    particular, there has been filed a motion for joinder and for

11    leave to file a Third Amended Complaint, briefing with regard

12    to that in response, briefing in reply.  And the reply suggests

13    that the plaintiffs -- actually, that the clients of Mr. Kopel

14    seek to join and that -- I guess all the plaintiffs seek to

15    amend the Complaint with yet another version of an Amended

16    Complaint, what I would call a Fourth Amended Complaint.

17              Do I correctly understand where we are as far as

18    posture on that particular motion?

19              MR. KOPEL:  Well -- Your Honor, the motion for joinder

20    and then the filing of exhibits, a proposed Third Amended

21    Complaint, and then of yesterday, replacing that with the

22    Fourth Amended Complaint was filed by me on behalf of my

23    clients.  We have -- that is our filing.  And the other parties

24    in the case may wish to state their own positions on that, but

25    that was a filing by me on behalf of my clients.
```

```
 1              THE COURT:  All right.  Raises an interesting
 2   procedural question.
 3              MR. KOPEL:  It does, Your Honor.
 4              THE COURT:  Ordinarily, when there is a circumstance
 5   such as this, a motion for joinder is not the preferred
 6   mechanism.  It is a motion to intervene.  But here, it doesn't
 7   make any difference whether it's a motion to intervene or a
 8   motion to join.  I understand that your clients wish to
 9   participate in this litigation to assert individual claims and
10   that you would like to be able to have those claims reflected
11   in a form of Complaint which is and has been tendered as the
12   Fourth Amended Complaint.
13              Is that correct?
14              MR. KOPEL:  Exactly, Your Honor.
15              THE COURT:  All right.  Thank you.
16              Then let me hear from those parties who wish to
17   address that motion.  The reply, essentially, becomes a new
18   motion.  I've not heard from the defendants with regard to
19   that -- I should say the defendant.
20              MR. GROVE:  One defendant, many attorneys.
21              THE COURT:  That's it.  You had me confused.
22              MR. GROVE:  Matthew Grove, Your Honor, on behalf of
23   the Governor.
24              Mr. Kopel and I have had a couple of discussions over
25   the last couple of days, and that's what resulted in his filing
```

1   what has been now been termed the Fourth Amended Complaint.

2   Many of the arguments that we've raised in our response to the

3   proposed Third Amended Complaint, which is Docket No. 112, is

4   our response, apply to the Fourth Amended Complaint as well.

5           There are some additional concerns that I'd like to

6   raise.  Let me just start off by saying, the Governor opposes,

7   as we did the Third Amended Complaint, the acceptance of the

8   Fourth Amended Complaint and the sheriffs' motion for joinder

9   and to amend the Fourth Amended Complaint.

10          There are a number of reasons for this.  The primary

11  one is that we don't believe that under Rule 16 the plaintiffs

12  have shown good cause to amend.  And under Rule 15, which is

13  the second step of the analysis, we don't believe that -- well,

14  we believe that an amendment at this point would be futile,

15  particularly with respect to House Bill 1224, which is the

16  large-capacity magazine restriction.

17          There are questions in addition with respect to 1229,

18  which is the universal background check provision, as to

19  whether the plaintiffs' Complaint, Fourth Amended Complaint,

20  states adequate allegations in order to nudge it across the

21  line from plausible under the *Twombly* and *Iqbal* test.  And so

22  that's something that -- again, this has all moved very

23  quickly, as Your Honor knows, that we're still processing.  But

24  at this point, that's our position.  Most of it is laid out in

25  the response to the proposed Third Amended Complaint.

 1           *THE COURT:*  Anything else you'd like me to consider?

 2           *MR. GROVE:*  Not with respect to our opposition.  If

 3    the Court has -- there are some other issues that I think we

 4    should probably discuss today, but we can move on from that.

 5           *THE COURT:*  I'm just concerned with this motion at

 6    this juncture.

 7           *MR. GROVE:*  Nothing else with respect to this motion.

 8           *THE COURT:*  All right.  Thank you.

 9           Any of the other plaintiffs want to address this?

10           *MR. KRUMHOLZ:*  Your Honor, on behalf of David --

11           *THE COURT:*  Would you go to the lectern, please.

12           *MR. KRUMHOLZ:*  Thank you, Judge.

13           With respect to David Bayne, Dylan Harrell, and the

14    nonprofit plaintiffs, we do not oppose Mr. Kopel's motion.

15           *THE COURT:*  Thank you.

16           *MR. FABIAN:*  Neither is there an objection from

17    Colorado State Shooting Association or family -- Hamilton

18    Family Enterprises.

19           *THE COURT:*  Thank you.

20           *MR. ABBOTT:*  Plaintiff Magpul does not object to the

21    motion.  Plaintiff Shooting Sports Foundation takes no

22    position.

23           *THE COURT:*  Thank you.

24           *MR. WATSON:*  The plaintiff federally licensed firearms

25    dealers take no position on the motion either.

 1          *THE COURT:*  Thank you.

 2          Is there any further argument you'd like to make,

 3    Mr. Kopel, on behalf of your clients?

 4          *MR. KOPEL:*  Yes, Your Honor.

 5          Your Honor, granting the Fourth Amended Complaint

 6    would promote judicial economy in two important ways.  First of

 7    all, it would prevent the -- would obviate the need for the

 8    filing of an entirely new Complaint by these 55 individuals,

 9    which would, of course, result in another case and a whole

10    other situation starting up.  Having their concerns resolved in

11    this single case, in which they have been participating for

12    over half a year, would, therefore, be substantially

13    instructive to judicial economy.

14          The Fourth Amended Complaint would also move this

15    particular case forward.  The claims that are brought forward

16    in the Fourth Amended Complaint are the same kind of individual

17    rights of individual firearms owners that have been at issue in

18    this case all along and on which extensive discovery and

19    briefing has taken place.

20          As was stated in the December 11 initial motion for

21    leave to file the Amended Complaint, there will be no new

22    witnesses in this case.  The six sheriffs who were proposed as

23    witnesses were deposed extensively already.  They were deposed

24    quite extensively, not only about their official capacity

25    issues, but also about their individual capacity issues, based

 1   on the understanding that the lawyers on both sides had at the

 2   time.  So as Exhibit A shows, they have been asked all about

 3   their particular individual firearms they personally own,

 4   particular magazines they personally own, how much they go

 5   hunting, how far they go target shooting.  Really, the full

 6   scope of their individual gun ownership was up for deposition

 7   and has been deposed.  Accordingly, no new discovery is

 8   necessary in this case.

 9          We -- in the Fourth Amended Complaint, pleaded as

10   concisely as possible to address all of defendant's express

11   concerns about the Third Amended Complaint raising new issues,

12   we don't believe that that Third Amended Complaint raised

13   anything new.  As the citations in the Complaint itself to the

14   discovery showed, these are all issues that have already been

15   on the table.  But we certainly don't need the third -- we

16   don't need any new complaint to continue to bring those issues

17   forward.  Those are well established by the Second Amended

18   Complaint back of July 1.

19          The Governor's response filed yesterday said that he

20   would support a simple amendment which simply brought the

21   sheriffs into the case as ordinary individuals with individual

22   rights.  We have done everything that was asked by him to do

23   so, to take out everything he objected to in the Third Amended

24   Complaint and radically reduce the content for what is left in

25   the Fourth Amended Complaint.  We've done that conscientiously,

1     in the spirit of expedition and cooperation.  And we believe

2     that the Governor's offer in his filing yesterday, that a

3     simple amendment would be supported should be accepted by this

4     court.

5              THE COURT:  Thank you.

6              MR. KOPEL:  Thank you, Your Honor.

7              THE COURT:  Docket No. 104, the motion for joinder and

8     leave to file an Amended Complaint, has by its -- by the

9     briefing become a motion for joinder and leave to file a Fourth

10    Amended Complaint.

11             Let me start with an observation that evolution of the

12    parties' positions during the course of briefing is not the

13    best way to frame up an issue for determination.  Our local

14    rule requiring conference between the parties expects and

15    anticipates that all of the conversation between the parties

16    will occur before any pleading is filed, and that way it is

17    clear what the issues are to be addressed at the time of the

18    hearing or ruling on the motion.

19             So I urge you, counsel, in the future, please do not

20    attempt to satisfy your Rule 7.1 required disclosure by simply

21    saying, we talked to the other side.  Complete your

22    conversation.  Review the other parties' pleadings so that

23    there is a clear framework for what will be determined here in

24    the courtroom.

25             As to the amended motion, I grant it in part, and I

 1  deny it in part.

 2        I recognize that from the plaintiffs' perspective,

 3  there is value to having many people who hold important

 4  positions of public office being named as plaintiffs in this

 5  case.  It attracts attention to their claims, and it helps

 6  shape the public debate.  But from a legal perspective, those

 7  things are irrelevant.  The symbolic figure of Lady Justice

 8  wears a blindfold to avoid consideration of who the parties are

 9  and how many of them agree with a particular perspective.

10  Instead of the court of public opinion, this is a court where

11  the determination will be made on the evidence and the law, not

12  who participates in the lawsuit.

13        Simply because a person holds public office or has

14  firmly held views on a matter does not entitle them to

15  participate in a lawsuit.  In order to have legal standing,

16  they must have a right that they are about to lose.  In a case

17  like this, a case that seeks to prospectively prevent the

18  application of a criminal statute, that usually means they are

19  likely to be subject to criminal prosecution in the future.  It

20  can also mean that they are likely to lose some other

21  recognized right or property interest by enforcement of the

22  law.  Thus, what is necessary here is for a plaintiff to

23  establish that he or she is under a real and immediate threat

24  of being injured in the future.

25        With regard to the statute prohibiting large-capacity

1  magazines, there is an exception to enforcement against

2  individuals who are employees of a department or an agency of

3  this state; and that covers all of the sheriffs so long as they

4  are sheriffs.  There are, however, 11 individuals who state

5  that they will be retiring from law enforcement within roughly

6  the next year.  These individuals are Mr. John Cooke, Mr. Ken

7  Putnam, Mr. James Faull, Mr. Larry Kuntz, Mr. Fred Jobe,

8  Mr. Donald Krueger, Mr. Stan Hilkey, Mr. Dave Strong, Mr. Peter

9  Gonzalez, Ms. Sue Kurtz, and Mr. Douglas Darr.

10       Their ability to participate in this lawsuit arises

11  from a potential loss that could arise from enforcement against

12  them after they cease to fall within the exception to the

13  statute.

14       Now, truly, it is January of 2015 that is the earliest

15  time period at which it appears from this Complaint that they

16  would fall victim, potentially, to such a law; but I find that

17  to be imminent enough to allow them to participate in this

18  action.

19       As to the other sheriffs, their joinder in this action

20  and their motion to amend must be denied, because it is futile.

21  They do not have current standing.  There has been no showing

22  with regard to the large-capacity magazine statute that they

23  are likely to lose a right or property interest or be subject

24  to prosecution.

25       And as to the statute requiring background checks, the

1    Amended Complaint offers only a singular paragraph that in

2    substance attempts to address standing.  It says that the

3    sheriffs as a group wish to sell, buy, give, and loan handguns

4    to or from anyone, including their families.  Such allegation

5    is too summary, too unspecific, too general, to indicate which

6    individuals might have standing due to a real and immediate

7    threat of being injured by enforcement of that statute.

8          As a consequence, I find that there was good cause to

9    bring both motions, that arising from my determination on the

10   motion to dismiss, but that no standing —— no facts sufficient

11   to establish standing of most of the sheriffs has been offered.

12   And, therefore, any amendment to the Complaint and any joinder

13   in the lawsuit is denied.

14         As to the 11 individuals that I have named, they may

15   join this lawsuit as plaintiffs, and the Complaint may be

16   amended to add the paragraphs that specifically deal with them.

17   They are paragraphs 107, 112, 123, 124, 130, 131, 136, 140,

18   147, 157, and 160.  A conclusory statement may be added with

19   regard to each claim that is asserted, indicating which of

20   these individuals assert —— joins in a particular claim.  No

21   new claims may be asserted; no new attachments to the Complaint

22   may be submitted.  The case will be framed as it currently is,

23   subject to the ruling that I made with regard to the motion to

24   dismiss.

25         Any need for clarification or further explanation?

1        MR. KOPEL:  If I could, Your Honor, just to follow

2   your instructions.  Would the case, then, be recaptioned with

3   the 11 individuals in the order in which they currently appear?

4        THE COURT:  They may be added to the caption with

5   their individual names.

6        MR. KOPEL:  Okay, Your Honor.  Thank you.

7        THE COURT:  No titles.

8        MR. KOPEL:  Those have been out in all of our filings.

9        THE COURT:  Indeed, it is because these are individual

10  claims and they are premised upon these individuals no longer

11  being sheriffs.  There is no need to refer to their status as

12  sheriffs at this point.

13       MR. KOPEL:  Certainly, Your Honor.  And just to follow

14  your instructions:  So, for example, paragraph 112 is a little

15  bit of biographical information about a particular plaintiff.

16  Do you want that to stay as it is in the proposed --

17       THE COURT:  You can include that.

18       MR. KOPEL:  So we would include the biographical

19  paragraphs of those particular individuals and likewise include

20  the paragraphs which addressed 1224, not the addresses which

21  address 1229 in the -- to comply with your order; would that be

22  correct?

23       THE COURT:  No.  Mr. Kopel, in the Complaint, you have

24  now an -- 11 new plaintiffs.  They're not bringing any new

25  claims.  They may join in any of the claims that are asserted.

1    MR. KOPEL:  I see, Your Honor.  So the -- if I may

2  restate what I understand -- and please correct me, because,

3  obviously, I was wrong the first time.  The new Complaint

4  should have the biographical information about these particular

5  people.

6    THE COURT:  It shouldn't, but you can put it in there.

7    MR. KOPEL:  It can be in there, to state their names.

8  And then nothing -- and then it would simply state which of the

9  other Complaint -- the other issues raised elsewhere in the

10  Complaint by other individuals some or all of these particular

11  11 join in?

12    THE COURT:  Most often in a Complaint, each claim for

13  relief, one, two, three, four, has a statement that immediately

14  follows after the identification of the claim that says which

15  parties bring that claim.

16    MR. KOPEL:  Okay.

17    THE COURT:  Your Complaint here doesn't do that.  I'm

18  allowing you to say with regard to each of those claims what

19  parties bring the claim.

20    MR. KOPEL:  Thank you, Your Honor.  And so in that --

21  the new Complaint, for example, on the first claim -- first

22  claim for relief involving magazines, we would state each of

23  those 11 individuals, and we would also state the other

24  plaintiffs who also bring that particular claim; is that

25  correct?

1        *THE COURT:*  To the extent that all the plaintiffs are

2   asserting that claim, you can say "all plaintiffs assert that

3   claim."

4        *MR. KOPEL:*  Okay.  Thank you, Your Honor.

5        *THE COURT:*  Okay.

6        Yes, sir.

7        *MR. GROVE:*  While we're here, Your Honor, your order

8   raises some questions on discovery for us.

9        *THE COURT:*  Okay.

10       *MR. GROVE:*  And I'm not sure how attuned the Court is

11  to the history of how we've done discovery, so let me kind of

12  sketch it out for you.

13       With respect to the sheriffs, what the parties agreed

14  to do, with Magistrate Judge Watanabe's blessing, was identify

15  a small pool of sheriffs.  We didn't want all 55 of them coming

16  in and testifying, because it would be repetitive, who would

17  then -- that we would depose, and they would offer testimony at

18  trial or affidavits in support of or against summary judgment

19  motions.  You've knocked out five of those six who we had

20  deposed, and I --

21       *THE COURT:*  That doesn't prevent them from testifying.

22       *MR. GROVE:*  That's -- that's fair, Your Honor.  I can

23  understand that.  However, we haven't had an opportunity to

24  depose them because of an agreement we had.  What I wanted to

25  request is that we have an opportunity to confer with Mr. Kopel

1    to see which of those sheriffs may in fact be testifying.  It

2    may be all eleven, I don't know, it may be two or three, and

3    then for us to have an opportunity for us to take depositions

4    as we have before.

5              THE COURT:  Of the 11, you've taken depositions of how

6    many?

7              MR. GROVE:  One.

8              THE COURT:  I'm sorry?

9              MR. GROVE:  One.

10             THE COURT:  Okay.  Mr. Kopel, are you going to be

11   calling different witnesses than you previously identified to

12   the defendant?

13             MR. KOPEL:  If I could ask a question, Your Honor,

14   that would help provide the answer to that.

15             Of the six who were deposed, as my Brother Grove has

16   indicated, one of them is in this set of eleven.  All of the 55

17   are members of the Colorado State Shooting Association, one of

18   the plaintiffs in the case.  So of those five who were deposed

19   but are not on this list, would it be permissible for them to

20   testify in this case as individuals who belong to the state

21   shooting association?

22             THE COURT:  Mr. Kopel, witnesses are witnesses.  They

23   don't need to be parties.

24             MR. KOPEL:  I appreciate the clarification -- thank

25   you, Your Honor.  I want to make sure --

1    THE COURT:  So the question is, are you going to be

2    calling different witnesses than you've previously disclosed to

3    the defense?

4        MR. KOPEL:  And the answer to that is no, Your Honor.

5        THE COURT:  Okay.

6        MR. KOPEL:  Your Honor, if I may raise one other

7    issue.

8        Since the -- there are two other -- two others on

9    this -- in this group for whom there is a date certain for

10   retirement.  It was not stated in the pleadings, but I would

11   inform you that Terry Maketa will be retiring in January, 2015,

12   and Grayson Robinson will be retiring on January 31, 2014.

13       THE COURT:  Mr. Kopel, it's too late.

14       MR. KOPEL:  I thought --

15       THE COURT:  And this is redundant.

16       MR. KOPEL:  Certainly, Your Honor.

17       THE COURT:  The inclusion of these plaintiffs does not

18   change the issues or the evidence that's going to be presented.

19       MR. KOPEL:  I accept that, Your Honor.  Thank you.

20       THE COURT:  All right.

21       Okay.  It sounds like that the defense, you're not

22   going to have any different witnesses.  I'm assuming that means

23   you don't need any further discovery.

24       MR. GROVE:  That resolves our concern, Your Honor.

25       THE COURT:  Okay.  Now, there was mention made about

1    the filing of dispositive motions.  And part of this -- the

2    reason I set this hearing down is to determine whether or not

3    there should be any dispositive motions.

4         There is a belief in civil litigation that dispositive

5    motions should be filed in every lawsuit.  My experience is

6    that only 15 percent of the time -- and that's a national

7    average -- does it matter.  So in order to move things most

8    expeditiously, you can bypass filing dispositive motions unless

9    there is going to really be something decided here and it would

10   shorten a trial.  I would suggest to you that you do that and

11   move the matter to trial, if there is going to be a trial, as

12   soon as we can.

13        So I'd like to hear from each side as to how any

14   summary adjudication under Rule 56 would streamline or avoid a

15   trial, what claims or issues should be tried, and whether there

16   should be any separate trial under Rule 42(b) of any claims or

17   issues.

18        Who would like to start on this one?

19        *MR. KRUMHOLZ:*  Your Honor, on behalf of the

20   plaintiffs, I'm happy to start the discussion as to those

21   issues that you've raised.

22        The plaintiffs' position, Your Honor, is that summary

23   judgment will not resolve any of the claims, much less most of

24   them.  And so we believe that it makes the most sense to

25   proceed to trial, proceed to putting together a final pretrial

1   order on which we can then base trial briefs for Your Honor's

2   consideration prior to the trial.  So we don't -- as to your

3   second question, we don't believe there is any issue that is

4   appropriate for summary judgment in this case.

5           THE COURT:  How about for bifurcation?

6           MR. KRUMHOLZ:  As for bifurcation, Your Honor, I'm not

7   sure which of the claims you had in mind.  My guess was the ADA

8   claim.

9           THE COURT:  Correct.

10          MR. KRUMHOLZ:  With respect to that, Your Honor, Rule

11  42(b) is directed at achieving efficiency.  And we will have

12  the same witnesses with respect to the ADA claims as we would

13  have -- some of the same witnesses that we would have in the

14  ADA claims as we'll have in our Second Amendment claims.  So

15  because of that overlap, there is no efficiency to be gained,

16  Your Honor, from the bifurcation.

17          THE COURT:  All right.  Thank you.

18          For the State.

19          MR. GROVE:  What I'm about to say may not surprise

20  you, Your Honor.

21          We think that all the claims are ripe and appropriate

22  for summary judgment in this case.  And I can sketch out why,

23  if you'd like.

24          THE COURT:  Please.

25          MR. GROVE:  Legal issues predominate this.  And the

1   course of discovery in this case has demonstrated that

2   virtually all of the operative facts are not in dispute.  There

3   are some things at the margins that are certainly in question.

4   But even more important than that, whether or not a summary

5   judgment motion ended up being granted on all the claims,

6   what's very important in this case is that we are sketching out

7   the structure of the Second Amendment.  And this is not

8   something that has -- that the Tenth Circuit, any court in the

9   Tenth Circuit has really had an opportunity to do at this level

10  of detail.  So there are very important legal questions that

11  should be considered in the context of a summary judgment

12  motion that are based on almost totally undisputed facts, for

13  example.

14       THE COURT:  They have to be wholly undisputed.  Not

15  almost wholly; wholly undisputed facts.

16       MR. GROVE:  Let me clarify that.  Wholly undisputed

17  material facts.

18       THE COURT:  Okay.

19       MR. GROVE:  For example, what does "common use" mean?

20  One of the plaintiffs' theories, as I understand it, is that a

21  magazine is an arm that is protected by the Second Amendment.

22  That's another question.  And, B, that it's in common use,

23  *Heller* says that you can't do anything to restrict it.  If the

24  plaintiffs are correct on that claim, we probably lose,

25  frankly.

1          *THE COURT:*  How would that speed the trial ultimately?

2          *MR. GROVE:*  It would streamline the format of the

3     trial, because it would -- getting a ruling on what that means

4     would allow the parties to tailor the evidence that they

5     presented at trial and address those questions directly.

6          *THE COURT:*  Let's use that as an example.  What

7     evidence would be excluded if there were a determination as to

8     whether or not a magazine was an arm?

9          *MR. GROVE:*  Well, if the determination is that a

10    magazine is not an arm, then summary judgment is appropriate,

11    and there wouldn't be a trial to begin with.

12         *THE COURT:*  But if the answer goes to the contrary,

13    how does that speed the determination at trial?

14         *MR. GROVE:*  I agree that it probably wouldn't in this

15    case.  We're not going to present any evidence that I can think

16    of off the top of my head -- although, don't hold me to that.

17         *THE COURT:*  Okay.

18         *MR. GROVE:*   -- that a magazine isn't an arm.  I think

19    that is primarily the legal argument.  But at the same time,

20    our goal is to have the Court address that in a summary

21    judgment motion and consider it.  Argument A in our summary

22    judgment motion is likely to be, a magazine is not an arm;

23    therefore, House Bill 1224 does not impinge on conduct that

24    falls within the scope of the Second Amendment's guarantee.

25         *THE COURT:*  All right.  I'm not inclined to have

1    dispositive motions, because all of that briefing can be done

2    in the context of pretrial preparation for trial.  So unless

3    you can show me that there is some issue that can be determined

4    that will ultimately streamline a trial, I'm happy to entertain

5    all of your legal arguments in the context of the trial.

6            *MR. GROVE:*  When Your Honor says "streamline," what

7    exactly do you mean by that?  I'd like to tailor what I'm

8    saying to what you're saying.

9            *THE COURT:*  Cuts out evidence, narrows the issues,

10   remembering that any determination on a motion for summary

11   judgment is purely interlocutory and can being reconsidered at

12   the time of trial.

13           *MR. GROVE:*  At a minimum, we think that if we're going

14   to push forward and go to trial, that the ADA claim and 1229

15   should be severed.

16           There are also --

17           *THE COURT:*  Tell me why you think they should be

18   severed.

19           *MR. GROVE:*  Well, the first -- the threshold question

20   under all of these, and 1224 is included here, is -- are

21   standing, ripeness, justiciability.  With respect to the ADA,

22   the first question that the question the Court has to ask and

23   answer is, can the ADA apply to the statute?  Is the statute a

24   service program or activity of the state of Colorado?  And

25   under Tenth Circuit precedent, *Elwell v. Oklahoma Board of*

1 | *Regents*, our position is going to be that it is not.

2 | With respect to 1229, the threshold question is, is

3 | there a private right to sell or transfer a firearm to another

4 | individual without going through a federally licensed firearms

5 | dealer?

6 | *THE COURT:* May I inquire as to why that issue was not

7 | brought up in the motion to dismiss?

8 | *MR. GROVE:* We would have loved to have raised it in a

9 | motion to dismiss, Your Honor. The pressure -- the time

10 | pressure did not allow us to do it. Our position is that it's

11 | still appropriate for summary judgment.

12 | *THE COURT:* All right. Is there any other issue that

13 | you think might impact a trial, either by bifurcation or by

14 | summary determination?

15 | *MR. GROVE:* The standard of review that the Court

16 | applies, assuming that any of the activities or conduct that

17 | are implicated by the plaintiffs' complaint, is a very

18 | important issue and, again, will guide the course of the

19 | evidence at the time. So we plan to advocate -- this is

20 | something that is wide open in the Tenth Circuit -- that if the

21 | burden on the plaintiffs that they have alleged is not

22 | substantial, that rational basis applies. And that it's the

23 | plaintiffs' burden to get across that line and demonstrate that

24 | there is a substantial burden in order for anything higher than

25 | rational basis -- anything more strict than rational basis

 1   would apply.

 2        Summary judgment briefing would give us an opportunity

 3   to argue that and, again, would provide guidance to the parties

 4   as to who bears the burden at trial and how that burden might

 5   be carried.

 6        THE COURT:  Anything else?

 7        MR. GROVE:  There is also the question of experts and

 8   who -- who will testify at trial, who will be necessary to

 9   testify at trial.  The -- the standard that the Court ends up

10   applying, decides is appropriate, may influence which experts

11   are eventually called, which expert opinions are proffered by

12   those experts.

13        And I think that's all I've got.

14        THE COURT:  Okay.  Let me hear from the plaintiffs

15   with regard to that.

16        MR. KRUMHOLZ:  Thank you, Your Honor.  There were a

17   couple of points Mr. Grove made that I wanted to respond to.

18        Number one, the suggestion that we could somehow

19   streamline the case by arriving at summary judgment as to prong

20   1, that is whether or not 16-plus magazines are protected under

21   the Second Amendment, the problem with that, Your Honor, is

22   there is tremendous overlap in the evidence between the proof

23   as to prong 1 and the proof as to prong 2.  And that's

24   especially so depending on -- depending on the level of

25   scrutiny that this court chooses to apply.

1          If you apply level of scrutiny that requires some sort

2   of balancing, well, then, that balancing process is going to

3   require some evidence that folds back onto the question of what

4   the -- what the nature of the burden is on the plaintiffs and

5   their Second Amendment rights.

6          I believe that's all I have for now, Your Honor.

7          *THE COURT:*  Okay.  Thank you.  I remain unpersuaded

8   that dispositive motions will significantly streamline trial in

9   this matter.  I'm also unpersuaded that a determination as

10  requested by the defendant as to the standard of scrutiny can

11  be made in a vacuum.  It ultimately is a legal question, but it

12  depends upon how severe the burden is on what are determined to

13  be core Second Amendment rights.  And the severity of the

14  burden and the identification of core Second Amendment rights

15  may be impacted by the presentation of evidence.  And so while

16  it ultimately is a legal determination, it is a determination

17  arguably based upon factual evidence.

18         As to the ADA issue, my initial thought was that that

19  could be bifurcated.  I'm persuaded by the plaintiffs'

20  representation that some of the same evidence that they would

21  use with regard to the other claims would apply to the ADA.

22  Obviously, the ADA claim has different standards.

23         Were this a jury trial, there might be some argument

24  for a presentation after some framing up of issues through

25  dispositive motions.  But where you're going to be presenting

1   both the evidence and the argument to the Court, it makes very

2   little difference whether it is in the form of a dispositive

3   motion or it is at trial.

4           So in deference to the need to have this matter

5   determined as promptly as possible in order to conserve the

6   resources of the parties and resolve the issues as

7   expeditiously as we can, I'm inclined to just have a trial.

8   And I will set a deadline for the filing of a proposed final

9   pretrial order today.

10          When will you be ready to file your proposed final

11   pretrial order?

12          *MR. GROVE:*  Your Honor, if I could just throw this out

13   there.  We haven't conferred with them.  Would it be possible

14   just to set a trial date and work backward from that?  I'm not

15   sure if that's how you do things.

16          *THE COURT:*  Well, I can do them in a number of

17   different ways.  It's a little hard to set a trial date until

18   you know how much time it's going to take to try the case.  Do

19   you feel like you know that today?

20          *MR. GROVE:*  I know that we had discussed originally in

21   the scheduling order that ten days was contemplated.  I don't

22   know if that has changed.

23          *THE COURT:*  Here is how I usually do it:  A trial day

24   is generally six hours in the courtroom, so six hours for

25   presentation of evidence and argument and objections and

1  rulings.  I usually look at the number of witnesses that are

2  going to be called and the amount of time that you all think

3  it's going to take to examine those witnesses, and I figure out

4  how many days we need based on that.

5       Now, maybe you've done that in your calculation of ten

6  days.  But let me assure you that if you tell me ten days,

7  that's what you get, but no more.

8       MR. GROVE:  Speaking for the defendant, Your Honor,

9  I'd be very surprised if we exceeded our five-day allotment.

10      THE COURT:  Okay.

11      MR. KRUMHOLZ:  Your Honor, if I understand your court

12  procedure with respect to pretrial orders, it is not a small

13  undertaking.  So we would propose that a deadline for a

14  pretrial order be sometime in the middle of January, which

15  would give us sufficient time between now and then to do the

16  things that we need to do to put together that pretrial order,

17  on which then you can base your determination of when the trial

18  will be, and we can make our determination how long we think

19  it's going to take.

20      THE COURT:  So do I understand you to say,

21  essentially, you don't agree with the ten-day trial?

22      MR. KRUMHOLZ:  No, I don't -- Your Honor, I think the

23  plaintiffs agree that at the moment, ten days still sounds like

24  an appropriate amount of time.

25      But as -- the pretrial order process is designed to

 1  help us -- aid us in that, in making that determination.  And

 2  so standing here now, on December 19, ten days sounds

 3  appropriate to the plaintiffs.  Based on the work we do in

 4  putting together the pretrial order, we may have a different

 5  view.  I don't foresee that, but it's possible.

 6          THE COURT:  Well, if you agree that ten days is the

 7  amount of time you need for trial, I'll go ahead and set a

 8  trial today.

 9          MR. KRUMHOLZ:  We would not be opposed to that.

10  Thanks, Judge.

11          THE COURT:  Okay.  When are you going to be ready to

12  go to trial?

13          MR. GROVE:  I assume next October is probably off the

14  table at this point.

15          THE COURT:  Pretty much.  I'm thinking February or

16  March.

17          MR. GROVE:  Certainly, the later, the better for us.

18  One issue that would need to be resolved is 702 motions.

19          THE COURT:  We can address that in a minute.

20          MR. GROVE:  Okay.  So -- as late as you could possibly

21  set it is fine with us, Your Honor.

22          THE COURT:  Okay.  My objective here is to comply with

23  rule one, not to set the trial as late as possible, but to set

24  a trial as soon as you can be ready.

25          MR. GROVE:  And I think that March, Your Honor -- it

 1   probably compatible with that.  But this is a major

 2   undertaking.

 3        THE COURT:  All trials are major undertakings.  I

 4   understand that, but I have every confidence that you will have

 5   adequate time to do what you need to do.

 6        MR. GROVE:  I appreciate your faith in us, Your Honor.

 7        MR. KRUMHOLZ:  Your Honor, February and/or March would

 8   be fine with us.

 9        THE COURT:  All right.  We'll set the trial, then, to

10   begin on March 31 and to run until April 11.

11        Trial will begin at 8:30 a.m. on Monday morning, the

12   31st.  It will run all of the days that week.  It will continue

13   on April 7th through the entirety of that week -- I should say,

14   the time allotted for it.  It will not extend beyond the 11th.

15   You'll each have 30 hours in which to make your presentation.

16   That includes all of your examination, cross-examination,

17   redirect examination, it includes all of your objections or

18   your responses to objections, your opening arguments, your

19   closing arguments.  You can allocate your time however you

20   want.  Rulings that I make will be divided 50/50, so that the

21   time is spent equally by each side.  And Ms. Glover will keep

22   track of this on a chess clock, so you can ask her at any point

23   in time where your time is.

24        We'll set the time for filing the final pretrial order

25   at January 31, 2014.  And only in the event that that final

1    pretrial order indicates that the amount of time that's

2    currently set for trial is inappropriate will the amount of

3    trial time be changed.

4         We'll set January 15, 2014, as the date for the filing

5    of any joint 702 motions.  That actually is later than the

6    deadline that you originally had with regard to the pretrial

7    scheduling order.

8         MR. GROVE:  Your Honor, may I just follow up on the

9    702 question quickly?

10        THE COURT:  Uh-huh.

11        MR. GROVE:  We had discussed -- Mr. Colin is not here

12   today.  I had discussed the possibility, given this is a bench

13   trial -- I know that Your Honor typically holds an evidentiary

14   hearing on 702s before the trial.  And what we had discussed

15   was filing the joint 702 motions as contemplated by the Court

16   and just folding that into -- folding that into the trial

17   itself.

18        THE COURT:  I think that makes good sense.  But I

19   would like to have the joint 702 motion so I know where your

20   areas of disagreement are.

21        MR. GROVE:  Absolutely.

22        THE COURT:  And it's important that they be joint.

23        MR. GROVE:  We'll --

24        THE COURT:  Otherwise it doesn't work real well, when

25   everybody is guessing what the other folks' opinion is going to

1   be.

2         I urge you to think about those opinions and not use a

3   comprehensive scatter-shot approach under Rule 702.  In other

4   words, if the methodology is a reliable methodology, please

5   don't challenge it.  If someone has adequate experience,

6   training, expertise, et cetera, please don't challenge that.

7         If you're looking at sufficiency and facts -- of the

8   facts and data, remember that the Tenth Circuit uses a

9   quantitative measure, not a qualitative measure.  So it's not,

10  what did you look at?  It's whether you looked at enough.

11        Any other matters that we should address, anticipating

12  trial?

13        Then we'll set a pretrial conference date -- yes, sir.

14        *MR. GROVE:*  Do you expect an Answer to the Fourth

15  Amended Complaint, and when?

16        *THE COURT:*  I haven't set a date for when it's going

17  to be filed.  And given the slight amendment that's going to

18  occur, I'm going to set a very tight Answer date and before

19  your final pretrial order is submitted, because that, of

20  course, will take the place of all of the previous pleadings.

21        So we'll set --

22        Mr. Kopel, when do you plan on the earliest date that

23  you can file the Fourth Amended Complaint?

24        *MR. KOPEL:*  Your Honor, I believe we could file the

25  Amended Complaint, consistent with your instructions, on

1   Monday, if that would be all right.

2          THE COURT:  On the 23rd?

3          MR. KOPEL:  Yes.

4          THE COURT:  Okay.

5          MR. KOPEL:  And I have one question on captioning.  It

6   was discussed today as being the Fourth Amended Complaint, but

7   since the Third Amended Complaint never really made it across

8   the finish line, should I call this the third or the fourth?

9          THE COURT:  The fourth.

10          MR. KOPEL:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          Can you file an Answer by the 3rd of January?

13          MR. GROVE:  Yes, Your Honor.

14          THE COURT:  Okay.  That will be our date for our

15   Answer on this.

16          Let me do a couple of cleanup rulings here.

17          We have the motion for extension of time to file

18   dispositive motions at Docket No. 97.  It is denied for the

19   reasons that have been expressed during the hearing.

20          Docket No. 105, an unopposed motion for leave to

21   restrict, this was a motion seeking restricted access to

22   certain exhibits that were attached to the Third Amended

23   Complaint.  Since the Third Amended Complaint is essentially

24   withdrawn and those exhibits will not be considered, I'm going

25   to deny the motion for leave to restrict but leave the exhibits

1    under restriction.

2            I don't think there are any other pending motions.

3    Have I overlooked any?

4            Then we need to set a final pretrial conference.  We

5    can set that for February 20 at 3 o'clock p.m.  Will that work

6    for everybody?

7            *MR. GROVE:*  That's fine for the Government, Your

8    Honor.

9            *MR. KOPEL:*  Your Honor, I teach at Denver University

10   Law School at that particular time; but my students, I'm sure,

11   would appreciate a day off.

12           *THE COURT:*  You can bring them into the courtroom, and

13   they can watch what is going on.

14           *MR. KOPEL:*  Thank you, Your Honor.

15           *MR. GROVE:*  There is -- that just triggered something

16   in my mind, Your Honor.

17           In your trial preparation memo, there is an indication

18   that the final pretrial conference, that the defendant needs to

19   appear in person.  This is an official capacity suit.  Would a

20   representative of the Governor's office be here be sufficient,

21   or would you like Governor Hickenlooper here in person?

22           *THE COURT:*  The reason that that is there is because

23   oftentimes the parties have little idea what happens in a real

24   trial.  Their experience has been watching things on TV, in the

25   movies; and real trials are different than what we see in the

1   media.  And one of the things that I try to do at the final

2   pretrial conference is help the parties have realistic

3   expectations as to what is going to happen at trial.  This

4   isn't one of those cases.  And as a consequence, I don't

5   believe any parties need to be here for the final pretrial

6   conference.

7            *MR. GROVE:*  Thank you, Your Honor.

8            *THE COURT:*  You're welcome.

9            Anything else that we need to deal with today?

10           *MR. GROVE:*  Nothing from the Governor, Your Honor.

11           *THE COURT:*  Thank you.  How about for the plaintiffs?

12           *MR. KRUMHOLZ:*  No, Your Honor.

13           *THE COURT:*  All right.  Then I will look forward to

14  seeing you in February, and we'll have this matter at trial by

15  the end of March.

16           We'll stand in recess.  I wish you all happy holidays.

17           (Recess at 4:07 p.m.)

18                    REPORTER'S CERTIFICATE

19

20       I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

21

22       Dated at Denver, Colorado, this 30th day of September,

23  2014.

24                                s/Therese Lindblom

25                    _____

                      Therese Lindblom,CSR,RMR,CRR

1

2

3

**U.S. District Court**
**District of Colorado**
**Notice of Electronic Filing**
The following transaction was entered on 12/12/2013 at 11:36 AM MST and filed on 12/12/2013
**Case Name:** Colorado Outfitters Association et al v. Hickenlooper
**Case Number:** 1:13−cv−01300−MSK−MJW
**Filer:**
**Document Number:** 107(No document attached)
**Docket Text:**
**ORDER denying [102] Motion to Amend/Correct/Modify. Having reviewed the Second**
**Amended Complaint, the Court finds that under the standards of Ashcroft v. Iqbal,**
**556 U.S. 663 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), there**
**is no plausible claim stated by any individual currently serving as sheriff.**
**Therefore, no further clarification or modification of the Courts November 27,**
**2013, Order [96] on the Motion to Dismiss is appropriate. The motion is DENIED.**
**By Chief Judge Marcia S. Krieger on 12/12/2013. Text Only Entry(msklc3, )**

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 13-cv-01300-MSK-MJW

**JOHN B. COOKE, Sheriff of Weld County, Colorado;**
**TERRY MAKETA, Sheriff of El Paso County, Colorado;**
**JUSTIN SMITH, Sheriff of Larimer County, Colorado;**
**DAVID A. WEAVER, Sheriff of Douglas County, Colorado:**
**BRUCE W. HARTMAN, Sheriff of Gilpin County, Colorado;**
**KEN PUTNAM, Sheriff of Cheyenne County, Colorado;**
**DENNIS SPRUELL, Sheriff of Montezuma County, Colorado;**
**TIM JANTZ, Sheriff of Moffat County, Colorado;**
**JERRY MARTIN, Sheriff of Dolores County, Colorado;**
**MIKE ENSMINGER, Sheriff of Teller County, Colorado;**
**SHAYNE HEAP, Sheriff of Elbert County, Colorado;**
**CHAD DAY, Sheriff of Yuma County, Colorado;**
**FRED D. MCKEE, Sheriff of Delta County, Colorado;**
**LOU VALLARIO, Sheriff of Garfield County, Colorado;**
**FRED HOSSELKUS, Sheriff of Mineral County, Colorado;**
**BRETT L. POWELL, Sheriff of Logan County, Colorado;**
**JAMES FAULL, Sheriff of Prowers County, Colorado;**
**LARRY KUNTZ, Sheriff of Washington County, Colorado;**
**BRIAN E. NORTON, Sheriff of Rio Grande County, Colorado;**
**DUKE SCHIRARD, Sheriff of La Plata County, Colorado;**
**JIM BEICKER, Sheriff of Fremont County, Colorado;**
**RONALD BRUCE, Sheriff of Hindsdale County, Colorado;**
**CHRIS S. JOHNSON, Sheriff of Otero County, Colorado;**
**FRED JOBE, Sheriff of Custer County, Colorado;**
**DONALD KRUEGER, Sheriff of Clear Creek County, Colorado;**
**JAMES CRONE, Sheriff of Morgan County, Colorado;**
**SI WOODRUFF, Sheriff of Rio Blanco County, Colorado;**
**TOM RIDNOUR, Sheriff of Kit Carson County, Colorado;**
**TOM NESTOR, Sheriff of Lincoln County, Colorado;**
**STAN HILKEY, Sheriff of Mesa County, Colorado;**
**FORREST FRAZEE, Sheriff of Kiowa County, Colorado;**
**RICK DUNLAP, Sheriff of Montrose County, Colorado;**
**TED B. MINK, Sheriff of Jefferson County, Colorado;**
**DAVE STONG, Sheriff of Alamosa County, Colorado;**
**FRED WEGENER, Sheriff of Park County, Colorado;**
**BRUCE NEWMAN, Sheriff of Huerfano County, Colorado;**
**RANDY PECK, Sheriff of Sedgwick County, Colorado;**
**DOMINIC MATTIVI, JR., Sheriff of Ouray County, Colorado;**
**JOHN MINOR, Sheriff of Summit County, Colorado;**
**SCOTT FISCHER, Sheriff of Jackson County, Colorado;**

**PETER GONZALEZ, Sheriff of Archuleta County, Colorado;**
**RICK BESECKER, Sheriff of Gunnison County, Colorado;**
**CHARLES "ROB' URBACH, Sheriff of Phillips County, Colorado;**
**ROD FENSKE, Sheriff of Lake County, Colorado;**
**GRAYSON ROBINSON, Sheriff of Arapahoe County, Colorado;**
**DAVID D. CAMPBELL, Sheriff of Baca County, Colorado;**
**MIKE NORRIS, Sheriff of Saguache County, Colorado;**
**AMOS MEDINA, Sheriff of Costilla County, Colorado;**
**MILES CLARK, Sheriff of Crowley County, Colorado;**
**DAVID ENCINIAS, Sheriff of Bent County, Colorado;**
**SUE KURTZ, Sheriff of San Juan County, Colorado;**
**JAMES (JIM) CASIAS, Sheriff of Las Animas County, Colorado;**
**GARRETT WIGGINS, Sheriff of Routt County, Colorado;**
**DOUGLAS N. DARR, Sheriff of Adams County, Colorado;**
**COLORADO OUTFITTERS ASSOCIATION;**
**COLORADO FARM BUREAU;**
**NATIONAL SHOOTING SPORTS FOUNDATION;**
**MAGPUL INDUSTRIES;**
**USA LIBERTY ARMS;**
**OUTDOOR BUDDIES, INC.;**
**WOMEN FOR CONCEALED CARRY;**
**COLORADO STATE SHOOTING ASSOCIATION;**
**HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER AT**
**CHERRY CREEK STATE PARK;**
**DAVID STRUMILLO;**
**DAVID BAYNE;**
**DYLAN HARRELL;**
**ROCKY MOUNTAIN SHOOTERS SUPPLY;**
**2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;**
**BURRUD ARMS INC. D/B/A JENSEN ARMS;**
**GREEN MOUNTAIN GUNS;**
**JERRY'S OUTDOOR SPORTS;**
**GRAND PRIX GUNS;**
**SPECIALTY SPORTS & SUPPLY; and**
**GOODS FOR THE WOODS;**

      **Plaintiffs,**

**v.**

**JOHN W. HICKENLOOPER, Governor of the State of Colorado,**

      **Defendant.**

**OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANT'S MOTION TO DISMISS**

**THIS MATTER** comes before the Court on the Defendant Governor John W.

Hickenlooper's (hereafter referred to as "the State") Motion to Dismiss **(#64)**.  The Plaintiffs

filed two Responses[1] to the motion **(#69, 70)**, and the State replied **(#75)**.

## I.  Background

The Colorado General Assembly recently enacted new gun regulations.  At issue in this

lawsuit are two statutes — C.R.S. §§ 18-12-112 and 18-12-302.

The first statute, § 18-12-112, imposes mandatory background checks for the transfer of

guns in private transactions, subject to certain exceptions.  The law mandates that before a

person (who is not a gun dealer) can transfer ownership of a gun to someone else, the transferor

must require that the transferee obtain a background check by a licensed gun dealer, and the

transferor must obtain approval of the transfer from the Colorado Bureau of Investigation.

§ 18-12-112(1).  An individual who violates the law is guilty of a crime.  § 18-12-112(9).

Although challenged in this lawsuit, § 18-12-112 is not the subject of the State's instant motion

to dismiss.

The second statute, § 18-12-302, prohibits the possession, sale, or transfer of large-

capacity ammunition magazines.  Section 18-12-301(2) defines "large-capacity magazine" to

---

[1] The Response found at Docket #69 was filed by Colorado Outfitters Association, Colorado
Farm Bureau, National Shooting Sports Foundation, Magpul Industries, USA Liberty Arms,
Outdoor Buddies, Inc., Women for Concealed Carry, Colorado State Shooting Association,
Hamilton Family Enterprises, Inc., David Strumillo, David Bayne, Dylan Harrell, Rocky
Mountain Shooters Supply, 2nd Amendment Gunsmith & Shooter Supply, LLC, Burrud Arms
Inc., Green Mountain Guns, Jerry's Outdoor Sports, Grand Prix Guns, Specialty Sports &
Supply, and Goods for the Woods.  The remaining Plaintiffs, county Sheriffs from across
Colorado, joined in the first response and also filed a separate Response at Docket #70.

include magazines that are capable of accepting, or are "designed to be readily converted to accept," more than fifteen rounds of ammunition.  Under the statute, a person who sells, transfers, or possesses a large-capacity magazine is guilty of a crime.  § 18-12-302(1).  However, the statute contains a grandfather clause that allows a person to possess a large-capacity magazine if he or she (1) owned the magazine as of July 1, 2013 (the effective date of the statute), and (2) has maintained "continuous possession" of the magazine thereafter.        § 18-12-302(2).  Only §§ 18-12-301 and -302 are at issue in the context of this motion.  Since these statutes were enacted, a number of relevant events have occurred.  The facts with regard to these events are undisputed and are recounted generally here.  To the extent further detail is required, the Court will elaborate in its analysis.

On May 16, 2013, the Colorado Attorney General, at the request of Governor Hickenlooper, sent a "Technical Guidance" letter to the Executive Director of the Colorado Department of Public Safety.  The letter was intended to assist Colorado law enforcement agencies in understanding and applying portions of the statute prohibiting large-capacity magazines.  The Technical Guidance addressed the scope of the phrase "designed to be readily converted to accept more than fifteen rounds of ammunition," and set forth the Attorney General's interpretation of the "continuous possession" requirement of the grandfather clause.

Soon after the Technical Guidance was issued, the Plaintiffs initiated this action. Their claims are currently stated in a Second Amended Complaint (**#62**).  They assert six claims, five of which challenge the constitutionality of various provisions of the new statutes.

The Plaintiffs assert that:

(1) the prohibition on the sale, transfer, or possession of magazines with a capacity larger than fifteen rounds of ammunition, §§ 18-12-301 and -302, violates the Second Amendment of the United States Constitution;[2]

(2) the prohibition on the sale, transfer, or possession of magazines that are "designed to be readily converted" to accept more than fifteen rounds of ammunition, §§ 18-12-301 and -302, violates the Second Amendment of the United States Constitution;[3]

(3) the phrase "designed to be readily converted," found in § 18-12-301(2)(a)(I), is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment;

(4) the phrase "continuous possession," found in the grandfather clause of § 18-12-302(2)(a)(II), is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment;

(5) §§ 18-12-301 *et seq.* and § 18-12-112 violate Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, because they discriminate against disabled persons; and

(6) the restrictions imposed on the transfer of firearms between private individuals under § 18-12-112 violates the Second Amendment of the United States Constitution.

A month after filing their initial Complaint (and just two weeks before the statute prohibiting large-capacity magazines was set to go into effect), the Plaintiffs requested a preliminary injunction to stop the statute from taking effect.  The parties were able to resolve

---

[2] The provisions of the Second Amendment to the United States Constitution are made applicable to state laws by virtue of the Fourteenth Amendment to the United States Constitution.  *See McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010).

[3] Although the Plaintiffs' first two claims appear to present separate challenges, the Court understands these two claims to actually be one claim challenging the constitutionality of §§ 18-12-301 *et seq.*, as a whole, under the Second Amendment.

such motion without the Court's involvement due, in part, to the State's agreement to issue further guidance on the statutes. The Colorado Attorney General issued a second Technical Guidance letter, providing additional guidance with regard to the definition of "large-capacity magazine" and as to the "continuous possession" requirement of the grandfather clause.

Citing to Fed. R. Civ. P. 12(b)(1),[4] the State now moves to dismiss particular claims in the Second Amended Complaint. The State requests that the Court dismiss the Plaintiffs' claims that the language found in §§ 18-12-301(2)(a)(I) and -302(2)(a)(II) is unconstitutionally vague and all claims asserted by the Sheriffs[5] in their official capacity. The State contends that the Court lacks subject matter jurisdiction over these claims because the Plaintiffs do not have standing to assert them.

---

[4] Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction generally take one of two forms. The moving party may (1) facially attack the complaint's allegations as to the existence of jurisdiction, or (2) go beyond the allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests. *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003).

Under a facial attack, the movant merely challenges the sufficiency of the complaint, requiring the Court to accept the allegations in the complaint as true. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). On the other hand, in a factual attack, the movant goes beyond the allegations in the complaint and challenges the facts upon which subject matter jurisdiction depends. In such situations, the Court must look beyond the complaint and has wide discretion to allow documentary and even testimonial evidence to resolve disputed jurisdictional facts. *Id.* In the course of a factual attack under Rule 12(b)(1), the Court's reference to evidence outside the pleadings does not convert the motion into a motion for summary judgment under Rule 56. *Id.*

The State presents both kinds of challenges under Rule 12(b)(1) — a factual attack as to the Plaintiffs' ability to establish standing to assert their vagueness claims and a facial attack as to the standing of the Sheriffs to bring claims in their official capacities.

[5] For the sake of clarity in identifying various groups of Plaintiffs, the Court notes that it uses the term "Plaintiffs" only when collectively referring to all of the Plaintiffs involved in this lawsuit. The group of Plaintiffs comprised of individuals identified as county Sheriffs is referred to as "the Sheriffs." The remaining non-sheriff Plaintiffs (including individuals and entities) are referred to by name where appropriate.

## II. Jurisdiction

The issues presented in the State's motion to dismiss concern whether the Court has

subject matter jurisdiction over certain claims.  The Court may exercise jurisdiction over this

matter so that it may determine its own jurisdiction.  *See Dennis Garberg & Associates, Inc. v.*

*Pack-Tech Intern. Corp.*, 115 F.3d 767, 773 (10th Cir. 1997).

## III. Analysis

Before beginning its legal analysis, the Court pauses to address a preliminary matter.

Recognizing that this case is one of great public concern and interest, it is important to identify

what the Court is *not* doing and *not* considering.

Determination of this motion to dismiss has nothing to do with the merits of the

Plaintiffs' claims.  The Court is  not be determining whether the new laws are good, bad, wise,

unsound, or whether they are the subject of legitimate concern.  Indeed, at this juncture, the

Court is not even considering whether the challenged portions of the laws are constitutional.

This ruling determines only whether the Court *can* consider particular claims (that is, the Court's

jurisdiction ).

A court's "jurisdiction" is a broad concept.  For purposes of the matters addressed herein,

jurisdiction  means a court's power or authority to interpret and apply the law.

All federal courts are courts of "limited jurisdiction," meaning that they possess only that

power given to them by the United States Constitution and federal statutes.[6]  *Kokkonen v.*

*Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).  Article III of the United States

Constitution restricts the authority of federal courts to adjudicating actual "cases" and

---

[6] This is in contrast to the state courts.  Typically courts of general jurisdiction, state courts are
presumed to have the power to hear virtually any claim arising under federal or state law, except
those which Congress or the United States Constitution  specifies can be heard only by federal
courts.

"controversies." U.S. Const. art. III, § 2, cl.1; *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008). Limitation of the jurisdiction of federal courts to cases and controversies is crucial to maintaining the "tripartite allocation of power" set forth in the United States Constitution. Indeed, no principle is more fundamental to the judiciary's proper role in our system of government. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474 (1982); *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

A case or controversy can only be brought by a person with "standing" to sue. This means that a plaintiff must have a right or interest that has been, is being, or will be affected by the challenged act or statute. *See Allen v. Wright*, 468 U.S. 737, 750-51 (1984). In other words, to invoke federal court jurisdiction, a plaintiff must demonstrate that he or she "has a stake" in the outcome at the time the suit is filed. Thus, unlike doctrines which restrain federal courts from exercising jurisdiction based on the characteristics of the claims themselves (*e.g.* doctrines of abstention or grants of exclusive jurisdiction), the question of standing focuses on the *party* who seeks relief rather than on the issues that he or she wants adjudicated. *See Flast v. Cohen*, 392 U.S. 83, 95 (1968). In addition, a plaintiff must demonstrate standing for each claim he or she asserts and for each form of relief that is sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

If there is no plaintiff with standing to assert a particular claim, federal courts lack jurisdiction to consider it. *Summers v. Earth Island Inst.*, 555 U.S. 488, 492-93 (2009). Parties who invoke federal jurisdiction, here the Plaintiffs, bear the burden of establishing a court's jurisdiction. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 104 (1998). Thus, it is the Plaintiffs who must establish their standing to proceed with the claims in the Second Amended Complaint.

To establish standing, a plaintiff must show that: (1) he or she has suffered an "injury in fact" that is concrete and particularized, and actual or imminent (not merely conjectural or hypothetical); (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000); *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004).

The "injury in fact" requirement is satisfied differently depending on what kind of relief a plaintiff seeks. A plaintiff may seek retrospective relief (typically in the form of an award of money damages) when he or she wants to be compensated for a past injury. In contrast, a plaintiff may seek prospective relief (usually in the form of a declaratory judgment or an injunction) when he or she believes that he or she will be injured in the future and wants to prevent the injury from happening. Here, the Plaintiffs do not claim that they have suffered any past injuries due to prior enforcement of the new statutes. Instead, they seek prospective relief by asking the Court to enjoin the State from enforcing the statutes in the future.

To have standing to seek prospective relief, a plaintiff must establish that he or she is suffering a continuing injury from the challenged act, or that he or she is under a real and immediate threat of being injured by that act in the future. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). The threatened injury must be "certainly impending" and not merely speculative. *Laidlaw*, 528 U.S. at 190. When, as here, the constitutionality of a criminal statute is challenged based on the prospect of future enforcement, a plaintiff must show that "there exists a credible threat of [future] prosecution" of the plaintiff under the statute. *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003).

**B.  Do any of the Plaintiffs have standing to assert that §§ 18-12-301 and -302 are unconstitutionally vague?**

The Plaintiffs claim that certain language found in §§ 18-12-301 and -302 is unconstitutionally vague under the Due Process clause of the 14th Amendment to the United States Constitution.  The State argues that these claims must be dismissed because no Plaintiff has, or can, show a "credible threat" that he, she, or it will be prosecuted under the statutes because the Technical Guidance letters have adequately clarified the statutory terms.  This is a factual challenge to the Plaintiffs' standing.  Accordingly, the Court does not presume the truthfulness of the factual allegations in the Second Amended Complaint and has wide discretion to consider affidavits, other documents, and evidence.  *Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995).

As noted above, to have standing, a plaintiff who challenges the prospective enforcement of a criminal statute must show a "real and immediate threat" of future prosecution under the statute.  *Bronson v. Swensen*, 500 F.3d 1099, 1107 (10th Cir. 2007).  This requirement has been characterized as a "credible" threat of prosecution, meaning that is arises from an "objectively justified fear of real consequences."  *Id.* (quoting *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004)).  In *Bronson*, the Tenth Circuit explained that the credible threat test operates as a continuum, along which the degree of likelihood of enforcement must be assessed.  At the "credible threat" end of the spectrum are cases in which the plaintiff has been explicitly threatened with arrest or prosecution.  *See, e.g., Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1156 (10th Cir. 2006).  At the "no credible threat" end of the spectrum are cases in which there was an affirmative assurance by a government actor responsible for enforcing the challenged statute that there will be no prosecution.  *Bronson*, 500 F.3d at 1108.  Such

assurances prevent a "threat" of prosecution from maturing into a "credible" one.  *See, e.g., Mink v. Suthers*, 482 F.3d 1244, 1253-55 (10th Cir. 2007); *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006); *Faustin v. City & County of Denver*, 268 F.3d 942, 948 (10th Cir. 2001).

Here, the Colorado Attorney General's two Technical Guidance letters specify how the statutes should be interpreted and enforced.  The State argues that the Technical Guidance letters act as assurances that there will be no prosecution contrary to their terms.  The Plaintiffs argue that the Technical Guidance letters are insufficient to act as "assurances" of non-prosecution because they are not binding on state or local law enforcement and they do not explicitly state that there will be no prosecution.

The Court rejects the Plaintiffs' argument.  Although the letters do not explicitly state that these Plaintiffs will not be prosecuted under the statutes, the Technical Guidance letters advise the Plaintiffs of the conduct that is permissible (for example, possession of magazines accepting fewer than fifteen rounds but with removable base plates), and therefore the Plaintiffs are assured that they will not be prosecuted for such conduct.  Indeed, C.R.S. § 18-1-504(2)(c) provides an affirmative defense to criminal liability if a defendant engages in conduct under a mistaken belief that the conduct is permitted by "[a]n official written interpretation of the statute or law relating to the offense."   In addition, the question is whether there is a credible threat of *prosecution*, not simply *arrest*.  The Plaintiffs have not provided any evidence to suggest that any District Attorney will prosecute in variance to the directive of the Attorney General.  The idea that a rogue District Attorney might choose to prosecute a Plaintiff for conduct explicitly permitted under the terms of the Technical Guidance is purely speculative.

Recognizing a spectrum of likelihood of prosecution, the Tenth Circuit has also held that the "possibility" of future enforcement need not be "reduced to zero" to defeat standing.  *Mink*,

482 F.3d at 1255 (quoting *Winness*, 433 F.3d at 733). Thus, a defendant need not contend or show that there is no possibility of prosecution. Instead, a plaintiff must demonstrate an "actual or imminent, not conjectural or hypothetical" threat that the statute will be enforced against him, her, or it. *Winness*, 433 F.3d at 733. Accordingly, the Court finds that the Technical Guidance letters are sufficient to act as assurances by the State that prosecution will be subject to the clarifications provided by the Technical Guidance letters.

In light of the Technical Guidance letters, to show a credible threat of prosecution, a Plaintiff must show that his, her or its intended behavior falls afoul of *both* the statute(s) *and* the Technical Guidance letters. It is not necessary for every Plaintiff to show a credible threat of prosecution for the claims to proceed. If any Plaintiff can show standing, the claim may proceed (albeit only as to that Plaintiff). *See American Atheists, Inc. v. Davenport*, 637 F.3d 1095, 1114 (10th Cir. 2010) (citing *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981)).

The Court notes that the Plaintiffs have brought separate vagueness claims as to specific phrases found in §§ 18-12-301 and -302. Thus framed, the Court focuses on *each challenged phrase* as interpreted by the Technical Guidance. To recap, the Plaintiffs claim that the phrases "designed to be readily converted," found in § 18-12-301(2)(a)(I), and "continuous possession," found in § 18-12-302(2)(a)(II), are unconstitutionally vague. In determining whether any Plaintiff has standing to assert these claims, the Court has considered all of the pleadings and factual showings made by the Plaintiffs as to how the new statutes might affect them.

1. "designed to be readily converted"

Section 18-12-302 prohibits the possession, sale, or transfer of large-capacity ammunition magazines. Section 18-12-301(2) defines "large-capacity magazine" as including "a fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, or that is

10

designed to be readily converted to accept, more than fifteen rounds of ammunition." The first

Technical Guidance letter set forth guidance as to how this phrase should be interpreted and

enforced:

> [t]he term "designed," when used as a modifier, denotes a feature
> that meets a specific function. This suggests that design features
> that fulfill more than one function, and whose function is not
> specifically to increase the capacity of a magazine, do not fall
> under the definition. The features of a magazine must be judged
> objectively to determine whether they were "designed to be readily
> converted to accept more than fifteen rounds."
>
> Under this reading of the definition, a magazine that accepts fifteen
> or fewer rounds is not a 'large capacity magazine simply because it
> includes a removable baseplate which may be replaced with one
> that allows the magazine to accept additional rounds. On many
> magazines, that design feature is included specifically to permit
> cleaning and maintenance. Of course, a magazine whose baseplate
> is replaced with one that does, in fact, allow the magazine to accept
> more than fifteen rounds would be a "large capacity magazine"
> under House Bill 1224.

The second Technical Guidance letter provided additional guidance with regard to

magazines with removable base plates:

> [m]agazines with a capacity of 15 or fewer rounds are not large
> capacity magazines as defined in [§ 18-12-301] whether or not
> they have removable base plates. The baseplates themselves do
> not enable the magazines to be expanded and they serve functions
> aside from expansion — notably, they allow the magazines to be
> cleaned and repaired. To actually convert them to higher capacity,
> one must purchase additional equipment or permanently alter their
> operation mechanically. Unless so altered, they are not prohibited.

Thus, to establish standing to challenge the phrase "designed to be readily converted," at

least one Plaintiff must show that he, she, or it intends to sell, transfer, or possess a magazine that

accepts fifteen rounds or less, but which has a design feature other than a removable base plate

that makes it capable of accepting more than fifteen rounds.

Nothing in the Second Amended Complaint or elsewhere in the record to establishes that any Plaintiff is under a credible threat of prosecution under § 18-12-302 for selling, transferring, or possessing a magazine that is "designed to be readily converted" to accept more than fifteen rounds of ammunition.  Several firearm dealer Plaintiffs, including 2nd Amendment Gunsmith & Shooter Supply, LLC; Green Mountain Guns; Jerry's Outdoor Sports; and Magpul Industries, indicate that they own and intend to sell magazines that have removable "floor plates" or "end caps" (which the Court understands to be equivalent to the "base plates" mentioned in the Technical Guidance letters).  However, in accordance with the Technical Guidance, possession or transfer of magazines that could potentially accept more than 15 rounds by virtue of removable floor plates or end caps alone is not precluded.  The letters expressly state that such magazines are not considered to be "designed to be readily converted" into large-capacity magazines for purposes of enforcement of the statute.

No other Plaintiff has alleged that they intend to sell, transfer, or possess magazines that have a design feature, other than a removable base plate, that allows the magazine to accept more than fifteen rounds.[7]  Accordingly, the Court finds that no Plaintiff has alleged sufficient facts to show a credible threat of prosecution for violation of § 18-12-301 based on the possession, sale, or transfer of a magazine that is "designed to be readily converted" to accept more than 15 rounds.  The State's motion to dismiss this claim is therefore GRANTED, and the claim that this portion of the statute is unconstitutionally vague is dismissed.

---

[7] Several Plaintiffs who are organizations and associations, including the National Shooting Sports Foundation, Colorado State Shooting Association, Outdoor Buddies, Colorado Outfitters Association, and Women for Concealed Carry, assert that they are suing on behalf of their members.  However, these Plaintiffs have not asserted that their individual members intend to sell, possess, or transfer a magazine that is designed to be readily converted to accept more than fifteen rounds by virtue of something other than a removable base plate.  Because these Plaintiffs have not established that their members would have standing to sue in their own right, they have not established their standing to sue on behalf of their members.  *See Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 181 (2000).

2. "continuous possession"

As noted, section 18-12-302 prohibits the possession, sale, or transfer of large-capacity magazines, subject to a grandfather clause. The grandfather clause protects a person who possesses a large-capacity magazine if he, she, or it (1) owned the magazine as of July 1, 2013 (the effective date of the statute), and (2) maintains "continuous possession" of the magazine thereafter. § 18-12-302(2).

The first Technical Guidance letter explains:

> Responsible maintenance, handling, and gun safety practices, as well as constitutional principles, dictate that [§ 18-12-302(2)(a)(II)] cannot be reasonably construed as barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee, unless that temporary transfer is otherwise prohibited by law. For example, an owner should not be considered to have "transferred" a large-capacity magazine or lost "continuous possession" of it simply by handing it to a gunsmith, hunting partner, or an acquaintance at a shooting range with the expectation that it will be promptly returned. Likewise, a gunsmith, hunting partner, or acquaintance at a shooting range who acquires temporary physical custody of a large-capacity magazine from its owner should not be considered in "possession" of the magazine so long as he or she remains in the owner's physical presence. However, it would be unreasonable to construe the bill or this guidance to exempt a temporary transfer of a large-capacity magazine in connection with criminal activity.
>
> For similar reasons, the bill's requirement that an owner must maintain "continuous possession" in order to ensure the application of the grandfather clause cannot reasonably be read to require continuous physical possession. . . .

The second Technical Guidance letter provides additional explanation:

> The phrase "continuous possession" in [§ 18-12-302(2)] shall be afforded its reasonable, every-day interpretation, which is the fact of having or holding property in one's power or the exercise of dominion over property, that is uninterrupted in time, sequence, substance, or extent. "Continuous possession" does not require a large-capacity magazine owner to maintain literally continuous

13

physical possession of the magazine.  "Continuous possession" is
only lost by a voluntary relinquishment of dominion and control.

In light of the Technical Guidance, to establish standing with regard to the phrase "continuous possession," a Plaintiff must establish that he, she, or it is subject to a credible threat of prosecution for possessing a large-capacity magazine and is not protected by the grandfather clause.  In other words, a Plaintiff must show that he, she or it acquired a large-capacity magazine before July 1, 2013, but that he, she, or it does not fall within the grandfather clause because he, she, or it intends to give up "continuous possession" of the magazine.

Plaintiff David Strumillo, a retired police officer, submitted a declaration in which he states that he owns firearms that use large-capacity magazines.  He asserts that under the new statute, he will be "prevented from lending [his] firearms containing [the large-capacity magazines] to [his] family members."

The Court finds that Mr. Strumillo's intended conduct of "lending" his large-capacity magazines to family members subjects him to a credible threat of criminal prosecution under § 18-12-302.  The second Technical Guidance letter states that "continuous possession" is lost only by a "voluntary relinquishment of dominion and control."  A reasonable interpretation of Mr. Strumillo's use of the word "lending" suggests that Mr. Strumillo intends to give up his dominion and control over the magazines for a period of time, and that the magazine will later be returned to him.  Thus, although Mr. Strumillo owned his magazines as of July 1, 2013, the grandfathering clause does not protect him because he intends to give up "continuous possession" of the magazines.

The State further contends that even if there is a Plaintiff who establishes a potential injury, that such Plaintiff lacks standing because the relief sought (an injunction against enforcement) will not redress the injury.  It argues that because the Plaintiffs sued the Governor,

any injunction against enforcement of the statute or declaratory relief deeming the statute unconstitutional would not bind the local District Attorneys who carry out the actual enforcement of the statute.

The Court is not persuaded.  The Colorado Constitution states that the "supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed."  Colo. Const. Art. IV, § 2.  Colorado has long recognized the practice of naming the governor, in his *official role as the state's chief executive*, as the proper Defendant in cases where a party seeks to enjoin state enforcement of a statute, regulation, ordinance, or policy.  *See Developmental Pathways v. Ritter*, 178 P.3d 524, 529 (Colo. 2008).  The Court finds that the Governor, in his official capacity, possesses sufficient authority to enforce (and control the enforcement of) the complained-of statute.  Thus, the relief sought is against the Governor in his official capacity, and therefore would redress injury to Mr. Strumillo.

Accordingly, the Court finds that at least one Plaintiff has established standing to assert a claim that the phrase "continuous possession," § 18-12-302(2), is unconstitutionally vague.  The State's motion to dismiss this claim is therefore DENIED.

**C.  Do the Sheriffs have standing to sue the State of Colorado?**

The State also request dismissal of all claims brought by Plaintiffs who are county sheriffs because they have no standing to sue the State in their "official capacity".  The State relies upon the political subdivision doctrine which teaches that a political subdivision of a state may not sue its parent state under certain provisions of the United States Constitution.

To understand the State's argument, it is important to distinguish between claims brought by a person in an "official capacity" and those brought in a personal/individual capacity.

Generally, a government official (whether elected or appointed) can assert rights in two different capacities.  One pertains to the office in which the official serves.  In that capacity, the official acts on behalf of, and is the representative of, the office that he or she holds.  That role continues until the person no longer serves in the office, at which point, the official's successor assumes that role.  An "official capacity" claim is one that is brought by or against the person acting as the representative of, or as substitute for, the office or agency.  In other words, in an official capacity claim, one can readily replace the named individual with the name of the office itself. For example, an official capacity claim brought by "John Cooke, Sheriff of Weld County," is actually a claim being brought by the Weld County Sheriff's Office.[8]  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).

A government official can also assert rights that he or she has as an ordinary, private citizen.  Following the prior example, a claim brought by Sheriff Cooke in an individual capacity is actually one by Mr. Cooke as a private citizen.

A government official can be involved in a lawsuit either in his or her official capacity (that is, as a representative of the office itself) or as an individual, or both.[9]  Here, the Court understands the parties to agree that the claims asserted by the Sheriffs in the Second Amended Complaint are all intended to be brought as official capacity claims.  *See generally* Docket # 70 (repeatedly arguing that the "Sheriffs have standing, in their official capacity," in various

---

[8] It is in this same sense that the Court has referred to the Defendant in this case — nominally, Mr. Hickenlooper — as simply "the State," as all claims are brought against Mr. Hickenlooper in his official capacity as the Governor of Colorado.

[9] The issue presented here is the relatively unusual question of whether *plaintiffs* are bringing claims in their official or individual capacities.  The more common question — whether a claim is brought against a *defendant* in an official or individual capacity — is not at issue here.  *See generally Watson v. Polland*, 2009 WL 1328316 (D. Colo. May 8, 2009) (slip op.) (discussing the difference between official and individual capacity claims brought against a defendant).

respects, but never contending that the Sheriffs have standing "in their individual capacity"). Thus, these are claims brought by the Sheriffs' offices of each of the respective county.

The State argues that under the doctrine of political subdivision standing, the Sheriff's Offices in each county are barred from suing the State because a county Sheriff's Office is a political subdivision of the State of Colorado. Consideration of this argument requires application of both federal and state law.

Turning first to federal law, political subdivisions of states, such as cities and counties, are recognized as subordinate governmental instrumentalities created by a state to assist in carrying out state governmental functions. *See Reynolds v. Sims*, 377 U.S. 533, 575 (1964). Under the doctrine of political subdivision standing, a political subdivision of a state cannot sue its parent state for alleged violations of the Fourteenth Amendment. This is because that amendment was written to protect individual rights, as opposed to protecting collective or structural rights.[10] *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 628 (10th Cir. 1998). Indeed, the Tenth Circuit has observed that there is not "a single case in which the Supreme Court or a court of appeals has allowed a political subdivision to sue its parent state under a substantive provision of the Constitution." *City of Hugo v. Nichols*, 656 F.3d 1251, 1253-54 (10th Cir. 2011).

This doctrine is an important limitation on the power of the federal government. It guarantees that a federal court will not resolve certain disputes between a state and local government. A political subdivision may seek redress against its parent state for violation of a

---

[10] The Tenth Circuit has expressed some doubt as to whether the issue of a political subdivision suing its parent state is properly regarded as a question of standing or a substantive determination that the Constitution does not afford rights to political subdivisions as against their states. *See City of Hugo v. Nichols*, 656 F.3d 1251, 1255 n.4 (19th Cir. 2011). Nevertheless, in an earlier decision, *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 628 (10th Cir. 1998), the Tenth Circuit cast the issue as one of jurisdictional standing. Thus, this Court treats it as such.

state Constitution, but the political subdivision cannot invoke (nor can a federal court impose) the protections of the United States Constitution for individuals against a state.  *See Williams v. Mayor & City Council of Balt.*, 289 U.S. 36, 40 (1933).  With regard to its own subdivisions, the power of the state is unrestrained by the Fourteenth Amendment.  *City of Trenton v. New Jersey*, 262 U.S. 182, 188 (1923).

Turning to Colorado law, a county in Colorado is undisputedly a political subdivision of the State of Colorado.  *See Bd. of Cnty. Com'rs of Douglas Cnty. v. Bainbridge, Inc.*, 929 P.2d 691, 699 (Colo. 1996).  The Colorado Constitution creates an office of Sheriff for each county and lists the Sheriff as a county officer.  Colo. Const. Art. XIV, § 8.  The Sheriff's Office functions as a department of the county, charged with enforcing State laws within the county limits.  As such, it is an extension of the county in which it is situated.  Thus, an official capacity claim asserted by a county Sheriff's Office is a claim asserted by a political subdivision of the State.

The Sheriffs argue that they are not a political subdivision of the State because the Office of Sheriff was created by the People of Colorado, through the Colorado Constitution, rather than being created by state law.  This argument is not persuasive.  The Sheriffs are correct that that the People of Colorado acted through the Colorado Constitution, but in doing so they created and empowered the State of Colorado and its subdivisions.  Colo. Const. Art. II, § 1 ("[a]ll political power is vested in and derived from the people; all government, of right, originates from the people . . . ."); Colo. Const. Art. II, § 2 ("The people of this state have the sole and exclusive right of governing themselves, as a free, sovereign and independent state . . . .").  In the Colorado Constitution, the People of the State of Colorado created the structure of the state government,

making counties and county Sheriff's Offices part of it – a political subdivision of the State of
Colorado.

Alternatively, the Sheriffs argue that the Supreme Court in *Board of Education v. Allen*,
392 U.S. 236 (1968), carved out an exception to the political subdivision doctrine if the plaintiff
has a "personal stake in the outcome" of the litigation.  In *Allen*, a local Board of Education sued
to stop enforcement of a New York statute requiring public school authorities to lend free
textbooks to students at parochial schools.  In a footnote, the Supreme Court noted that the
Board's standing had not been challenged.  However, the Court went on to observe that the
"[plaintiffs] have taken an oath to support the United States Constitution.  Believing [the statute]
to be unconstitutional, they are in the position of having to choose between violating their oath
and taking a step — refusal to comply with [the statute] — that would be likely to bring their
expulsion from office and also a reduction in state funds for their school districts.  There can be
no doubt that [the plaintiffs] thus has a 'personal stake in the outcome' of this litigation." *Allen*,
392 U.S. at 241 n.5 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  The Sheriffs argue that,
like the members of the Board of Education, they are compelled by their oath to enforce both the
U.S. Constitution and state law, yet believe that the state law they are required to enforce violates
the U.S. Constitution, giving them the same "personal stake" in the outcome.

The Tenth Circuit addressed this aspect of *Allen* in *City of Hugo v. Nichols*, 656 F.3d
1251 (10th Cir. 2011).  In that case, the Tenth Circuit specifically considered *Allen* in the context
of the political subdivision doctrine.  The Tenth Circuit explained that in *Allen*, standing was
based on the *individual* board members' personal stake in losing their jobs.  656 F.3d at 1260.  In
other words, the board members were asserting individual claims, rather than "official capacity"
claims.  Thus, even if members of the Board of Education in *Allen* did not have standing to bring

an official capacity claim, its members could bring a claim as individuals who were at risk of losing their jobs if they adhered to the oath they took. .

The same is true in this case.  If individual sheriffs wish to protect individual rights or interests they may do so.  In the Second Amended Complaint, however, the Sheriffs have confused their individual rights and interests with those of the county Sheriff's Office.  They each assert that they have a  stake in the outcome of this litigation because (1) they desire to adhere to their oath of office, (2) must preserve their ability to use *posse comitatus*,[11] (3) it would be burdensome to do background checks before transferring weapons in the routine execution of Sheriff duties (*e.g.* issuing Sheriff's Office-owned firearms to deputies, collecting and maintaining firearms seized as evidence, etc.), and (4) it would compromise the performance  of their office by diverting time and financial resources away from higher law-enforcement priorities.

The latter three interests are all incident to the functioning of a Sheriff's Office, but are not individual rights of the person who serves as Sheriff.  In other words, Mr. Cooke does not have an individual ability to invoke *posse comitatus* or to issue Sheriff's Office firearms to deputies or to direct use of Sheriff Office resources.  Thus, any injuries affecting these rights are suffered by the Sheriff's Office, not Mr. Cooke.  Because such injury is to a political subdivision of the State, they are not the type of injury  to the individual interests of a government official as contemplated in *Allen* and *Hugo*.

The remaining injury identified by the Sheriffs — the duty to avoid violating their oath of office — is a type of "personal stake" or potential injury that is acknowledged in *Allen.*

---

[11] Essentially, the power of law enforcement authorities to call upon the general citizenry for assistance in keeping the peace.  <u>Black's Law Dictionary</u>, 7th Ed. at 1183.  The Sheriffs' argument is thus that a citizenry dispossessed of certain weapons due to the operation of the statutes offers the Sheriffs a less effective "posse."

However, in *Allen*, the Supreme Court characterized this "personal stake" as the dilemma of "choos[ing] between violating their oath and taking a step . . . that would be likely to bring their expulsion from office." 392 U.S. at 241 n. 5. Similarly, the Court in *Hugo* understood standing under *Allen* to be "based on the individual board members' personal stake in losing their jobs." 656 F.3d at 1260. Perhaps there are individual Sheriffs who desire to bring claims in their individual capacities like that asserted in *Allen*. But no individual claims have been asserted in the Second Amended Complaint.[12]

Finally, the Sheriffs contend that they have third-party standing on behalf of (1) the Colorado mounted rangers and their *posse comitatus*, (2) sheriffs and deputies who wish to purchase large-capacity magazines, and (3) current and former Sheriffs who are disabled under the ADA. This argument presents many problems.

First, the Second Amended Complaint makes no mention of the third parties whose rights the Sheriffs seek to vindicate. Third-party standing is asserted for the first time in the Sheriffs' response to the motion to dismiss. Second, for the reasons discussed above, the Sheriff's Office cannot sue the State under substantive provisions of the United States Constitution. And finally, "third-party standing" requires not only an injury in fact and a close relation to the third-party, but also a hindrance or inability of the third-party to pursue his or her own claims." *Terrell v. INS*, 157 F.3d 806, 809 (10th Cir. 1998). The Sheriffs have not explained why the third-parties did not, or cannot, raise the claims on their own.

Accordingly, the Court finds the doctrine of political subdivision standing applies to the Sheriffs' claims in their official capacity. The Sheriffs, in their official capacities, cannot sue the

---

[12] The Court offers no opinion as to whether the Sheriffs could rejoin the lawsuit by seeking to amend the Second Amended Complaint to assert individual capacity claims, nor what specific facts they must assert to successfully state a claim in which they would have such individual standing.

State under the Fourteenth Amendment to the United States Constitution.  With regard to the ADA claims asserted in this case, the Court also finds that the Sheriffs cannot assert them in an official capacity.  The statutory provisions under which the claims are asserted  protect individual rights, and do not specifically provide rights to political subdivisions.  *See City of Hugo*, 656 F.3d at 1257 (the Supreme Court and courts of appeals have allowed a political subdivision to sue its parent state only when Congress has enacted statutory law specifically providing rights to municipalities).

Accordingly, all claims asserted by the Sheriffs in the Second Amended Complaint are DISMISSED for lack of standing.

## IV.  Conclusion

For the forgoing reasons, the Defendant's Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**.  The motion is **GRANTED** with respect to all claims asserted by the Sheriffs.  The claims are **DISMISSED** without prejudice.  Any Sheriff shall have 14 days from the date of this Order in which to seek to join the action in an individual capacity.

The motion is **GRANTED** with respect to the Plaintiffs' claim that the phrase "designed to be readily converted," found in § 18-12-301(2)(a)(I), is unconstitutionally vague, and the claim is **DISMISSED**.

The claims proceeding in this case are (1) Second Amendment challenges to §§ 18-12-301 *et seq*. and § 18-12-112; (2) a claim for unconstitutional vagueness as to the phrase "continuous possession," § 18-12-302(2)(a)(II); and (3) the ADA claims.

Dated this 27th day of November, 2013.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge