Nos. 14-1290, -1292

In The
United States Court of Appeals
For the Tenth Circuit

COLORADO OUTFITTERS ASSOCIATION, et al.,

*Plaintiffs-Appellants,*

v.

JOHN W. HICKENLOOPER,

*Defendants-Appellees.*

JIM BEICKER, SHERIFF OF FREMONT COUNTY, et al.,

*Plaintiffs-Appellants,*

v.

JOHN W. HICKENLOOPER,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
THE HONORABLE CHIEF JUDGE MARCIA S. KRIEGER
CASE NO. 13-CV-1300-MSK

**AMICUS CURIAE BRIEF FOR THE CONGRESS OF RACIAL EQUALITY,
PINK PISTOLS, WOMEN AGAINST GUN CONTROL, DISABLED
SPORTSMEN OF NORTH AMERICA, AND SECOND AMENDMENT
SISTERS IN SUPPORT OF PLAINTIFFS-APPELLANTS**

Brian S. Koukoutchos
28 Eagle Trace
Mandeville, LA 70471
(985) 626-5052
bkoukoutchos@gmail.com

*Counsel for* Amici Curiae

Appellate Case: 14-1290    Document: 01019373884    Date Filed: 01/23/2015    Page: 2

## CORPORATE DISCLOSURE STATEMENT

None of the *amici* has a parent corporation nor does any publicly held corporation own 10% or more of the stock of any *amicus*.

<u>s/Brian S. Koukoutchos</u>
Brian S. Koukoutchos

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT............................................i

TABLE OF AUTHORITIES.......................................................ii

INTEREST OF *AMICI CURIAE* ............................................. 1

INTRODUCTION ............................................................ 2

ARGUMENT ................................................................ 3

I.   THE DISTRICT COURT CORRECTLY HELD THAT COLORADO'S MAG-
     AZINE LIMIT INFRINGES SECOND AMENDMENT RIGHTS...............   3

II.  EVEN IF INTERMEDIATE SCRUTINY WERE THE PROPER STAND-
     ARD, THE DECISION BELOW MUST BE REVERSED BECAUSE THE
     DISTRICT COURT MISCONCEIVED THE SECOND AMENDMENT LIB-
     ERTY AND COLORADO FAILED TO PROVE THAT ITS MAGAZINE
     LIMIT WILL SUBSTANTIALLY ADVANCE THE STATE'S GOAL. ........   4

     A.   Colorado Enacted the Magazine Limit To Reduce Casu-
          alties During Mass Shootings by Forcing Shooters To
          Reload More Often, Thereby Creating Pauses During
          Which Victims Might Hide, Flee or Overwhelm the
          Shooter...........................................................   4

     B.   The District Court Erroneously Held that the Constitu-
          tion Is Satisfied so Long as a State's Laws Do Not *In-
          fringe the Rights of Law-Abiding Citizens* More than
          They *Inconvenience Homicidal Psychopaths.* ..................   6

     C.   The State Must Marshal Extensive Empirical Evidence
          that Its Magazine Ban Will Substantially Advance the
          Goal of Reducing Bloodshed During Shootings. ..............   9

Appellate Case: 14-1290    Document: 01019373874    Date Filed: 01/23/2015    Page: 4

D.    The Magazine Limit Is Unconstitutional Because Colorado's Evidence Fails To Prove that It Will Substantially Advance the State's Goal of Reducing Injuries from Mass Shootings.................................................    12

    1.    *Colorado's evidence for the "anticipated reduction in the number and magnitude of injuries" from mass shootings from its fifteen-round limit was drawn from studies of the federal ten-round limit, which under Colorado's own reasoning expands the opportunities for mass mayhem that the statute was enacted to prevent.* ..........................................    12

    2.    *The district court upheld the Magazine Limit on the premise that it will create a life-saving "critical pause" —but this pause is a beguiling fiction born of wishful thinking and exposed as a false hope by the very atrocities that gave birth to the challenged law.* ..........................................................    18

    3.    *Colorado has not proven that its Magazine Limit will reduce firearms violence in general, even apart from mass shootings.*.................................................    28

CONCLUSION .................................................................    32

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Bolden v. City of Topeka*, 327 Fed. App'x 58 (10th Cir. 2009) ............ 9, 10

*Brown v. Louisiana*, 383 U.S. 131 (1966) .................................................. 8

*Colorado Outfitters Ass'n v. Hickenlooper*,
24 F. Supp. 3d 1050 (D. Colo. 2014) ............................................ *passim*

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................... 2, 4, 9, 11

*Edwards v. California*, 314 U.S. 160 (1941) ............................................ 27

*Ezell v. Chicago*, 651 F.3d 684 (7th Cir. 2011) ...................................... 11

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) .............................. 32

*McDonald v. Chicago*, 561 U.S. 742 (2010) ...................................... 10, 12

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ........................... *passim*

*Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013) .............................. 9

*Robb v. Hungerbeeler*, 370 F.3d 735 (8th Cir. 2004) ................................ 8

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ................... *passim*

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012) ...................... 11, 32

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010) ............................ 9

*United States v. Virginia*, 518 U.S. 515 (1996) .................................. 9, 10

## Legislative and Statutory Materials

WILLIAM J. KROUSE, CONG. RESEARCH SERV., RL32842, GUN CONTROL
LEGISLATION (2012), *available at* http://goo.gl/LJixGy. ...................... 31

COLO. REV. STAT.

§ 18-12-301(2)(a)(I) ................................................................................ 2

§ 18-12-302 ................................................................................. *passim*

## Other

Alan Leshner *et al.*, INST. OF MED. & NAT'L RESEARCH COUNCIL, PRI-
ORITIES FOR RESEARCH TO REDUCE THE THREAT OF FIREARM-RE-
LATED VIOLENCE (2013) ................................................................. 27, 28

Alex Klein, *A Look at the Aurora Shooter's Guns*, THE DAILY BEAST (July 22, 2012), http://goo.gl/sa8Mpf ............................................. 21, 22

Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban*, *1994-2004*, *in* REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS (Daniel W. Webster & Jon S. Vernick eds., 2013) ............................... 31

CNN Wire, *Colorado Shooter James Holmes Had 100-round Rifle Magazine*, ABC15.COM (July 20, 2012, 3:08PM), http://goo.gl/q2Y7Lb ............................................................................ 20

Dan Baum, *The Price of Gun Control*, HARPER'S MAGAZINE (July 20, 2012, 7:30PM), *available at* http://goo.gl/LBhycc/ ............... 31

Dave Cullen, COLUMBINE (2009) .................................................. 21, 24, 25

James Alan Fox & Jack Levin, EXTREME KILLING: UNDERSTANDING SERIAL AND MASS MURDER (3d ed. 2015) ...................................... 16, 17

James Alan Fox *et al.*, *Mass Shootings in America: Moving Beyond Newtown*, 18 HOMICIDE STUDIES 125 (2013), *available at* http://goo.gl/sklrTI .................................................................... 16, 17

Jeffrey Zax, *The Federal LCM Ban and the Virginia Firearms Clearinghouse Data* (unpublished manuscript prepared for use at trial 2014) ........................................................................................ 29

Karen E. Crummy, *Hickenlooper: Tougher Gun Laws Would Not Have Stopped the Shooter*, THE DENVER POST (July 22, 2012, 10:57AM), http://goo.gl/9Y36dV ......................................................... 22

Mark Follman *et al.*, *A Guide to Mass Shootings in America*, MOTHER JONES (Feb. 27, 2013, 9:32PM), http://goo.gl/22leSW .......... 15

Matthew Lysiak, NEWTOWN: AN AMERICAN TRAGEDY (2013) ........... 22, 23

Virginia Tech Review Panel, *Mass Shootings at Virginia Tech Report* (Apr. 16, 2007), *available at* http://goo.gl/XtSEB5 ...................... 25

W. Hays Parks, *Joint Service Combat Shotgun Program*, 1997 ARMY LAW. 16 .............................................................................. 20

Appellate Case: 14-1290   Document: 01019373874   Date Filed: 01/23/2015   Page: 7

## INTEREST OF *AMICI CURIAE*

*Amici* are organizations representing segments of the American population that are disproportionately the targets of armed criminal violence and that support the right to keep and bear arms.[1] CORE, The Congress of Racial Equality, has been one of America's leading African-American civil rights organizations for more than 70 years. Pink Pistols is a national society that honors gender and sexual diversity and advocates the responsible use of firearms for self-defense; its creed is: "Without self-defense, there are no gay rights." Women Against Gun Control has been a leading national advocacy group for Second Amendment rights for two decades; its motto is: "The Second Amendment *is* the Equal Rights Amendment." Disabled Sportsmen of North America serves the interests of disabled Americans in pursuing the shooting sports and the responsible use of firearms for self-defense. Many of America's disabled citizens who engage in shooting sports were disabled during military service. Second Amendment Sisters is an advocacy group dedicated to preserving the

---

[1] This brief was not authored in whole or in part by a party or a party's counsel. No one other than *amici*, their members and their counsel funded this submission. The parties have graciously consented to its filing.

1

fundamental right of self-defense and promoting responsible gun owner-

ship.

## INTRODUCTION

Colorado's Magazine Limit outlaws the possession of firearm mag-

azines that hold more than fifteen rounds of ammunition. COLO. REV.

STAT. §§ 18-12-301(2)(a)(I), 18-12-302(1)(a). Because Colorado criminal-

izes magazines that are "of the kind in common use . . . for lawful pur-

poses," the Act violates the Second Amendment. *District of Columbia v.*

*Heller*, 554 U.S. 570, 624 (2008) (internal quotation marks omitted).

Assuming *arguendo* that "intermediate scrutiny" is the proper

standard of review, the decision below should be reversed because it is

logically impossible to prove—on the basis of the data presented to the

district court, which classify mass shootings into (a) those perpetrated

with magazines of ten rounds or fewer and (b) those perpetrated with

magazines of more than ten rounds—that Colorado's fifteen-round limit

will have any effect. The data on mass shootings on which the State pred-

icates its defense—which are not scholarly research but mere compila-

tions of news clippings—are artifacts of the now-defunct federal ten-

round magazine limit, and therefore were simply not designed to support

any conclusions with respect to Colorado's fifteen-round limit.

Furthermore, the court below conceded that Colorado's magazine restriction will impair the ability of citizens to use firearms in self-defense—an issue of particular interest to the *amici* here, who belong to demographic groups who are disproportionately the victims of armed criminal violence erroneously. *Yet the court held, in an opinion that beggars belief, that the Second Amendment is satisfied so long as a State's gun regulations do not infringe the rights of law-abiding citizens any more than they inconvenience homicidal psychopaths.* Surely that cannot be the law.

## ARGUMENT

### I.   THE DISTRICT COURT CORRECTLY HELD THAT COLORADO'S MAGAZINE LIMIT INFRINGES SECOND AMENDMENT RIGHTS.

The district court held that the "*scope*" of Colorado's law "touches the *core* of an individual right guaranteed by the Second Amendment— the right to keep and bear (use) firearms for the purpose of self and home defense." *Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1069 (D. Colo. 2014) (original emphasis). The court endorsed the parties' stipulations that "lawfully owned semiautomatic firearms using a maga-

zine with a capacity of greater than 15 rounds number in the tens of mil-

lions," and that these "firearms are commonly used for multiple lawful

purposes, including self-defense." *Id.* at 1068. The court therefore cor-

rectly held that "the statute burdens the core right protected by the Sec-

ond Amendment," *id.*, because *Heller* guarantees law-abiding citizens

"the right to possess those weapons that are 'in common use' for 'self-

defense' purposes," *id.* at 1067 (quoting *Heller*, 554 U.S. at 624–25).

II. **EVEN IF INTERMEDIATE SCRUTINY WERE THE PROPER STANDARD, THE DECISION BELOW MUST BE REVERSED BECAUSE THE DISTRICT COURT MISCONCEIVED THE SECOND AMENDMENT LIBERTY AND COLORADO FAILED TO PROVE THAT ITS MAGAZINE LIMIT WILL SUBSTANTIALLY ADVANCE THE STATE'S GOAL.**

A. **Colorado Enacted the Magazine Limit To Reduce Casualties During Mass Shootings by Forcing Shooters To Reload More Often, Thereby Creating Pauses During Which Victims Might Hide, Flee, or Overwhelm the Shooter.**

The court found that, "[a]ccording to Colorado" itself, the

> objective in passing § 18-12-302 was to reduce the number and magnitude of injuries caused by gun violence, *specifically in mass shootings*. The legislative record reflects that members of the General Assembly were acutely aware of the Aurora Theater shooting in 2012, as well as other *mass shootings* inside and outside Colorado.

*Id.* at 1071-72 (emphasis added). Reducing bloodletting during mass

shootings is plainly an important objective. Yet it is crucial to note that

reducing the supposedly aggravating influence of ammunition magazines on mass shootings is (1) *the key—arguably the only—objective identified by the Colorado legislature and* (2) *the only basis on which the court below rejected the Second Amendment challenge* to the Magazine Limit. *See id.* at 1054, 1055 & n.5, 1068-73.[2]

The court reasoned that capping magazines at fifteen rounds ensures that there will be a pause while a shooter reloads. *See id.* at 1072-73. Obviously, *any* magazine limit imposes such a pause, but evidently Colorado concluded that a pause after every fifteen shots was better than a pause after every seventeen or eighteen—even though these are the regular sizes for magazines that come standard-issue with many of the most common and popular semiautomatic firearms used by civilians for the lawful purposes of target shooting, hunting and self-defense.

The theory is that this so-called " 'critical pause' . . . gives potential victims an opportunity to hide, escape, or attack the shooter." *Id.* at 1072.

---

[2] After expressly finding that the Colorado Assembly focused on mass shootings, the court noted in passing that the legislature also touched briefly on the possibility of reducing firearms violence in general. *See id.* at 1071-72. This proposition and the dearth of evidence for it are discussed *infra* in Part II.D.3.

The district court brushed aside the awkward fact that "skilled shooters"—and it is undisputed that all mass shooters practice and prepare elaborately for their assaults—"can reload more quickly than can unskilled shooters, which would reduce the duration of the critical pause. That is undoubtedly true, but also largely irrelevant." *Id.* at 1073. What matters, we are told, is that "[a] pause, of any duration, imposed on the offensive shooter can only be beneficial, allowing some period of time for victims to escape, victims to attack, or law enforcement to intervene." *Id.*

### B.    The District Court Erroneously Held that the Constitution Is Satisfied so Long as a State's Laws Do Not *Infringe the Rights of Law-Abiding Citizens* More than They *Inconvenience Homicidal Psychopaths.*

Having accepted Colorado's rationale that forcing everyone to reload more often would be a boon to public safety, the district court *conceded* that such a rule would infringe the right to bear arms of law-abiding citizens. Yet the court was unmoved, *because rough parity between criminals and their victims is supposedly all that the Second Amendment requires:*

> *The pause compelled by the limitation on magazines also could temporarily impair a defensive shooter*, but beyond acknowledging that fact, *there are too many external variables to permit a conclusion that pauses effectively compelled on both sides are necessarily better or worse than having no such*

6

*pauses on either side.*

*Id.* (emphasis added). To be clear: the court ruled that, so long as limiting magazine capacity *affects mass-murderers and law-abiding citizens equally*—by compelling everyone to reload more often with smaller magazines—the law does not infringe the Second Amendment.

Lest it appear that this was merely an instance of infelicitous phrasing, the district court reiterated that Colorado's Magazine Limit is constitutional because its "restriction will, at a minimum, reduce the ready availability of large-capacity magazines *to both criminals and law-abiding citizens.*" *Id.* (emphasis added).

The problem is not that the court below effectively threw up its hands and called the evidentiary contest over magazine capacity and firearms violence to be a draw (it isn't, *see* Part II.D. below). The problem is that the court ruled that the Second Amendment is satisfied so long as the *rights of law-abiding citizens are infringed* no more than the *homicidal schemes of mass killers are inconvenienced*. This is perverse and it

cannot be the law.[3] The district court would have us believe that, *regardless* whether "the legislature's decision might *raise the risk of harm to the public* in some" mass shootings, while "diminishing it in others[,] does not defeat the conclusion that the legislature's decision was substantially related" to its interest in reducing the casualties from mass shootings. *Id.* at 1073 (emphasis added).

The court below could not have been more wrong. It found that Colorado predicated the challenged law on threats to "public safety"—"*specifically in mass shootings.*" *Id.* at 1072 (emphasis added). But "[e]ven with an important purpose, however, *Colorado must prove* that the 15-round limitation in § 18-12-302 is *substantially related to an anticipated*

_____

[3] Thus, we are told that the enumerated rights of law-abiding citizens may be disregarded based *not* on what *they* have done with their magazines, but on the violence that the State anticipates from psychotic criminals who lurk on society's fringe. But to ban standard-capacity magazines because criminals use them is to tell law-abiding citizens that their liberties depend not on their own conduct, but on the conduct of the lawless, and that the law can vouchsafe the law-abiding only such rights as the lawless will allow. This cannot be. Just as "[t]he First Amendment knows no heckler's veto," *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004), the Second Amendment cannot tolerate infringements based on the threat to public safety posed *not* by law-abiding citizens but by criminals who may obtain such firearms, legally or otherwise, *cf. Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966).

Appellate Case: 14-1290    Document: 01019375574    Date Filed: 01/23/2015    Page: 15

*reduction in the number and magnitude of injuries . . .*" from mass shootings. *Id.* (emphases added). If the Magazine Limit will impair the utility of firearms to "both criminals and law-abiding citizens" equivalently*,* and "raise the risk of harm to the public in some" mass shootings while "diminishing it in others," *id.* at 1073, then it is inconceivable that the challenged statute could survive intermediate scrutiny.

Indeed, *a net effect of zero* on the casualties from mass shootings would not enable the Magazine Limit to survive even rational-basis review. The court below acknowledged that "the statute burdens the core right protected by the Second Amendment." *Id.* at 1068. Such a law must meet a standard more rigorous than rationality. *See Heller*, 554 U.S. at 628 n.27; *United States v. Reese*, 627 F.3d 792, 801–02 (10th Cir. 2010); *Peterson v. Martinez*, 707 F.3d 1197, 1222 (10th Cir. 2013) (Lucero, J., concurring).

### C.   The State Must Marshal Extensive Empirical Evidence that Its Magazine Ban Will Substantially Advance the Goal of Reducing Bloodshed During Mass Shootings.

Even if the proper standard of review were intermediate scrutiny, which it is not, "*[t]he burden of justification is demanding and it rests entirely on the State.*" *United States v. Virginia*, 518 U.S. 515, 533 (1996)

(emphasis added). This Court's usual "presum[ption] that state legislatures have acted within their constitutional power" does not apply when "a state law trammels fundamental personal rights." *Bolden v. City of Topeka*, 327 Fed. App'x 58, 61 (10th Cir. 2009).

The Supreme Court has spurned the impertinent suggestion that courts may "treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ." *McDonald v. Chicago*, 561 U.S. 742, 780 (2010). And when it has applied intermediate scrutiny in other areas, the Court has required the government to demonstrate an "*exceedingly persuasive justification*" for a challenged statute. *Virginia*, 518 U.S. at 531 (emphasis added). The State must prove with "*substantial* evidence" that the statute "*will* alleviate" the identified harm "*in a material way*." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (emphasis added).

As noted, the court below conceded that Colorado "must prove" that its Magazine Limit "*is substantially related to an anticipated reduction in the number and magnitude of injuries caused by the use of large-capacity magazines*." *Colorado Outfitters*, 24 F. Supp. 3d at 1072 (emphasis added). Colorado must mount a "pragmatic defense" of its Magazine

10

Appellate Case: 14-1290    Document: 01019373574    Date Filed: 01/23/2015    Page: 17

Limit and "marshal *extensive empirical evidence*" that the law "[i]s *vital to public safety*." *Moore v. Madigan*, 702 F.3d 933, 939–40 (7th Cir. 2012) (emphases added). *See also id.* at 939 (striking down statute banning any public carrying of firearms because "the empirical literature on the effects of allowing the carriage of guns in public fails to establish a pragmatic defense of the Illinois law"). The State must adduce "tangible evidence," not merely "unsupported intuitions." *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012). *See Ezell v. Chicago*, 651 F.3d 684, 709 (7th Cir. 2011) ("[T]he government must supply actual, reliable evidence to justify restricting protected [activity] based on secondary public-safety effects.").

If the evidence presented on the effectiveness of a firearms regulation is inconclusive, *then the constitutional stature of the Second Amendment trumps the policy objective of the State.* Despite "the problem of [firearms] violence in this country," the "enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. As the Seventh Circuit explained while invalidating Illinois' total ban on the public carrying of firearms:

> The theoretical and empirical evidence (*which overall is inconclusive*) is consistent with concluding that a right to carry

firearms in public may promote self-defense. Illinois had to provide us with more than merely a rational basis for believing that its uniquely sweeping ban is justified by an increase in public safety. It has failed to meet this burden.

*Moore*, 702 F.3d at 942 (emphasis added).[4]

> **D.    The Magazine Limit Is Unconstitutional Because Colorado's Evidence Fails To Prove that It Will Substantially Advance the State's Goal of Reducing Injuries from Mass Shootings.**

Colorado cannot meet this standard because all of its evidence relates to ten-round magazine limits—not fifteen—and thus Colorado's 50%-higher limit would permit most of the bloodshed it was enacted to staunch, and because Colorado's expert witness—the centerpiece of the State's defense—impeached his own testimony.

---

[4] The Second Amendment is not the only rights guarantee that "has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *McDonald*, 561 U.S. at 782 (controlling opinion of Alito, J.). The Constitution "generates substantial social costs," which may "include setting the guilty free and the dangerous at large." *Id.* at 783 (internal quotation marks omitted). This is the price of liberty.

1.     Colorado's evidence for the "anticipated reduction in the number and magnitude of injuries" from mass shootings from its fifteen-round limit was drawn from studies of the federal ten-round limit, which under Colorado's own reasoning expands the opportunities for mass mayhem that the statute was enacted to prevent.

The problem for Colorado is that *all of the evidence* on which it relies to show that its fifteen-round limit will reduce casualties in mass shootings is based on the former federal ban (in place from 1994–2004) on magazines holding more than ten rounds. Those data compilations rarely specify magazine capacity other than in a simple binary manner—that is, a magazine used in a crime is classified either as holding more than ten rounds or fewer than eleven. As a matter of logic, data of this kind are simply incapable of distinguishing the public-safety impact of magazines holding fifteen rounds from magazines holding more than fifteen, for the simple reason that the data do not tell us whether the magazine was outlawed by the now-defunct federal ban for holding eleven rounds— or twelve, or fourteen or thirty. Thus there is no basis on which to infer that Colorado's fifteen-round limit would have made *any difference* in any of the past crimes or mass shootings on which Colorado relies to justify its infringement of Second Amendment rights.

The district court relied on the State's principal expert, Professor

Jeffrey Zax, for its finding that Colorado had "prove[n] that the 15-round limitation in § 18-12-302 is substantially related to an anticipated reduction in the number and magnitude of injuries" from mass shootings. *Colorado Outfitters*, 24 F. Supp. 3d at 1072. As explained above, this was erroneous as a matter of both law and logic.

Moreover, Professor Zax irretrievably impeached his own testimony. He admitted that he is a labor economist entirely unschooled in criminology, 17 App. 3576, 3578, firearms, *id.* at 3579, 3684, and mass shootings, *id.* at 3725–26. Zax has never published *any* research relating to crime or firearms. *Id.* at 3576–81. This case was his introduction to the subject. *Id.* He admitted under oath that he cannot forecast or quantify any reduction in carnage from mass shootings if magazines holding more than fifteen rounds become less available, *id.* at 3728, and that he has "no data to support the notion that mass shooters will be affected by the increased cost of obtaining" such magazines, *see id.* at 3728–29. Professor Zax concluded his testimony with a telling admission that negated everything he had said in support of the Magazine Limit. He was asked whether there was *any* evidence "for the notion that there are people who wanted to commit a mass shooting but were unable to because [they]

14

didn't have an LCM [magazine of more than fifteen rounds] . . . ." *Id.* at

3730.

> [Prof. Zax]: "Maybe I need to clarify this. There is [*sic*] most certainly data. There are the experiences that have been reported . . . through *Mother Jones* [magazine], through [the advocacy group] Mayors Against Illegal Guns. Now, *that data has [sic] not been assembled in such a way as to make the inquiry that you propose feasible*; but that data does exist . . . .
> "*And one of the striking elements of this entire proceeding is how many opinions are being offered on matters which could be quantified, but which no one has expended the effort to do so*."
> [Counsel]: "And your testimony, then, is that no one has done so with respect to the question I asked?"
> [Prof. Zax]: "To this point, no."

*Id.* at 3730–31 (emphasis added). In that italicized passage, Colorado's

own expert concedes that *nobody—including himself*—has "expended the

effort" to collect and analyze the data needed to support the Colorado law.

Therefore there is no "substantial evidence" that the Magazine Limit

"will alleviate" the identified harm "in a material way." *Turner Broad.*,

520 U.S. at 195. According to the sworn testimony of its star witness,

Colorado has manifestly failed to "marshal extensive empirical evidence"

that the law "[i]s vital to public safety." *Moore*, 702 F.3d at 939–40.

Professor Zax made passing reference to a compilation of news reports of mass shootings put together by the magazine *Mother Jones*. 17

App. 3730.[5] But this article has been systematically debunked in the scholarly literature.[6] Despite the horrors of recent mass shootings, the truth is that "[m]ass shootings have not increased in number or in overall death toll, at least not over the past several decades."[7] *Mother Jones* reached the opposite conclusion only because it manipulated the data set, hand-picking 62 incidents out of the FBI database of 927 mass shootings between 1976 and 2011,[8] and excluding inconvenient data that did not fit its predetermined conclusion.[9] *Mother Jones* did not even apply its skewed selection criteria "consistently."[10] It offered only the lame excuse that its journalism was focused on "senseless" mass shootings[11]—which begs the question of precisely what a "sensible" massacre would look like.

---

[5] This appears to be a reference to Mark Follman *et al., A Guide to Mass Shootings in America*, MOTHER JONES (Feb. 27, 2013, 9:32PM), http://goo.gl/22leSW (all sites last visited Jan. 22, 2015).

[6] *See* James Alan Fox *et al., Mass Shootings in America: Moving Beyond Newtown*, 18 HOMICIDE STUDIES 125 (2013), *available at* http://goo.gl/sklrTI.

[7] *Id.* at 128.

[8] James Alan Fox & Jack Levin, EXTREME KILLING: UNDERSTANDING SERIAL AND MASS MURDER 161-63 (3d ed. 2015).

[9] *Id.* at 161-62.

[10] *Id.* at 162.

[11] *Id.* at 161, 162.

16

Bereft of actual "substantial evidence" that the challenged law "will alleviate" the harm "in a material way," which is what even intermediate scrutiny requires, *Turner Broad.*, 520 U.S. at 195, the district court, Colorado, and its star witness are reduced to citing shoddy journalism.

Professor James Alan Fox, Lipman Family Professor of Criminology, Law, and Public Policy at Northeastern University and the preeminent authority on mass homicide, has concluded that the notion that restoring the federal ban on "assault weapons" and ten-round magazines—a ban 50% more restrictive than Colorado's fifteen-round limit—"will prevent these horrible crimes" is a "myth."[12] "[A] comparison of the incidence of mass shootings during the 10-year window when the [federal ban] was in force against the time periods before implementation and after expiration shows that the legislation had virtually no effect" on mass shootings.[13] The problem is the "overwhelming majority of mass murderers . . . could have identified an alternate means of mass casualty if that were

---

[12] Fox, 18 HOMICIDE STUDIES at 136. Professor Fox has published 18 books and hundreds of articles and columns on the subject, and been an advisor to Presidents, Attorneys General, and the Bureau of Justice Statistics. *See* Fox, EXTREME KILLING, *supra* note 8, at 345.

[13] Fox, 18 HOMICIDE STUDIES at 136.

necessary,"[14] such as the omnipresent, wholly unregulated, and exceedingly lethal turkey-hunting shotgun. *See infra* note 18. Professor Fox concluded: "Eliminating the risk of mass murder would involve extreme steps that we are unable or unwilling to take—abolishing the Second Amendment . . . and rounding up anyone who looks or acts at all suspicious."[15]

> 2.   *The district court upheld the Magazine Limit on the premise that it will create a life-saving "critical pause"—but this pause is a beguiling fiction born of wishful thinking and exposed as a false hope by the very atrocities that gave birth to the challenged law.*

The court below accepted Colorado's theory that reducing magazine capacity is justified by the creation of a " 'critical pause' because it gives potential victims an opportunity to hide, escape, or attack the shooter." *Colorado Outfitters*, 24 F. Supp. 3d at 1072. But the court's embrace of this notion is rendered untenable by the very examples upon which it relies. The court noted that legislative supporters of the "critical pause" notion

point[ed] to several shooting incidents, including those that

---

[14] *Id.*

[15] *Id.* at 141.

18

took place at the Aurora theater, at a Safeway in Tucson, Arizona, and at an elementary school in Sandy Hook, Connecticut, when a pause allowed a shooter to be overcome, law enforcement to intercede, or potential victims to flee.

*Id.* at 1072-73. In truth, these examples negate the district court's conclusion that reducing ammunition capacity below the level of standard magazines creates critical pauses that save lives.

**The Aurora Theater**. The pause in James Holmes' rampage was induced not by limited magazine capacity but by the fact that his rifle jammed.[16] That's what allowed some of the 400 potential victims to flee. The district court was forced to concede that a "weapon malfunction or jam can be as effective as mandatory reloading in creating a critical pause. However, one cannot predict whether or when a firearm will malfunction." *Id.* at 1073. True enough, yet the court's answer begs the question why neither the State nor the court could offer a better example than Aurora of the supposed magazine-limit "critical pause" that, we are told, justifies infringement of Second Amendment rights.

Aurora likewise fails as an example of the court's theory that a

---

[16] *See* 17 App. 3539:5-11 (testimony of Colorado witness Douglas Fuchs); *id.* at 3637-38 (parties' stipulation on facts of Aurora shooting). When Holmes tried to reload his rifle with different magazines, it malfunctioned again. *Id.* at 3638 (parties' stipulation of facts on Aurora).

pause to reload (or to switch firearms) enables victims to overwhelm the shooter. Given the mere seconds it takes to hit a magazine release button and shove in a fresh magazine, this route to salvation is more dubious than dauntless. There were 400 patrons in the theater, but nobody ever charged Holmes: not when he switched from his shotgun to his rifle, not when his rifle jammed on its 100-round magazine, not when he tried to reload the rifle with 30-round magazines, not when he switched to his pistol—never. And who could blame them? Holmes still had a handgun (with a single, fifteen-round magazine legal under Colorado law),[17] and he also had a Remington 870 pump shotgun (typically used for hunting ducks or turkeys, and with a tubular magazine legal under Colorado law), and dozens, if not hundreds, of 12-gauge shells—and a shotgun is far more deadly in a mass-shooter situation than even a fully automatic machinegun.[18]

---

[17] *Id.* at 3637 (parties' stipulation).

[18] *See* W. Hays Parks, *Joint Service Combat Shotgun Program*, 1997 ARMY LAW. 16, 18, 20 (discussing military study concluding that old-fashioned pump shotguns are far more lethal than fully automatic machineguns out to a range of 70 yards); CNN Wire, *Colorado Shooter James Holmes Had 100-round Rifle Magazine*, ABC15.COM (July 20, 2012, 3:08PM) (Steven Howard, a "security and firearms expert" and a "former U.S. Border Patrol Agent," explained that a shotgun "would do

When Holmes stopped shooting, it wasn't because a "critical pause" had allowed some of his targets to overwhelm him, nor because he'd run out of either ammunition or victims—he had simply gotten bored, which is not uncommon among mass shooters.[19] Nor did any "critical pause" enable law enforcement to intervene. The police reacted swiftly, so they are not to be faulted. But police intervention was unnecessary to stop the slaughter of the innocents. Holmes wandered out of the theater before he ran out of ammo; when the police arrived, Holmes was in the parking lot,

_____

more damage among a tightly packed theater audience because its ammunition comes out of the weapon in a reverse funnel shape and would disperse across a wider area . . . . In a theater scenario, . . . so many people's heads are lined up next to each other that if you fire down these rows of people . . . one [shotgun] blast is going to kill or seriously injure 10 or 15 people . . . ." (penultimate alteration in original)), http://goo.gl/q2Y7Lb; Alex Klein, *A Look at the Aurora Shooter's Guns*, THE DAILY BEAST (July 22, 2012) (Holmes had purchased 300 shotgun shells and never ran out of ammunition.), http://goo.gl/sa8Mpf.

[19] *See* Dave Cullen, COLUMBINE 350-51 (2009) (this behavior is "normal for a psychopath"; the Columbine shooters "got bored" seventeen minutes into their attack; "[k]illing had turned tedious," and they "roamed aimlessly" around the school shooting up "empty classrooms," ignoring "[a]t least two or three hundred kids [who] remained in the school.").

idly shooting holes in his own car.[20] As Colorado Governor John Hick-
enlooper said in the wake of Holmes' massacre, "[i]f it was not one
weapon, it would have been another, and he was diabolical."[21]

*The Sandy Hook School*. No matter how long a critical pause
might last, nobody could seriously expect six-year-old children to subdue
an armed adult.[22] Before he brought chaos and horror to the Newtown
School in Sandy Hook, Adam Lanza had practiced "tactical reloads" with
the AR-15, just as soldiers and police are taught; thus Lanza was swap-
ping out his magazines before they were empty to maintain ammunition
in his weapon at all times so that he could lay down fire, thereby leaving
no opportunity for his intended victims to escape.[23] There was never a
time when Lanza was out of ammunition or short on victims.[24] Colorado's
witness Douglas Fuchs, a Connecticut police officer, testified that Lanza

---

[20] Klein, *A Look at Aurora Shooter's Guns*, *supra* note 18.

[21] *See* Karen E. Crummy, *Hickenlooper: Tougher Gun Laws Would
Not Have Stopped the Shooter*, THE DENVER POST (July 22, 2012,
10:57AM), http://goo.gl/9Y36dV.

[22] Of the 26 people gunned down at Newtown, 20 were first-graders.
*See* Matthew Lysiak, NEWTOWN: AN AMERICAN TRAGEDY 156 (2013).

[23] *See* 17 App. 3547–3551, 3553, 3561 (testimony of Colorado wit-
ness Douglas Fuchs).

[24] *Id.* at 3561.

made seven magazine exchanges with his AR-15 and that nobody was able to tackle him or flee during those supposedly "critical pauses."[25] The students who escaped death at Newtown did so due to the quick thinking and courage of teachers who rushed them out the back of the school through doors that were not near where Lanza was killing people, or who barricaded and hid their students in classrooms *other* than the rooms in which, at any given moment of the massacre, Lanza was shooting people.[26] He stopped doing so only when he heard the police sirens; then he killed himself.

A more general point about the district court's "hide or flee" hope must also be made: there is never a shortage of targets when a mass shooter opens fire—that's part of the reason such killers select crowded public spaces, theaters, and schools in which to vent their homicidal madness. Thus for every potential victim quick (and lucky) enough to escape while a shooter reloads his gun with another statutorily limited magazine, there will always be two or three or twenty innocent souls who are

---

[25] *Id.* at 3548. It is possible that six children may have been able to escape the school when Lanza's rifle jammed. *Id.* at 3535, 3543-44, 3561-62.

[26] *See* Lysiak, Newtown, *supra* note 22, at 91-92, 96; 17 App. 3548.

paralyzed with fear or who cannot find an exit in time and who therefore die.[27] Although an escape would be of infinite comfort to the family of any child (or other victim) who gets away, the public policy of reducing bloodshed overall is little served by the district court's critical-pause theory and it therefore cannot be said that the Magazine Limit, even if on rare and unpredictable occasions it induces a pause during which a victim actually escapes, is "*substantially related to an anticipated reduction in the number and magnitude of injuries*" from mass shootings. *Colorado Outfitters*, 24 F. Supp. 3d at 1072 (emphasis added).

**Columbine.** Colorado's fifteen-round magazine limit would have made no difference at Columbine High School. Eric Harris did most of his killing with a 9mm Hi-Point rifle, which he constantly reloaded with a succession of ten-round magazines—entirely legal even under Colorado's new law.[28] Harris and Dylan Klebold were also armed with one pump shotgun and one double-barreled shotgun—again, there was no violation

---

[27] At Columbine, students tried to hide under library tables where they remained in plain sight. Shooters Harris and Klebold simply squatted to shoot them. *See* Cullen, COLUMBINE, *supra* note 19, at 77, 83-84, 205, 226-27.

[28] Cullen, COLUMBINE, *supra* note 19, at 46-51.

of Colorado's Magazine Limit and these were weapons of very limited ammo capacity (two rounds for one shotgun, four or five for the pump gun) that should have, under the district court's theory, allowed myriad opportunities to tackle the killers.[29] But none of the two thousand high school students or teachers ever tried. When Harris was alone outside the high school and vulnerable—on several occasions because he was changing out empty ten-round magazines and at one point when his rifle jammed—a police officer stationed at the school fired repeatedly at Harris, but missed.[30] So much for the salvation of a "critical pause" allowing law enforcement to intervene. The theory is far more comforting than the reality.[31]

---

[29] *Id*. Klebold also carried a 9mm TEC-9 pistol, *id*. at 48, 335, which can accommodate up to a thirty-round magazine, *id*. at 36. However, it is uncertain what size magazine Klebold's gun was equipped with that day. What is known is that Klebold relied on his shotgun and rarely fired his handgun at his victims, perhaps as few as three times. *Id*. at 48-49, 51.

[30] *Id*. at 51.

[31] Similarly, Colorado's Magazine Limit would not have reduced the carnage at Virginia Tech on April 16, 2007, when Seung-Hui Cho killed 32 people using ten- and fifteen-round magazines. The official inquiry concluded that exclusive use of "10-round magazines that were legal would have not made much difference in the incident." Virginia Tech Review Panel, *Mass Shootings at Virginia Tech Report* at 71, 74 (Apr. 16, 2007), *available at* http://goo.gl/XtSEB5.

*The Safeway parking lot in Tucson*. Jared Loughner's attempt to murder Congresswoman Gabby Giffords in 2011 during a political meet-and-greet in a grocery-store parking lot is another example that provides poor precedent for the district court's critical-pause theory. Insofar as he was tackled and disarmed by members of the crowd, Loughner would appear (finally) to be an example that sustains rather than subverts the district court's theory. But people in the crowd did not get the opportunity to overwhelm Loughner because of his need to change out an empty magazine. Rather, Loughner was struggling to unjam his handgun when he was tackled. Furthermore, Loughner was exceptional in that he was not stalking the members of the crowd as his prey, but was instead standing among them. It appears that Loughner's only real target was Giffords. His attack was more an attempt to assassinate her than to commit mass murder, which may well have been something of an afterthought. That was why—highly unusual for mass shooters—he had taken only a single firearm to the political rally and why he had moved so deeply within the crush of the crowd: so that he could shoot Giffords in the face at point-blank range. That put him within arms' reach of those who took him down.

Appellate Case: 14-1290　　Document: 01019375784　　Date Filed: 01/23/2015　　Page: 33

Although they are all that the district court or the Colorado Assembly pointed to, Aurora, Sandy Hook, Columbine and Tucson do not constitute "substantial evidence" that Colorado's statute "will alleviate" the identified harm "in a material way." *Turner Broad.*, 520 U.S. at 195. As Judge Posner has explained, the "mere possibility" that a gun control law will save lives is not enough. *Moore*, 702 F.3d at 939. If it were, "*Heller* would have been decided the other way." *Id.*

Sadly, Colorado's legislative attempt to create supposedly life-saving "critical pauses" is but a "promise to the ear to be broken to the hope, a teasing illusion like a munificent bequest in a pauper's will." *Edwards v. California*, 314 U.S. 160, 186 (1941) (Jackson, J., concurring). The monstrosities at Aurora, Columbine, Virginia Tech, Tucson, and Sandy Hook were not particular firearms or ammunition magazines, but the depraved individuals who wielded those weapons.[32]

---

[32] In its recently announced research agenda on ways to reduce gun violence, especially mass killings, the National Research Council made no mention of limiting magazine capacity. *See* Alan Leshner *et al.*, INST. OF MED. & NAT'L RESEARCH COUNCIL, PRIORITIES FOR RESEARCH TO REDUCE THE THREAT OF FIREARM-RELATED VIOLENCE (2013). The NRC—which is certainly not biased in favor of Second Amendment rights—conceded that there is insufficient evidence to indicate that *any* public policy

> 3.  *Colorado has not proven that its Magazine Limit will re-*
>     *duce firearms violence in general, even apart from mass*
>     *shootings.*

After expressly finding that Colorado's objective related exclusively to mass shootings, the court below noted, in passing, that, "[w]ith regard to general gun violence, the General Assembly also considered statistics drawn from several cities that large-capacity magazines were used in 14–26% of all gun crimes and in 31–41% of fatal police shootings." *Colorado Outfitters*, 24 F. Supp. 3d at 1072. The court identified no source for these statistics, but they are apparently drawn from Professor Zax's second-hand reading of the research of Dr. Koper. 17 App. 3653, 3729.

Professor Zax did not proffer any analysis of his own, except for his review of a database gleaned from confiscated firearms by an agency known as the Virginia Firearms Clearinghouse. *See Colorado Outfitters*, 24 F. Supp. 3d at 1072-73; *see also* 25 App. 5369-73 (charts); 17 App. 3600-3608 (Zax testimony discussing data). Those data disclose, at most, the potential use in crimes of magazines holding more than ten rounds,

---

could actually inhibit such demented acts of evil. *See id.* at 7 ("No conclusive data exist about interventions intended to reduce the number and impact of mass shootings."), 47 ("Regarding interventions for public mass shootings, there is no conclusive information about which policies and enforcement and prevention strategies might be effective.").

*but not whether there was any use of magazines exceeding fifteen rounds—* as Zax himself admitted. 17 App. 3599. Moreover, in his analysis of the Virginia Clearinghouse data, Professor Zax concluded that the reduction in the number of magazines over ten rounds wrought by the now-defunct federal ban was barely discernible in 2002, when the ban had been in effect for eight years: "the net effect of the ban was to reduce the proportion of confiscated firearms" with magazines over ten rounds "*by slightly less than one-quarter of one percentage point below the level it would have attained in the absence of the ban.*" Jeffrey Zax, *The Federal LCM Ban and the Virginia Firearms Clearinghouse Data* 4 (unpublished manuscript prepared for use at trial 2014) (emphasis added). *See also* 17 App. 3608. That result gives new meaning to the adjective "trivial."[33] Even more telling is Professor Zax's admission that his analysis did *not show—*

---

[33] Zax also admitted that he stopped his analysis of the Clearinghouse data with the year 2010, when he calculated that magazine reduction was at its greatest, and that he deliberately omitted the last three years of data that were available (for 2011 through 2013), even though he admitted (i) that those data could be relevant to his analysis, (ii) that those three years of data may have shown an *increase* in the proportion of magazines over ten rounds and, therefore, (iii) may have shown that the federal ban on magazines of more than ten rounds was not working. 17 App. 3694-96.

because he never bothered to consider the question—whether any reduction in magazine availability resulted in a decrease in firearms crime. *Id.* at 3700-01. This is exceedingly odd, given that the point of limiting magazine capacity is supposedly to reduce firearms crime—yet Professor Zax admitted that he had nothing whatsoever to contribute on that subject.

Having no training or experience in the subject matter, Professor Zax relied "principal[ly]," 17 App. 3593, on "[h]is review," *id.* at 3721, of the research of Dr. Christopher Koper, who performed the Justice Department's studies on the former federal magazine limit, *id.* at 3593–94, 3653, 3655, 3658–59, 3729. But Zax admitted that all of Koper's research was confined to the effects, if any, of the federal *ten*-round magazine limit. *Id.* at 3729–30.

Moreover, the effect on crime of any kind—mass shootings included—of the decade-long federal ban on magazines of more than ten rounds has never been proven. Professor Koper—on whom Colorado witness Zax heavily relied and whose reports were admitted into evidence

below—concluded that there was "no discernible reduction in the lethality or injuriousness of gun violence during the post-ban years."[34] Professor Koper found the data so poor that "it was impossible to make definitive assessments of the ban's impact on gun violence."[35]

Contrary to the apparent assumption of the court below, firearms violence has been declining for more than four decades. The firearm-murder rate peaked at 6.6 per 100,000 members of the population in 1974, and declined to 3.2 in 2011.[36] Thus firearms-related homicide has been cut in half precisely during the period when firearms ownership—and particularly ownership of modern handguns with magazine capacities over fifteen rounds—has skyrocketed. "Gun laws are far looser than they were twenty years ago, even while crime is plunging—a galling juxtaposition for those who place their faith in tougher gun laws."[37]

---

[34] *See* Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004, in* REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS 165-66 (Daniel W. Webster & Jon S. Vernick eds., 2013).

[35] *Id.* at 166.

[36] WILLIAM J. KROUSE, CONG. RESEARCH SERV., RL32842, GUN CONTROL LEGISLATION 10 (2012), *available at* http://goo.gl/LJixGy.

[37] Dan Baum, *The Price of Gun Control*, HARPER'S MAGAZINE (July 20, 2012, 7:30PM), *available at* http://goo.gl/LBhycc/.

## CONCLUSION

The district court acknowledged that, "[e]ven with an important purpose, . . . *Colorado must prove that the 15-round limitation* in § 18-12-302 *is substantially related to an anticipated reduction in the number and magnitude of injuries caused by the use of large-capacity magazines.*" *Colorado Outfitters*, 24 F. Supp. 3d at 1072 (emphasis added). Yet the State has offered merely "unsupported intuitions." *Carter*, 669 F.3d at 418. "[S]peculation" and "conjecture" will not suffice; the State must demonstrate "that its restriction *will in fact alleviate*" the targeted threat to public safety. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (emphasis added). This it has not done. Therefore, the judgment below should be reversed.

January 23, 2015                Respectfully submitted,

                                s/Brian S. Koukoutchos
                                Brian S. Koukoutchos
                                28 Eagle Trace
                                Mandeville, LA 70471
                                (985) 626-5052
                                bkoukoutchos@gmail.com

                                *Counsel for* Amici Curiae

32

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements


1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) because:

> [x] this brief contains 6864 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

> [ ] this brief uses a monospaced typeface and contains <state the number of> lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> [x] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14 point font, or

> [ ] this brief has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.


January 23, 2015

s/Brian S. Koukoutchos
Brian S. Koukoutchos
28 Eagle Trace
Mandeville, LA 70471
(985) 626-5052
bkoukoutchos@gmail.com

*Counsel for* Amici Curiae

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify with respect to the foregoing:

1) The digital form of this pleading submitted to the Court was scanned for viruses using Kaspersky Endpoint Security 10 software, version 10.2.1.23(a) (most recent virus definition created on January 22, 2015), and, according to the program, the document is virus-free.

2) This ECF submission is an exact duplicate of the seven hard copies to be delivered to the clerk's office pursuant to 10th Cir. R. 31.5.

3) Privacy redactions were not required on any page of this brief.

January 23, 2015

s/Brian S. Koukoutchos
Brian S. Koukoutchos
28 Eagle Trace
Mandeville, LA 70471
(985) 626-5052
bkoukoutchos@gmail.com

*Counsel for* Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Brief of *Amicus Curiae* was served via ECF on the following:

| | |
|---|---|
| Douglas Abbott | dabbott@hollandhart.com |
| David C. Blake | david.blake@state.co.us |
| Marc F. Colin | mcolin@brunolawyers.com |
| Daniel D. Domenico | Dan.Domenico@state.co.us |
| Anthony Fabian | fabianlaw@qwestoffice.net |
| Matthew D. Grove | matt.grove@state.co.us |
| David Kopel | david@i2i.org |
| Peter Krumholz | pkrumholz@halewestfall.com |
| John T. Lee | jtlee@state.co.us |
| LeeAnn Morrill | leeann.morrill@state.co.us |
| Stephanie Scoville | stephanie.scoville@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Richard A. Westfall | rwestfall@halewestfall.com |

I hereby certify that a true and correct copy of the foregoing Brief of *Amicus Curiae* was served via email on the following:

| | |
|---|---|
| Jonathan Michael Anderson | jmanderson@hollandhart.com |

Appellate Case: 14-1290    Document: 01019375534    Date Filed: 01/23/2015    Page: 42

Johnathan Patrick Fero            jon.fero@state.co.us

Molly Allen Moats                 molly.moats@state.co.us


January 23, 2015                  <u>s/Brian S. Koukoutchos</u>
                                  Brian S. Koukoutchos
                                  28 Eagle Trace
                                  Mandeville, LA 70471
                                  (985) 626-5052
                                  bkoukoutchos@gmail.com

                                  *Counsel for* Amici Curiae