Nos. 14-1290, -1292

_____

In The
United States Court of Appeals
For the Tenth Circuit

COLORADO OUTFITTERS ASSOCIATION, et al.,

*Plaintiffs-Appellants,*

v.

JOHN W. HICKENLOOPER,

*Defendant-Appellee.*

_____

JIM BEICKER, SHERIFF OF FREMONT COUNTY, et al.,

*Plaintiffs-Appellants,*

v.

JOHN W. HICKENLOOPER,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
THE HONORABLE CHIEF JUDGE MARCIA S. KRIEGER
CASE NO. 13-CV-1300-MSK

_____

**AMICUS CURIAE BRIEF FOR NATIONAL RIFLE ASSOCIATION
OF AMERICA, INC. IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

_____

Charles J. Cooper
  *Counsel of Record*
David H. Thompson
Peter A. Patterson
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
202-220-9600

*Attorneys for Amicus Curiae National
Rifle Association of America, Inc.*

Appellate Case: 14-1290   Document: 01019375414   Date Filed: 01/23/2015   Page: 2

# CORPORATE DISCLOSURE STATEMENT

The National Rifle Association of America, Inc. does not have a parent

corporation, nor does any publicly held corporation own 10% or more of its stock.


s/ Charles J. Cooper
Counsel for *Amicus Curiae*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................... ii

INTEREST OF AMICUS CURIAE ............................................................. 1

INTRODUCTION ........................................................................................ 1

ARGUMENT ................................................................................................ 2

I.  COLORADO'S MAGAZINE BAN VIOLATES THE SECOND AMENDMENT. ............. 2

II.  THIS COURT SHOULD NOT FOLLOW THE D.C. CIRCUIT'S FLAWED DECISION UPHOLDING THE DISTRICT OF COLUMBIA'S MAGAZINE BAN. .......... 7

III.  COLORADO'S BACKGROUND-CHECK REQUIREMENT FOR PRIVATE FIREARM TRANSFERS VIOLATES THE SECOND AMENDMENT. ......................... 24

CONCLUSION ............................................................................................ 29

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page**

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991) .................................................13

*Brown v. Entertainment Merchs. Ass'n*, 131 S. Ct. 2729 (2011) ......................11, 12

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ...............................23

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993)...........................................................................................11

*City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993) .....................28

*Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050
   (D. Colo. 2014) ............................................................................................*passim*

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
   657 F.3d 936 (9th Cir. 2011) .............................................................................26

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................*passim*

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...........................................6

*Friedman v. City of Highland Park*, 2014 WL 4684944
   (N.D. Ill. Sept. 18, 2014) .....................................................................................7

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011).....................*passim*

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012)...........6, 12, 23, 24

*Kolbe v. O'Malley*, 2014 WL 4243633 (D. Md. Aug. 22, 2014) .............................7

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ................................................13, 23

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .......................................*passim*

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...................................................6

*Morrison v. Olson*, 487 U.S. 654 (1988) ................................................................1

*NRA v. BATFE*, 700 F.3d 185 (5th Cir. 2012) ("*BATFE I*") ...........................12, 24

*NRA v. BATFE*, 714 F.3d 334 (5th Cir. 2013).......................................................14

*NYSRPA v. Cuomo*, 990 F. Supp. 2d 349 (W.D.N.Y. 2013) ...............................7, 8

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) .........................................13

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)............................14

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) ...............................7

*Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013).......................................5, 12

*Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014)...........................................................17

*Revo v. Disciplinary Bd. of the S. Ct. for N.M.*,
    106 F.3d 929 (10th Cir. 1997) ...............................................24

*Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014) ..............................................7

*Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003) .....................................................16

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991)...............................................................10

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ...............................11, 21, 23

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 2014 WL 7181334
    (6th Cir. Dec. 18, 2014) ...............................................11, 12

*U.S. West, Inc. v. FCC*, 182 F.3d 1224 (10th Cir. 1999)...................................24, 28

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012) .....................................22, 24

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013)........................................23

*United States v. Grace*, 461 U.S. 171 (1983) ...........................................................13

*United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012)......................5, 6

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)....................................24

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)..................................12

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000)...........................19

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010)..........................................5, 6

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)................................................23

*Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014)..............................................23

## Constitutional and Statutory Provisions

U.S. CONST. amend. II...............................................................................................2, 4

18 U.S.C. § 922(t) ......................................................................................................25

COLO. REV. STAT.

    § 18-12-112...................................................................................................27

    § 18-12-112(6) .............................................................................................26

    § 18-12-203(3) .............................................................................................27

    § 18-12-204(1)(b) .........................................................................................27

    § 18-12-205(4)(c)..........................................................................................26

§ 18-12-302 ....................................................................................................3

**Other**

1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND
(1765) .............................................................................................................16

Andy Greenburg, *Gunsmiths 3D-Print High Capacity Ammo Clips To
Thwart Proposed Gun Laws*, FORBES.COM (Jan. 14, 2014, 3:43PM),
http://goo.gl/cW6bzl ........................................................................................21

JAMES D. WRIGHT & PETER H. ROSSI, ARMED & CONSIDERED DANGEROUS
(new 2d ed. 2008) ............................................................................................26

NYPD, ANNUAL FIREARMS DISCHARGE REPORT 2011 (2012),
http://goo.gl/pz8UHo .......................................................................................17

Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of
the Right To Bear Arms*, 49 LAW & CONTEMP. PROBS. 151 (1986) ...................20

Appellate Case: 14-1290     Document: 01019373959     Date Filed: 01/23/2015     Page: 7

**INTEREST OF AMICUS CURIAE**

The National Rifle Association of America, Inc. ("NRA") is America's foremost and oldest defender of Second Amendment rights. Founded in 1871, the NRA has approximately five million members and is America's leading provider of firearms marksmanship and safety training for civilians. The NRA has a strong interest in this case, because the laws at issue here violate the Second Amendment rights of its many members residing in Colorado by prohibiting the use of standard-capacity ammunition magazines and by subjecting them to a burdensome background-check requirement for private transfers of firearms.

The parties have consented to the filing of this brief. A party's counsel has not authored this brief in whole or in part, a party or a party's counsel has not contributed money that was intended to fund preparing or submitting this brief, and no person other than the amicus curiae, its members, or its counsel has contributed money that was intended to fund preparing or submitting this brief.

**INTRODUCTION**

Infringements of Second Amendment rights sometimes "come … clad, so to speak, in sheep's clothing." *See Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). Other times the "wolf comes as a wolf." *Id*. This case involves infringements of both varieties.

1

The State of Colorado has purported to ban its law-abiding citizens from defending themselves, their homes, and their families with firearms equipped with standard-capacity magazines capable of holding more than 15 rounds of ammunition. But because such firearms are "arms" protected by the Second Amendment, they cannot be banned. As the Supreme Court has made clear, if the Second Amendment "right *applies* to" certain firearms, "citizens *must* be permitted to use [them] for the core lawful purpose of self-defense." *McDonald v. City of Chicago*, 561 U.S. 742, 767–68 (2010) (emphases added) (quotation marks omitted). Colorado's magazine ban is thus flatly irreconcilable with the Second Amendment.

Colorado's requirement that private citizens obtain a background check from a licensed firearms dealer before completing a private firearm transfer violates the Second Amendment for a different reason: the State has failed to justify the broad and burdensome reach of the particular background-check system that it has enacted. While some sort of background-check regime for firearm transfers may be consistent with the Second Amendment, Colorado's is not.

## ARGUMENT

### I. COLORADO'S MAGAZINE BAN VIOLATES THE SECOND AMENDMENT.

1. Despite the Second Amendment's specific protection of "the right of the people to keep and bear Arms," U.S. CONST. amend. II, the State of Colorado

bans standard-capacity magazines capable of holding more than fifteen rounds of ammunition. *See* COLO. REV. STAT. § 18-12-302. The banned magazines are an integral component of the firearms they equip and have no function apart from those firearms. Thus, the practical effect of Colorado's ban is to prohibit the use of firearms capable of firing more than 15 rounds of ammunition without reloading. Such firearms are extremely popular. The banned magazines are standard equipment on many of the Nation's best-selling firearms. *See, e.g.*, JA1503 ¶ 15, JA1504 ¶ 22. Indeed, the parties stipulate that "the number of lawfully owned semi-automatic firearms that utilize a detachable box magazine with a capacity greater than 15 rounds is in the *tens of millions*." JA1502 ¶ 10 (emphasis added). The parties further stipulate that these tens of millions of firearms "are used for multiple lawful purposes, including recreational target shooting, competition shooting, collecting, hunting, and are kept for home defense and defense outside the home." JA1503 ¶ 19.

These stipulations resolve this case under *District of Columbia v. Heller*, 554 U.S. 570 (2008), and they establish that Colorado's ban infringes the Second Amendment rights of the people of the State.

*First*, the magazines that Colorado bans are *protected by the Second Amendment*. The Second Amendment, *Heller* explains, "extends, prima facie, to *all* instruments that constitute bearable arms." 554 U.S. at 582 (emphasis added). The

government thus bears the burden of showing that any bearable arms that it seeks to ban are unprotected. To do so it must show that such arms are "not typically possessed by law-abiding citizens for lawful purposes," but rather are "highly unusual in society at large." *Id.* at 625, 627. As explained above, firearms equipped with the banned magazines are far from unusual. Americans own tens of millions of them, and banned magazines are standard equipment on many popular firearms. It follows that they are protected by the Second Amendment.

      *Second*, arms protected by the Second Amendment *cannot be banned*. The text of the Second Amendment provides that "the right of the people to keep and bear *Arms*, shall not be infringed." U.S. CONST. amend. II (emphasis added). It follows that there are certain "instruments that constitute bearable arms," *Heller*, 554 U.S. at 582, that law-abiding, responsible, adult citizens have an inviolable right to acquire, possess, and use.

      *Heller* confirms that the Second Amendment "*elevates above all other interests* the right of law-abiding, responsible citizens to use *arms* in defense of hearth and home." *Id.* at 635 (emphases added). Thus, all that needs to be done to resolve a challenge to a flat ban of certain weapons is to determine whether they are "arms" protected by the Second Amendment. Any further evaluation of allegedly competing public-policy considerations is foreclosed by the constitutional text. That text is the "very *product* of an interest-balancing by the

people," and "[t]he very enumeration of the right [to keep and bear arms] takes out of the hands of government … the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id*. at 634, 635.

*McDonald* confirms this understanding of the Second Amendment. There, the Court explained that, "in *Heller*, … we found that [the Second Amendment] right *applies* to handguns …. Thus, we concluded, citizens *must* be permitted to use handguns for the core lawful purpose of self-defense." *McDonald*, 561 U.S. at 767–68 (emphases added) (brackets and quotation marks omitted).

In sum, because the Second Amendment right *applies* to the magazines that Colorado bans, law-abiding citizens *must* be permitted to use them.

2.    This Circuit has applied a "two-step" framework when analyzing Second Amendment claims concerning the concealed carrying of firearms outside the home and the possession of firearms by individuals who are not law-abiding, responsible citizens. *See, e.g.*, *Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013) (concealed carry); *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012) (illegal aliens); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (individuals "who, based on their past behavior, are more likely to engage in domestic violence"). Even if that framework applied to a ban on law-abiding, responsible citizens using protected firearms for self-defense in the home, it would reinforce the conclusion that Colorado's ban is flatly unconstitutional.

At the first step, because the Second Amendment's "central component … is to secure an individual's ability to defend his home, business, or family," *Huitron-Guizar*, 678 F.3d at 1170 (quotation marks omitted), Colorado's flat prohibition on law-abiding citizens defending their homes, businesses, and families with firearms equipped with banned standard-capacity magazines "imposes a burden on conduct falling within the scope of the Second Amendment's guarantee," *Reese*, 627 F.3d at 800.

At the second step, because a flat ban on protected arms necessarily would fail "any of the standards of scrutiny … applied to enumerated constitutional rights," *Heller*, 554 U.S. at 628, there is neither need nor warrant to engage in a tiers-of-scrutiny analysis when confronted with one. Indeed, a flat ban on protected arms is "entirely inconsistent with the protections afforded by an enumerated right," making application of means-ends scrutiny "an exercise in futility." *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 n.9 (2d Cir. 2012).

Other circuits that apply the same two-step framework as this Court recognize that certain laws are so antithetical to the Second Amendment that they are "categorically unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011). The Seventh Circuit, for example, held that the State of Illinois's "flat ban on carrying ready-to-use guns outside the home" was flatly unconstitutional. *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012). The Ninth

6

Circuit likewise found that "applying heightened scrutiny was unnecessary" to strike down San Diego's limitation of concealed-carry permits to citizens who demonstrate "a unique risk of harm." *Peruta v. County of San Diego*, 742 F.3d 1144, 1168, 1169 (9th Cir. 2014).

The same reasoning applies here. While Colorado may desire to strike its own "balance" between the "state's public safety concerns with respect to the Second Amendment rights of its citizens," JA1946, it lacks the authority to do so. The Second Amendment itself "is the very *product* of an interest-balancing by the people," and it "elevates above *all other interests* the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller*, 554 U.S. at 635 (second emphasis added)—including arms equipped with the standard-capacity magazines that Colorado bans.

## II. THIS COURT SHOULD NOT FOLLOW THE D.C. CIRCUIT'S FLAWED DECISION UPHOLDING THE DISTRICT OF COLUMBIA'S MAGAZINE BAN.

Several district courts, including the district court in this case, have ignored *Heller*'s teaching by sustaining laws limiting magazine capacity, despite holding or assuming that the banned magazines are constitutionally protected. *See, e.g.*, *Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1071 (D. Colo. 2014); *Kolbe v. O'Malley*, 2014 WL 4243633, at *12 (D. Md. Aug. 22, 2014); *Friedman v. City of Highland Park*, 2014 WL 4684944, at *8 (N.D. Ill. Sept. 18, 2014); *Shew v. Malloy*, 994 F. Supp. 2d 234, 246 (D. Conn. 2014); *NYSRPA v.*

*Cuomo*, 990 F. Supp. 2d 349, 365 (W.D.N.Y. 2013). These district courts have instead followed the example of *Heller v. District of Columbia* ("*Heller II*"), in which a divided panel of the D.C. Circuit rejected a Second Amendment challenge to the District of Columbia's ban on magazines capable of holding more than ten rounds of ammunition, despite expressly acknowledging that such magazines are "in common use." *See* 670 F.3d 1244, 1261 (D.C. Cir. 2011).

By holding that protected arms can be banned, *Heller II* departs sharply from *Heller*. Indeed, the *Heller II* majority was able to reach the result that it did only by committing several errors that this Court must avoid if it is to remain true to *Heller*.

*First*, *Heller II* improperly cited First Amendment doctrine to reason that even a wholesale ban on protected arms potentially may be justified under a levels-of-scrutiny analysis. *See id.* at 1262. *Heller*, to be sure, frequently draws on First Amendment doctrines and concepts while interpreting the Second Amendment. For example, in determining that the Second Amendment protects an individual right, the Court emphasized that the Second Amendment, like the First, "use[s] the phrase 'right of the people.' " *Heller*, 554 U.S. at 579. In rejecting as "bordering on the frivolous" the argument "that only those arms in existence in the 18th century are protected by the Second Amendment," the Court reasoned that "[j]ust as the First Amendment protects modern forms of communications, … the Second

Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. at 582. And in acknowledging that the Second Amendment is subject to historically grounded limitations, the Court indicated that in this regard it "is no different" than the First. *See id*. at 595, 635.

By drawing frequent parallels between the Second Amendment and the First Amendment, *Heller* makes clear that the two Amendments are due equal respect and that the Second is not be treated as "second-class" or "singled out for special— and specially unfavorable—treatment." *McDonald*, 561 U.S. at 778–79, 780 (opinion of Alito, J.). But it does not follow that the Court meant to incorporate the full panoply of First Amendment scrutiny analysis into the Second Amendment context. To the contrary, the Court struck down the District of Columbia's handgun ban *without* applying any particular level of scrutiny, and in so doing it emphasized that the Second Amendment "surely elevates *above all other interests* the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635 (emphasis added). *Heller* thus indicates that *no* interest can be so compelling, and *no* law sufficiently tailored to any such interest, to justify a wholesale ban on protected arms in the home. As explained above, this conclusion is consistent with the two-step framework that this Court has adopted

for Second Amendment claims, because any law banning protected arms in the home necessarily would fail any level of heightened scrutiny.

By establishing that a law banning protected arms in the home is categorically unconstitutional, *Heller* arguably departs from First Amendment precedent holding that even a content-based restriction of speech—i.e., a law that strikes at the heart of the right to free speech—may be justified if the government can satisfy strict scrutiny. But such a result is a virtue, not a vice, for it prevents the drawing of any inference "that States may [ban protected arms] whenever they believe there is a compelling justification for doing so." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 125 (1991) (Kennedy, J., concurring in judgment). Levels of scrutiny analysis originally "derives from … equal protection jurisprudence," and

> [a]lthough the notion that protected speech may be restricted on the basis of content if the restriction survives what has sometimes been termed the most exacting scrutiny may seem familiar, the Court appears to have adopted this formulation in First Amendment cases by accident rather than as the result of a considered judgment.

*Id*. at 124, 125 (citation and quotation marks omitted). *Heller* demonstrates that the Court is not prepared to make such an "ill advised" decision in the Second Amendment context. *Id.* at 124. Indeed, during oral argument Chief Justice Roberts emphasized that "these standards that apply in the First Amendment just kind of

developed over the years as sort of baggage that the First Amendment picked up."
Tr. of Oral Arg. at 44, *Heller* (No. 07-290) (Mar. 18, 2008).

*Second*, even if a levels-of-scrutiny analysis were applicable, *Heller II* drew
the wrong lessons from First Amendment doctrine to hold that intermediate
scrutiny, rather than strict scrutiny, applies to a ban on standard-capacity
ammunition magazines. As an initial matter, *Heller II*'s reliance on *Turner
Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997), as a touchstone for
intermediate scrutiny analysis is a clear red flag, because the "*Heller* majority …
flatly *rejected* Justice Breyer's *Turner Broadcasting*-based approach." *Tyler v.
Hillsdale Cnty. Sheriff's Dep't*, 2014 WL 7181334, at *16 (6th Cir. Dec. 18, 2014)
(emphasis added). *Heller* thus establishes that *Turner* and other "First Amendment
cases applying intermediate scrutiny" do not provide the proper analysis for
reviewing a flat ban on protected arms. 554 U.S. at 704 (Breyer, J., dissenting).

Furthermore, a ban on protected arms strikes at the very heart of a
fundamental, enumerated constitutional right. To avoid treating the Second
Amendment as a "second-class" right, such a ban at a minimum must be reviewed
under strict scrutiny. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of
Hialeah*, 508 U.S. 520, 546 (1993) (applying strict scrutiny to law targeting
practices of particular religion); *Brown v. Entertainment Merchs. Ass'n*, 131 S. Ct.
2729, 2738 (2011) (applying strict scrutiny to law targeting content of protected

speech). This conclusion is consistent with the reasoning of several other circuits. *See, e.g.*, *Tyler*, 2014 WL 7181334, at *17 ("choosing strict scrutiny" for Second Amendment challenges because it "is more appropriate [than intermediate scrutiny] for assessing a challenge to an enumerated constitutional right"); *Peruta*, 742 F.3d at 1168 n.15 ("Intermediate scrutiny is not appropriate … for cases involving the destruction of a right at the core of the Second Amendment."); *Kachalsky*, 701 F.3d at 93 ("applying less than strict scrutiny when the regulation *does not* burden the 'core' protection of self-defense in the home") (emphasis added); *NRA v. BATFE*, 700 F.3d 185, 195 (5th Cir. 2012) ("*BATFE I*") ("A regulation that threatens a right at the core of the Second Amendment … triggers strict scrutiny."); *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("[W]e assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny.").

*Heller II* nevertheless held that intermediate scrutiny applies "because it thought the ban was similar to a regulation of the manner in which speech takes place, a type of regulation subject to intermediate scrutiny under the time, place, and manner doctrine of the First Amendment." 670 F.3d at 1262 (quotation marks and ellipsis omitted). But a wholesale ban is the antithesis of a time, place, and manner restriction: it prohibits use of banned arms at *any* time, in *any* place, and in

*any* manner. *See Colorado Outfitters*, 24 F. Supp. 3d at 1069 (subject to irrelevant exceptions, Colorado's "ban applies to every person in Colorado, in every venue, and for every use"). Genuine time, place, and manner restrictions must "leave open ample alternative channels for communication of *the information*" in question. *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014) (emphasis added). "Additional restrictions *such as an absolute prohibition on a particular type of expression*" trigger strict scrutiny. *United States v. Grace*, 461 U.S. 171, 177 (1983) (emphasis added).

First Amendment time, place, and manner doctrine thus militates *against* applying intermediate scrutiny to a ban on protected arms, and the same is true of First Amendment case law applying intermediate scrutiny to other types of laws restricting speech. Laws restricting commercial speech, for example, are subject to intermediate scrutiny, but this is because the Court has deemed such speech to occupy a "subordinate position in the scale of First Amendment values." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). Similarly, laws restricting "expressive conduct within the outer perimeters of the First Amendment" likewise are subject to intermediate scrutiny. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991). The possession of protected arms in the home, by contrast, occupies a preeminent position in the scale of Second Amendment values and lies at the core

Appellate Case: 14-1290   Document: 01019375659   Date Filed: 01/23/2015   Page: 20

of the Second Amendment right, and a ban on such arms must at a minimum be subject to strict scrutiny.

*Third*, *Heller II* erroneously focused on the fact that the District of Columbia's ban "left a person free to possess any otherwise lawful firearm." 670 F.3d at 1262 (quotation marks omitted). But "restating the Second Amendment right in terms of what IS LEFT after the regulation rather than what EXISTED historically, as a means of lowering the level of scrutiny, is exactly backward from *Heller*'s reasoning." *NRA v. BATFE*, 714 F.3d 334, 345 (5th Cir. 2013) (Jones, J., dissental). Indeed, *Heller* establishes that a ban on certain protected arms cannot be justified by the availability of other protected arms that are not banned. "It is no answer," *Heller* held, "to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." 554 U.S. at 629. As the D.C. Circuit decision affirmed by *Heller* put it, the District of Columbia's argument that "residents still have access to hundreds more" types of firearm was "frivolous." *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007).

*Fourth*, the *Heller II* court exceeded its authority by questioning whether citizens really *need* the banned magazines, reasoning that the availability of substitutes meant that citizens retained the "ability to defend themselves." 670 F.3d at 1262. The Second Amendment reserves to law-abiding citizens, not courts or

14

legislatures, the right to decide which protected arms are best-suited for their defense. Thus, while *Heller* identified several "reasons that a citizen may prefer a handgun for home defense," the Court held that "*[w]hatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id*. at 629 (emphasis added).

*McDonald* underscores this point. In dissent, Justice Breyer argued against incorporation of the Second Amendment because, in his view, "determining the constitutionality of a particular state gun law requires finding answers to complex empirically based questions of a kind that legislatures are better able than courts to make," such as, "What sort of guns are necessary for self-defense? Handguns? Rifles? Semiautomatic weapons?" *McDonald*, 561 U.S. at 922–923 (Breyer, J., dissenting). Justice Alito's controlling opinion squarely rejected this argument: "Justice Breyer is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions …. [W]hile his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion." *Id*. at 790–91. When determining whether a particular weapon may be banned, it is the choices of the American people that matter, not judges' or legislators' assessments of those choices.

At any rate, just as there are reasons why citizens may prefer handguns for home defense, there also are reasons why citizens may prefer the standard-capacity

ammunition magazines that the District of Columbia and Colorado have banned.

The principal reason is the desire not to become a crime victim by running out of

ammunition before being able to repel a violent attack. The Second Amendment is

designed for the worst-case scenario in which citizens are left with no choice but to

use force to protect themselves and their families from an immediate threat of

violence from sources such as criminal attack, civil unrest, or a tyrannical

government. *See, e.g.*, *Heller*, 554 U.S. at 594 (The right to arms "was by the time

of the founding understood to be an individual right protecting against both public

and private violence."); *McDonald*, 561 U.S. at 857 (Thomas, J., concurring) ("The

use of firearms for self-defense was often the only way black citizens could protect

themselves from mob violence."); *Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir.

2003) (Kozinski, J., dissental) ("The Second Amendment is a doomsday provision,

one designed for those exceptionally rare circumstances where all other rights have

failed …."); 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND

*140 (1765) ("[T]o vindicate these rights [to the free enjoyment of personal

security, of personal liberty, and of personal property], when actually violated or

attacked, the subjects of England are entitled, in the first place, to the regular

administration and free course of justice in the courts of law; next to the right of

petitioning the king and parliament for redress of grievances; and lastly to the right

of having and using arms for self-preservation and defence."). The fact that the

police often fire 15 or more rounds to defend themselves shows that a law-abiding

citizen reasonably may prepare to do so as well, particularly in preparing for a

worst-case scenario. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014)

(holding that police officers acted reasonably "in firing a total of 15 shots" because

threat persisted during the time in which the shots were fired); NYPD, ANNUAL

FIREARMS DISCHARGE REPORT 2011, at 23 (2012), http://goo.gl/pz8UHo (In 2011,

New York City police officers fired more than 15 rounds in 15% of incidents in

which they fired their weapons to defend themselves and others.). And it makes

perfect sense that a citizen preparing for such a scenario should be entitled to

acquire the arms commonly possessed in the society at large, *because those are the*

*arms the citizen may potentially expect to face*.

 *Fifth*, *Heller II* placed undue weight on criminal misuse of banned

magazines. *See* 670 F.3d at 1262–64. *Heller* demonstrates that the focus of Second

Amendment analysis is the choices made by law-abiding citizens, not the choices

made by criminals. Indeed, if a ban on handguns would fail "any of the standards

of scrutiny … applied to enumerated constitutional rights," including intermediate

scrutiny, *Heller*, 554 U.S. at 628, the same necessarily must be true of a ban on

other protected arms, because the vast majority of gun violence in this country is

committed using handguns. The *Heller* Court struck down the District of

Columbia's handgun ban in full "aware[ness] of the problem of handgun violence

in this country." *Id.* at 636. Indeed, Justice Breyer's dissent supported the assertion that handguns "are by far the firearm of choice" for many crimes with a litany of statistics, including that "[f]rom 1993 to 1997, 81% of firearm-homicide victims were killed by handgun," and that "roughly the same rate" obtained from 1993 to 2001. *Id.* at 693–99, 711. The District of Columbia likewise emphasized the vastly disproportionate use of handguns in crime: "Although only a third of the Nation's firearms are handguns, they are responsible for far more killings, woundings, and crimes than all other types of firearms combined." Brief for Petitioners at 51, *Heller* (No. 07-290) (Jan. 4, 2008). If criminal misuse of handguns cannot justify banning handguns, lesser criminal misuse of other types of firearms likewise cannot justify a ban.

*Sixth*, *Heller II*'s reasoning relies on a fundamental tension that undermines the court's analysis. As explained above, the court decided to apply intermediate scrutiny because it concluded that the availability of non-banned substitutes meant that the District of Columbia's ban would not "substantially affect [individuals'] ability to defend themselves." *Heller II*, 670 F.3d at 1262. But the court did not extend this reasoning to its intermediate scrutiny analysis. Instead, the court reasoned that there was a "reasonable 'fit'" between the ban and "important interests in protecting police officers and controlling crime" because of the

enhanced "firepower" the banned magazines purportedly would offer criminals. *Id.* at 1263.

There is a basic disconnect between the two parts of this analysis. If the availability of substitutes means that banning certain arms does not substantially affect law-abiding citizens' ability to defend themselves, the availability of the same substitutes means that the ban does not substantially affect criminals' ability to commit crimes. And if the banned arms offer enhanced firepower to criminals, the banned arms offer the same enhanced firepower to law-abiding citizens. At best, then, bans like the District of Columbia's and Colorado's affect law-abiding citizens and criminals in the same way. Indeed, the district court in this case acknowledged that both offensive and defensive shooters could be affected by being required to pause to reload a firearm but concluded that "there are too many external variables to permit a conclusion that pauses effectively compelled on both sides are necessarily better or worse than having no such pauses on either side." *Colorado Outfitters*, 24 F. Supp. 3d at 1073. Just as "the tie goes to free expression" in the First Amendment context, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 819 (2000), the tie must go to the possession of protected arms by law-abiding citizens in the Second Amendment context. Indeed, as explained above, *Heller* makes clear that priority must be given to law-abiding citizens, not criminals.

To make matters worse, bans like the District of Columbia's and Colorado's actually have a disproportionately negative effect on *law-abiding citizens*. Because criminals by definition are less likely to obey a ban on any particular type of firearm, to the extent that a firearm offers its user an advantage in a confrontation, that advantage will go to the criminal who ignores the law when making his weapon choice. As the influential Italian criminologist Cesare Beccaria put it long ago, laws forbidding "wear[ing] arms … disarm[ ] those only who are not disposed to commit the crime which the laws mean to prevent," which "makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder." Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right To Bear Arms*, 49 LAW & CONTEMP. PROBS. 151, 154 (1986).

Furthermore, criminals retain the upper hand even if they do forego the use of banned arms, because it is criminals, not their targeted victims, that choose the time and place of a confrontation. Criminals thus have a much greater capacity than law-abiding citizens to ensure that they enter a confrontation with substitute measures such as multiple firearms or multiple legal magazines.

*Seventh*, *Heller II* failed to adequately account for the lack of evidence that a State or municipal magazine ban will actually work. As explained above, violent criminals are unlikely to care whether any particular magazine they want to use is

20

banned. In order for a ban to work, then, it must at a minimum make it more difficult for criminals to obtain the banned items.

The problem for advocates of bans like the District of Columbia's and Colorado's is the lack of evidence that such bans force criminals to use different magazines when the most they have to do to obtain one is drive to a neighboring jurisdiction where they are entirely legal. (Or manufacture one using a 3-D printer. *See* Andy Greenburg, *Gunsmiths 3D-Print High Capacity Ammo Clips To Thwart Proposed Gun Laws*, FORBES.COM (Jan. 14, 2014, 3:43 PM), http://goo.gl/cW6bzl.) Even under intermediate scrutiny, the government bears the burden to demonstrate that its law is "designed to address a real harm" and that it "will alleviate [that harm] in a material way." *Turner*, 520 U.S. at 195. In determining whether the government has carried this burden, *Turner* instructs courts to "accord substantial deference to the predictive judgments" of the legislature. *Id*. But judicial deference does not mean judicial abdication. To the contrary, the Court must ensure that the legislature "grounded" its judgment "on reasonable factual findings supported by evidence that is substantial for a legislative determination." *Id*. at 224.

Colorado's legislature did not rely on substantial evidence to support the magazine ban because no such evidence exists. While the district court purported to defer to the opinion of the State's witness on this issue, *Colorado Outfitters*, 24

F. Supp. 3d at 1073, there is no empirical evidence that a state-level magazine ban results in less frequent use of banned magazines in crime. Indeed, Professor Christopher Koper, who has testified in support of state "assault weapon" and magazine bans in other cases, admits that

> **there is little evidence on how state ["assault weapon" (AW)] bans affect the availability and use of AWs** (the impact of these laws is likely undermined to some degree by the influx of AWs from other states ….).

JA5055 (Christopher S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban* 81 n.95 (2004)) (emphasis added); *see also* Supplemental Declaration of Christopher S. Koper ¶ 14, *NYSRPA v. Cuomo* (No. 13-291) (W.D.N.Y. Sept. 24, 2013), Doc. 124 ("[T]here is little evidence on how state assault weapon bans affect the availability and use of assault weapons.").

Given this state of the evidence, it is sheer speculation whether or not a state-level magazine ban will reduce criminal use of the banned magazines. And "mere anecdote and supposition" cannot suffice to justify an intrusion upon the right to keep and bear arms. *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) (quotation marks omitted).

*Eighth*, and finally, *Heller II* failed to consider obvious alternatives to a blanket magazine ban that would provide greater respect to the rights of law-abiding citizens. While magazine bans purportedly aim to reduce the deadliness of public mass shootings committed by mentally disturbed individuals, they

needlessly restrict the rights of law-abiding, responsible citizens in their homes.

While the constitutionality of alternative measures is not free from doubt, unlike a

flat ban they at least attempt to accord some degree of respect to the Second

Amendment rights of law-abiding citizens. *Cf. Burwell v. Hobby Lobby Stores,*

*Inc.*, 134 S. Ct. 2751, 2781–83 (2014) (striking down application of contraceptive

mandate in light of less-restrictive alternative); *Wheaton College v. Burwell*, 134 S.

Ct. 2806, 2807 (2014) (enjoining application of the alternative).

Even under intermediate scrutiny, the mere existence of alternative measures

is fatal to a flat magazine ban. While intermediate scrutiny does not require a law

to be the least restrictive alternative, it does require the government to prove that it

does not "burden substantially more" protected conduct "than is necessary to

further" the government's interest. *Turner*, 520 U.S. at 213–14. *See also Ward v.*

*Rock Against Racism*, 491 U.S. 781, 798 (1989); *McCullen*, 134 S. Ct. at 2535.

Accordingly, many circuit-court decisions applying intermediate scrutiny in

Second Amendment cases—including *Heller II* itself—expressly recognize the

inquiry's tailoring component. *See, e.g.*, *United States v. Chovan*, 735 F.3d 1127,

1139 (9th Cir. 2013) ("[A]ll forms of the [intermediate scrutiny] standard require

… a reasonable fit between the challenged regulation and the asserted objective.");

*Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) ("To survive

intermediate scrutiny, the fit between the challenged regulation" and the

government's interest must be "substantial."); *BATFE I*, 700 F.3d at 208–09

(discussing government's "burden of showing a reasonable means-ends fit between

the challenged federal laws and an important government interest"); *Carter*, 669

F.3d at 418 ("[T]he government must carry its burden to establish the fit between a

regulation and a governmental interest."); *Heller II*, 670 F.3d at 1258 (government

must "demonstrate[ ] a close fit between [law's] requirements and its governmental

interests"); *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010)

(determining whether challenged law "fits reasonably with [governmental]

interest"). And in other contexts, this Court has not hesitated to strike down laws

under intermediate scrutiny where, as here, significantly less burdensome

alternatives were available. *See U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1238–39;

*Revo v. Disciplinary Bd. of the S. Ct. for N.M.*, 106 F.3d 929, 935–36 (10th Cir.

1997).

## III.  COLORADO'S BACKGROUND-CHECK REQUIREMENT FOR PRIVATE FIREARM TRANSFERS VIOLATES THE SECOND AMENDMENT.

Unlike a ban on protected arms, a background check requirement may not

necessarily be inconsistent with the Second Amendment. *Heller*, after all, ordered

the District of Columbia to allow the plaintiff "to register his handgun and [to]

issue him a license to carry it in the home," but it conditioned this order on the

assumption that "Heller is not disqualified from the exercise of Second

Amendment rights." 554 U.S. at 635. This statement acknowledges that some

individuals have forfeited their Second Amendment rights (for example, by committing violent felonies), and we assume for the sake of argument that the government may take some steps to assure that these individuals do not obtain guns. The federal government, for example, imposes a background check requirement for commercial firearm sales. *See* 18 U.S.C. § 922(t).

But it does not follow that the government has unfettered authority to impose whatever restrictions it likes on any and all transfers of firearms. *Heller* indicates that the test should be whether "historical justifications" support the particular restrictions being challenged. 554 U.S. at 635. And while such justifications may support "laws imposing conditions and qualifications on the *commercial* sale of arms," *id*. at 626–27 (emphasis added), which, after all, are often impersonal transactions between strangers, it does not follow that they support similar conditions and qualifications on the *private* sale (or lending) of arms, which often occurs between friends, family members, and other acquaintances.

Furthermore, even under this Court's two-step approach, the State's restrictions at a minimum must pass intermediate scrutiny. *See Heller*, 554 U.S. at 628 n.27 (rejecting rational basis review). And it is doubtful that a background check requirement on private transfers can meet this test. Indeed, it is likely that the only effect of such a requirement will be to impose additional and unnecessary

burdens on law-abiding citizens, for it is fanciful to expect violent criminals to go

to the trouble of obtaining a background check and alerting the authorities to their

intention to obtain a gun.  Indeed, given that "most of the methods through which

criminals acquire guns and virtually everything they ever do with those guns are

already against the law," JAMES D. WRIGHT & PETER H. ROSSI, ARMED &

CONSIDERED DANGEROUS xxxv (new 2d ed. 2008) (emphasis omitted), the

likelihood that a background check requirement on private transfers will have any

impact on such criminals is minimal.

But even if *some* sort of background check system for private firearm

transfers were constitutional, Colorado has failed to demonstrate that its *particular*

system is. Subject to specified exceptions, Colorado requires all private transfers of

firearms, whether temporary or permanent, to be preceded by a background check

by a licensed gun dealer. *See* COLO. REV. STAT. § 18-12-112. "Here, there are a

number of feasible, readily identifiable, and less-restrictive means of addressing

the [State's] concerns." *Comite de Jornaleros de Redondo Beach v. City of*

*Redondo Beach*, 657 F.3d 936, 950 (9th Cir. 2011) (en banc). The Plaintiffs in this

case cited several at trial that the district court acknowledged—and proceeded to

ignore—in its opinion. *Colorado Outfitters*, 24 F. Supp. 3d at 1076. For example,

the State grants concealed-carry permits only if an applicant has passed a thorough

background check. *See* COLO. REV. STAT. § 18-12-205(4)(c). A permit is valid for

26

five years, and it is subject to revocation if the permittee is no longer entitled to a permit. *Id.* §§ 18-12-203(3); 18-12-204(1)(b). At trial, Plaintiffs proposed as a less-restrictive alternative that concealed-carry permit-holders be exempted from § 18-12-112's background-check requirement. *See* JA3839–41. If the State's interest is to "help prevent crime and improve public safety," as the district court held, *Colorado Outfitters*, 24 F. Supp. 3d at 1075, it is hard to imagine why permit-holders—who have passed through a rigorous application process and whom the State trusts to carry a concealed handgun in public—should be subjected to § 18-12-112's requirements.

Yet, the district court never conducted an analysis of available alternatives. Although the district court cited evidence in the record that, in the district court's view, "show[ed] that private background checks will make it more difficult for prohibited individuals to acquire firearms," *Colorado Outfitters*, 24 F. Supp. 3d at 1075, it cited no evidence and provided no analysis of whether *other* means of conducting private background checks were substantially less burdensome than § 18-12-112. Because Plaintiffs do not challenge the *principle* of requiring private background checks, JA1666, the State's evidence about the efficacy of background checks in general is *irrelevant*. The question, instead, is whether *this particular* background-check regime—as compared with other available regimes—is constitutional, *see Heller II*, 670 F.3d at 1259–60 (remanding because, among

27

other things, the Government failed to develop any facts pertaining to a registration requirement for long guns *in particular*), and the district court never conducted that analysis.

Indeed, it affirmatively refused to do so, calling Plaintiffs' proposed-alternatives argument "one of preferred policy … that is left solely to the legislature." *Colorado Outfitters*, 24 F. Supp.3d at 1076. But both Supreme Court and Tenth Circuit precedent hold otherwise, insisting instead that the evaluation of alternative means is "certainly a relevant consideration" in an intermediate scrutiny analysis. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993); *see also U.S. West*, 182 F.3d at 1238. For that reason alone, the district court's order must be reversed.

Moreover, the State utterly failed to carry its burden of demonstrating that § 18-12-112 was not substantially more burdensome than the available alternatives. This Court would search the trial record in vain for any evidence demonstrating why, for example, concealed-carry permit-holders should be subject to § 18-12-112. The State has simply not produced anything resembling the level of proof necessary to carry its burden under intermediate scrutiny. Therefore, this Court must hold § 18-12-112 unconstitutional.

# CONCLUSION

For the foregoing reasons, this Court should reverse the decision below.

Date: January 23, 2015          Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper
    *Counsel of Record*
David H. Thompson
Peter A. Patterson
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
ccooper@cooperkirk.com
202-220-9600

*Attorneys for Amicus Curiae National Rifle*
*Association of America, Inc.*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) because:

> [x] this brief contains 6,618 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

> [ ] this brief uses a monospaced typeface and contains <state the number of> lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> [x] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font, or

> [ ] this brief has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

Date: January 23, 2015          s/ Charles J. Cooper
                                Charles J. Cooper
                                David H. Thompson
                                Peter A. Patterson
                                COOPER & KIRK, PLLC
                                1523 New Hampshire Avenue, N.W.
                                Washington, D.C. 20036
                                ccooper@cooperkirk.com
                                202-220-9600

                                *Attorneys for Amicus Curiae National Rifle*
                                *Association of America, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Brief of Amicus Curiae was served via ECF on the following:

| | |
|---|---|
| Douglas Abbott | dabbott@hollandhart.com |
| David C. Blake | david.blake@state.co.us |
| Marc F. Colin | mcolin@brunolawyers.com |
| Daniel D. Domenico | Dan.Domenico@state.co.us |
| Anthony Fabian | fabianlaw@qwestoffice.net |
| Matthew D. Grove | matt.grove@state.co.us |
| David Kopel | david@i2i.org |
| Peter Krumholz | pkrumholz@halewestfall.com |
| John T. Lee | jtlee@state.co.us |
| LeeAnn Morrill | leeann.morrill@state.co.us |
| Stephanie Scoville | stephanie.scoville@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Richard A. Westfall | rwestfall@halewestfall.com |

I hereby certify that a true and correct copy of the foregoing Brief of Amicus Curiae was served via email on the following:

| | |
|---|---|
| Jonathan Michael Anderson | jmanderson@hollandhart.com |
| Johnathan Patrick Fero | jon.fero@state.co.us |

Appellate Case: 14-1290    Document: 01019375429    Date Filed: 01/23/2015    Page: 38

Molly Allen Moats                    molly.moats@state.co.us


Virus scan certification: the digital form of this pleading submitted to the Court was scanned for viruses using Kaspersky Endpoint Security 10 software, version 10.2.1.23(a) (most recent virus definition created on January 22, 2015), and according to the program, the document is virus-free.

ECF Submission: undersigned certifies that this ECF submission is an exact duplicate of the seven hard copies delivered to the clerk's office pursuant to 10th Cir. R. 31.5.

Privacy redactions: privacy redactions were not required on any page of this brief.


<u>s/ Charles J. Cooper</u>
Charles J. Cooper

*Attorney for Amicus Curiae*
*National Rifle Association of*
*America, Inc.*