Nos. 14-1290, 14-1292

---

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

————————————————————

COLORADO OUTFITTERS ASSOCIATION, *et al.*,
*Plaintiffs-Appellants,*
*v.*
JOHN W. HICKENLOOPER,
*Defendant-Appellee.*

JIM BEICKER, *et al.*,
*Plaintiffs-Appellants,*
*v.*
JOHN HICKENLOOPER,
*Defendant-Appellee.*

————————————————————

**On Appeal from the United States District Court for the District of Colorado,
The Honorable Chief Judge Marcia S. Krieger, Case No. 13-CV-1300-MSK**

————————————————————

**BRIEF *AMICUS CURIAE* OF WESTERN STATES SHERIFFS'
ASSOCIATION, *ET AL.*, IN SUPPORT OF PLAINTIFFS-APPELLANTS
AND IN SUPPORT OF REVERSAL\***

————————————————————

<div style="text-align:right">

Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
Telephone: (703) 352-7276
dan@danpetersonlaw.com

</div>

January 23, 2015                          Counsel for *Amici Curiae*
*All *Amici* are listed on inside cover

---

Appellate Case: 14-1290 Document: 01019374278 Date Filed: 01/23/2015 Page: 2

*Amici* **participating in this brief are:**

**WESTERN STATES SHERIFFS' ASSOCIATION**

**COLORADO POLICE PROTECTIVE ASSOCIATION**

**LAW ENFORCEMENT LEGAL DEFENSE FUND**

**LAW ENFORCEMENT ACTION NETWORK**

**LAW ENFORCEMENT ALLIANCE OF AMERICA**

**INTERNATIONAL LAW ENFORCEMENT EDUCATORS AND
    TRAINERS ASSOCIATION**

Appellate Case: 14-1290   Document: 01019334278   Date Filed: 01/23/2015   Page: 3

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, each *amicus* listed above states that it is a nonprofit organization which has no parent corporation, that it issues no stock, and that therefore no publicly held company owns 10% or more of its stock.

/s/ Dan M. Peterson
Dan M. Peterson

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ....................................................................i

TABLE OF AUTHORITIES ..................................................................iv

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................1

STATEMENT PURSUANT TO RULE 29(c) .......................................4

INTRODUCTION ..................................................................................5

ARGUMENT .........................................................................................5

I. THE MAGAZINE BAN IS UNCONSTITUTIONALLY
VAGUE BECAUSE DISTINGUISHING BANNED
MAGAZINES FROM THOSE LAWFULLY POSSESSED
IS NEARLY IMPOSSIBLE FROM A LAW
ENFORCEMENT PERSPECTIVE. ........................................................5

    A. A Critical Reason that Vague Laws Must Be Held
    Unconstitutional Is that They Cannot Be Applied by
    Law Enforcement in a Uniform Manner ........................................5

    B. The Magazine Ban Does Not Provide Intelligible,
    Objective Standards to Guide Law Enforcement Personnel
    in Determining Which Magazines Are Illegal................................8

        1. A law enforcement officer in the field cannot tell
        by observation or other objective evidence whether
        a magazine was acquired by its current possessor on
        or before July 1, 2013.........................................................8

        2. A law enforcement officer in the field cannot tell
        by observation or other objective evidence whether
        the current possessor of a magazine has had it in his
        "continuous possession" since July 1, 2013.......................10

Appellate Case: 14-1290   Document: 01019374278   Date Filed: 01/23/2015   Page: 5

      3. The officer in the field will have to rely on
      unreliable evidence, resulting in arbitrary enforcement......................14

II. THE MAGAZINE BAN WILL NOT
PROMOTE PUBLIC SAFETY ..............................................................17

      A. The Magazine Ban Will Not Reduce
      Criminal Violence or Injuries .......................................................18

      B. Law Enforcement Personnel Overwhelmingly Recognize
      that Magazine Bans Are Not Effective in Fighting Crime...........................22

      C. The Magazine Ban Impairs the Ability of Law-Abiding
      Citizens to Defend Themselves and Their Loved Ones
      Against Criminal Attack ...............................................................25

CONCLUSION ........................................................................................30

CERTIFICATE OF COMPLIANCE.......................................................31

CERTIFICATE OF SERVICE ...............................................................32

iii

Appellate Case: 14-1290  Document: 01019374278  Date Filed: 01/23/2015  Page: 6

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bushco v. Shurtleff*, 729 F.3d 1294 (10th Cir. 2013) .................................................7

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ...........................................6, 7, 17

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................4, 17, 25

*Fyock v. City of Sunnyvale*, 25 F.Supp.3d 1267 (N.D. Cal. 2014) .........................21

*Hill v. Colorado,* 530 U.S. 703 (2000) ....................................................................7

*Hoffman Estates v. Flipside, Hoffman Estates*,
455 U.S. 489 (1982) ...................................................................................................7

*Kolender v. Lawson,* 461 U.S. 352 (1983)............................................................6, 8

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .....................................4, 7, 17

*New York State Rifle and Pistol Association v. Cuomo*,
1:13-cv-00291 (W.D.N.Y) (Dkt. No. 47-1) .............................................................25

*Nojay v. Cuomo*, 14-36-CV(L) (2d. Cir.) (Dkt. No. 93).........................................25

*Smith v. Goguen*, 415 U.S. 566 (1974) .....................................................................6

*United States v. Williams*, 553 U.S. 285 (2008) .....................................................14

## CONSTITUTIONS, STATUTES, AND REGULATIONS

U.S. Const., Amend. II.................................................................5, 17, 25

C.R.S. § 18-12-112 ................................................................................5

C.R.S. § 18-12-302 .......................................................................1, 5, 14, 17

C.R.S. § 18-12-302(1)(a) ....................................................................14

C.R.S. § 18-12-302(2)(a) ....................................................................15

C.R.S. § 18-12-302(2)(b) ...............................................................15, 29

C.R.S. §§ 18-12-301-303 ....................................................................24

Haw. Rev. Stat. Ann. § 134-8(c)..........................................................19

NY SAFE Act, S. 2230, 2013 Reg. Sess. (N.Y. 2013),
amended by S. 2607D, 2013 Reg. Sess. (N.Y. 2013)..............................24

## OTHER AUTHORITIES

D.C. Reedy and C.S. Koper, "Impact of handgun types
on gun assault outcomes: a comparison of gun assaults
involving semiautomatic pistols and revolvers,"
*Injury Prevention* 151, 152-53 (2003) ....................................................20

L. Boyle, "Adam Lanza hated his mother he shot dead
because he thought 'she loved the students at Sandy
Hook more than him,'" *DailyMail.com* (Dec. 28, 2013)........................22

M.D. McGonigal, *et al.,* "Urban firearm deaths:
a five-year perspective," *The Journal of Trauma* 532-537 (1993)...........20

PoliceOne, *Gun Policy & Law Enforcement Survey* (2013)..............22, 23

**STATEMENT OF INTEREST OF AMICI CURIAE**

**Western States Sheriffs' Association**

The Western States Sheriffs' Association ("WSSA") was established in 1993, and consists of hundreds of members from fifteen member states throughout the Western United States (Arizona, California, Colorado, Idaho, Montana, North Dakota, New Mexico, Nevada, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, and Wyoming). The mission of WSSA is to assist Sheriffs and their offices with federal and state legislative issues, develop guidelines to promote uniformity in matters that are important to Sheriffs of the Western United States, and to work together to keep the office of Sheriff strong. WSSA supports the Colorado sheriffs and other plaintiffs in opposition to the statutes at issue in this appeal.

**Colorado Police Protective Association**

The Colorado Police Protective Association, established in 1922, currently has approximately 2,000 members who are certified peace officers in the State of Colorado or who are associate members. The CPPA is committed to providing input and lobbying on law enforcement related legislation, enhancing officer rights and safety, and improving resources for law enforcement personnel in Colorado. The magazine ban, C.R.S. § 18-12-302, adversely impacts CPPA's membership in

many ways.  While providing little or no law enforcement benefit, it is virtually impossible to apply in the field.  It also deprives private citizens, such as the relatives of CPPA members, and law enforcement support personnel who are associate members of CPPA but do not have the benefit of the statute's "law enforcement exemption," of a frequently chosen, constitutionally protected means of self-defense in the home.

## Law Enforcement Legal Defense Fund

Law Enforcement Legal Defense Fund ("LELDF") is a 501(c)(3) non-profit organization, headquartered in Alexandria, Virginia, that provides legal assistance to law enforcement officers. LELDF has aided nearly one hundred officers, many of whom have been acquitted, mostly in cases where officers have faced legal action for otherwise authorized and legal activity in the line of duty.  While LELDF supports measures that will further legitimate public safety interests and protection of law enforcement officers, it does not support provisions which do not advance those interests, and which because of vagueness may subject police officers to risk of lawsuits for false arrest and similar causes of action.

## Law Enforcement Action Network

Law Enforcement Action Network ("LEAN") is a sister organization of LELDF, headquartered in Alexandria, Virginia, which has received 501(c)(4)

status.  LEAN promotes policies that protect law enforcement officers' personal and professional safety. LEAN seeks to provide insight to the Court about the negative ground level impact the challenged provisions will have on police officers and citizens.

### Law Enforcement Alliance of America, Inc.

Law Enforcement Alliance of America, Inc. ("LEAA") is a non-profit, non-partisan advocacy and public education organization founded in 1992 and made up of thousands of law enforcement professionals, crime victims, and concerned citizens.  LEAA represents its members' interests by assisting law enforcement professionals and seeking criminal justice reforms that target violent criminals, rather than vague regulatory laws that create confusion in law enforcement and potential criminal liability for otherwise law-abiding citizens.  LEAA has been an *amicus curiae* in numerous other federal and state appellate cases, and on the prevailing side in two United States Supreme Court cases.

### International Law Enforcement Educators and Trainers Association

International Law Enforcement Educators and Trainers Association ("ILEETA"), is a professional association of 4,000 persons committed to the reduction of law enforcement risk and to saving lives of police officers and the general citizenry through the provision of training enhancements for criminal

justice practitioners. ILEETA's *amicus* briefs were cited in opinions by several Supreme Court justices in the *Heller* and *McDonald* cases. ILEETA has joined this brief because the Colorado magazine ban will not reduce violent crime or injuries, and because it is impossible for police in the field to enforce laws for which the relevant evidence to make a decision is unobtainable by them.

*Amici* believe that the perspective of front line law enforcement personnel and law enforcement organizations should be of assistance to this court in evaluating whether Colorado's magazine ban and its grandfathering provision can be enforced in a uniform manner, and whether any interest in reducing violent crime is actually served by that ban.

## STATEMENT PURSUANT TO RULE 29(c)

No party's counsel authored this brief in whole or in part. The National Rifle Association of America contributed money intended to fund preparing or submitting this brief. Except as noted, no party or party's counsel, and no person other than *amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

# INTRODUCTION

*Amici* support the position of Appellants in both consolidated cases that the ban on magazines that can accept more than 15 rounds, C.R.S. § 18-12-302, violates the Second Amendment to the United States Constitution and is void for vagueness.[1]  In this brief, *Amici* first explain why the statute is unconstitutionally vague, concentrating on the very real, practical uncertainties—even impossibilities—that front line law enforcement personnel will encounter in attempting to enforce this statute.  In the second part, *amici* show why, based on law enforcement experience and the evidence of record, the magazine ban will not reduce the number or magnitude of injuries caused by criminal violence.

# ARGUMENT

**I.   THE MAGAZINE BAN IS UNCONSTITUTIONALLY VAGUE BECAUSE DISTINGUISHING BANNED MAGAZINES FROM THOSE LAWFULLY POSSESSED IS NEARLY IMPOSSIBLE FROM A LAW ENFORCEMENT PERSPECTIVE.**

### A.   A Critical Reason that Vague Laws Must Be Held Unconstitutional Is that They Cannot Be Applied by Law Enforcement in a Uniform Manner.

As the courts have frequently stated, a statute is unconstitutionally vague if it

---

[1] *Amici* also support Appellants' challenges to the requirements in C.R.S. § 18-12-112 that all private transfers of firearms be processed through a licensed dealer and that a background check be performed.  However, only the magazine ban is addressed in this *amicus* brief.

fails "to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits…." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality opinion).

Less frequently emphasized, but at least as important, is the principle that a statute must be sufficiently definite for law enforcement personnel, prosecutors, and courts to apply it in a fair and uniform manner.  As the Supreme Court has explained, the void-for-vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and *in a manner that does not encourage arbitrary and discriminatory enforcement.*" *Kolender v. Lawson,* 461 U.S. 352, 357 (1983) (emphasis added). The Supreme Court emphasized that "[a]lthough the doctrine focuses both on actual notice to citizens and arbitrary enforcement," the Court has:

> recognized recently that the more important aspect of the vagueness doctrine "is not actual notice, but the other principal element of the doctrine—*the requirement that a legislature establish minimal guidelines to govern law enforcement.*"  *Smith* [*v. Goguen*, 415 U.S. 566 (1974)] at 574.  Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Id.*, at 575.

*Kolender*, 461 U.S. at 357-58 (emphasis added).

More recently, the Court has held that, "even if an enactment does not reach a

substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards *for the police and public* that are sufficient to guard against the arbitrary deprivation of liberty interests." *Chicago v. Morales*, 527 U.S. 41, 52 (1999) (emphasis added).

This Court has also recognized that law enforcement must have adequate standards or evidence to rely on:

> A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement.

*Bushco v. Shurtleff*, 729 F.3d 1294, 1305 (10th Cir. 2013) (quoting *Hill v. Colorado,* 530 U.S. 703, 732 (2000)).

Statutes that affect fundamental constitutional rights are scrutinized especially closely for vagueness:

> [P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.

*Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982). The right to keep and bear arms is an enumerated, fundamental right. *McDonald v. City of Chicago*, 561 U.S. 742, 767-78 (2010).

7

Thus, in addition to providing notice to persons who must conform their conduct to a statutory proscription, it is essential that the legislature "establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358. Front line law enforcement personnel cannot correctly and uniformly enforce a statute when no one—not themselves, the public, prosecutors, juries, or judges—can tell if it has been violated. As shown below, the magazine ban places law enforcement in that very quandary.

**B.    The Magazine Ban Does Not Provide Intelligible, Objective Standards to Guide Law Enforcement Personnel in Determining Which Magazines Are Illegal.**

**1.    A law enforcement officer in the field cannot tell by observation or other objective evidence whether a magazine was acquired by its current possessor on or before July 1, 2013.**

As described by expert witness Michael Shain, in evaluating a criminal statute one must ask:

> [W]hat would a law enforcement officer need in order to enforce the statute? How would they interpret it? How would they develop probable cause? And how would they ultimately determine what evidence existed in order to support a violation, ultimately, an arrest.

JA 10:2079. Regarding whether the magazine was first acquired by its possessor on or before July 1, 2013, Mr. Shain explained that, with one exception, "there is no way to determine it." JA 10:2082.    He continued, "I don't know of any

manufacturer or distributor or retailer that marks a magazine with the date of sale, which would be the date of acquisition." JA 10:2082. Only a single manufacturer, Magpul, even marks the date of *manufacture* on its magazines (which is, of course, not the date of acquisition). *Id.* If the date of manufacture was after July 1, 2013, on a Magpul magazine:

> then you would have a violation. Clearly, that would be an example where an officer in the field has some definitive, empirical evidence in front of them that they could determine there is a violation. But absent that very kind of rare circumstance, all the other manufacturers, all the other magazines made in the United States, and, for that matter, offshore, have no such marking on them. So there would be no objective way for that officer to make that determination.

JA 10:2083. For an officer trying to obtain information or evidence about the date of acquisition, "there simply isn't any. There is no way to obtain that information." JA 10:2083.

Accordingly, if an officer encounters an individual in possession of a magazine over 15 rounds, he must either let the individual go (thereby overlooking a potential violation), or take the individual into custody (when the officer has no objective evidence that a crime has actually been committed). This places the officer in an untenable position, because of the indeterminate, unenforceable nature of the law itself.

2.    **A law enforcement officer in the field cannot tell by observation or other objective evidence whether the current possessor of a magazine has had it in his "continuous possession" since July 1, 2013.**

As expert witness Shain testified, a similar problem faces the officer in determining whether a magazine has been in the individual's "continuous possession" since July 1, 2013.  For an officer "standing there at the scene with the suspect in front of him" there is no way to determine:

> if that person had somehow relinquished dominion and control of their magazines, and then got them back again, again, there is no objective, technical -- there is no standard way to determine that for a law enforcement officer. There is no standard way for an officer to determine the acquisition date, and there is no standard way for them to determine that continuous possession part of the statute. So it becomes unenforceable on its face for that officer in the field.

JA 10:2084.

In addition, "continuous possession" has no well-accepted meaning, and is vague and open-ended.  The two "technical guidance" letters (JA 23:4964, 4967) issued to the state police regarding the definition of "continuous possession" do not clarify the definition, but render it impossibly vague and even incomprehensible.

The first Technical Guidance, issued on May 16, 2013, stated that the "continuous possession" requirement would not be construed to ban temporary transfers where the owner hands a magazine "to a gunsmith, hunting partner, or

10

acquaintance at a shooting range with the expectation that it will be promptly returned."   JA 23:4965.   It also states that a "gunsmith, hunting partner, or acquaintance at a shooting range who acquires temporary physical custody of a large-capacity magazine from its owner should not be considered in 'possession' of the magazine *so long as he or she remains in the owner's physical presence.*"   JA 23:4965-66.   So, for the owner to avoid liability for a transfer, is the test that the magazine "will be promptly returned"?   Or is "physical presence" required in that case as well?   It makes a difference.   If a hunter loans a magazine to a hunting partner, it is unlikely that they will remain in each other's "physical presence," even though the magazine may be expected to be "promptly returned."

The first Technical Guidance also reveals an unusual perception of how gunsmiths operate.   An owner of a firearm or accompanying magazine does not stand there in the physical presence of the gunsmith while he works on it. Generally, the gunsmith will take weeks or even months to accomplish the repair or other work.   The firearm and accompanying magazine may be sent to a specialized gunsmith located out of state.   Does the owner become a lawbreaker simply by having his gun worked on?   Are the police or the sheriff's officers to arrest and charge him?   And arrest and charge the local gunsmith as well?

What about individuals who serve abroad in the military, and may be out of

11

the country for a year?  If an individual in the armed forces leaves his or her firearms (and magazines) with a friend or relative while overseas, does that serviceman or servicewoman (and the friend or relative) automatically commit a criminal offense?  There will certainly be no "prompt return" of the magazine to the owner, nor will the person holding the magazine be in the "physical presence" of the owner.

These are not far-fetched hypotheticals, but ordinary life circumstances that will certainly be encountered by those who must obey this law, and by those who must enforce it.

In the second Technical Guidance, the vagueness is compounded.  JA 23:4967.  The second Technical Guidance purports to apply afford a "reasonable, every-day interpretation" to the words "continuous possession."  It defines that term as "the fact of having or holding property in one's power or the exercise of dominion over property, that is uninterrupted in time, sequence, substance, or extent."  But what does that mean?

What does it mean for one to exercise dominion over property, that is "uninterrupted" in "extent"?  One would think that the "extent" of one's dominion over the magazine would be interrupted by loaning it to a hunting partner, for example, because then the partner has at least some temporary power or practical

dominion over it, and the owner has less. Yet the first Technical Guidance says such a temporary loan is permissible. What does it mean for the "substance" of one's dominion over property to be interrupted or uninterrupted? And what does it mean for the "sequence" of dominion to be uninterrupted? There is no "sequence" if dominion is truly continuous; and if there is a temporary transfer as allowed by the first Technical Guidance, then there is a "sequence" which is *not* "uninterrupted."

Finally, the four qualifiers in this definition are conjoined by the word "or." If the "substance" of one's dominion is uninterrupted, for example, does that mean that the dominion may be interrupted, perhaps indefinitely, in "time"? The first Technical Guidance did not appear to take that position.

The second Technical Guidance goes on to state an additional, different principle: "Continuous possession is only lost by a voluntary relinquishment of dominion and control." JA 23:4967. While perhaps clearer, that statement is not the equivalent of being "uninterrupted" in "time, sequence, substance, or extent." So which principle is to be followed? And perhaps more importantly, does the second Technical Guidance replace and nullify the first Technical Guidance? Or are citizens and law enforcement officers supposed to try to reconcile them? The second Technical Guidance does not say.

13

Appellate Case: 14-1290   Document: 01019373427   Date Filed: 01/23/2015   Page: 21

As the Supreme Court has stated, "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). Here, citizens and law enforcement officers cannot tell what facts they are supposed to consult, but are left to wrestle with metaphysical subtleties such as whether the "substance" of a person's "dominion" is "uninterrupted."

When no one can tell what a statute is supposed to mean, when official guidance is conflicting, and when the guidance consists of imponderables such as whether the "extent" of "dominion" is "uninterrupted," the statute is unconstitutionally permeated with vagueness.

### 3. The officer in the field will have to rely on unreliable evidence, resulting in arbitrary enforcement.

The manner in which § 18-12-302 is written compounds the vagueness for law enforcement. Paragraph (1)(a) provides that "Except as otherwise provided in this section, on and after July 1, 2013, a person who sells, transfers, or possesses a large capacity magazine commits a Class 2 misdemeanor."

Paragraph (2)(a) then states:

> A person may possess a large-capacity magazine if he or she:
>
>> (I) owns the large-capacity magazine on the effective date of this section; and
>> (II) maintains continuous possession of the large-capacity magazine.

The following Paragraph (2)(b) then states:

> (b) If a person who is alleged to have violated Subsection (1) of this Section asserts that he or she is permitted to legally possess a large-capacity magazine pursuant to Paragraph (a) of this Subsection (2), the prosecution has the burden of proof to refute the assertion.

It is unclear whether the grandfathering provision in Paragraph (2)(a) is part of the definition of the offense, or whether it is an affirmative defense (as to which the burden of proof may later shift to the prosecution). If the former, law enforcement officers should not be arresting anyone without definitive proof that the individual did *not* own the magazine on the effective date, or did *not* maintain continuous possession. Otherwise, they could be liable to suits for false arrest or similar kinds of actions. Even if it is technically an affirmative defense, officers would be ill-advised to arrest people for unlawful possession of a magazine, if there is no present evidence that the prosecution would be able to carry its burden of proof after that burden shifts. Similarly, the tens of thousands of citizens of Colorado who lawfully possess grandfathered magazines should not be subjected to

15

arrest, unless there is valid, definite proof that they did *not* possess the magazine on the effective date or did *not* maintain continuous possession.

That means that when an officer in the field encounters an individual with a magazine that is not imprinted with a date mark (which is nearly all magazines), he or she will have to engage in a colloquy with the individual possessing it.  If the officer asks "When did you acquire this magazine," and the answer indicates that it was before July 1, 2013, must the officer take the person's word for it, whether truthful or not?  What if the individual remains silent, or replies "I don't know," or "I don't want to discuss it?"

If the person states that the magazine was acquired prior to July 1, 2013, the officer would presumably be required also to ask, "Has the magazine been in your continuous possession since July 1, 2013?"  The answer the citizen gives is unlikely to comport with the conflicting and murky guidance in the second Technical Guidance.  Some may think that if the magazine was continuously *owned* since then, that is sufficient, and may answer "yes," even though there may have been "interruptions" in possession.  Others may believe that temporary transfers that the Technical Guidance *allows* make the possession not continuous, and may erroneously answer "no."  And again, must the officer take the individual's word for it?  The opportunities for inconsistent enforcement and arrests that may not be

16

Appellate Case: 14-1290   Document: 01019334278   Date Filed: 01/23/2015   Page: 24

justified are rife, given the fallibility of people's memories, the officer's discretion as to whether to believe an individual, the willingness of some people to lie, the lack of any objective information evident from the magazine itself, and the tangled definitions in the Technical Guidance regarding continuous possession.

Determination of what property citizens are forbidden from possessing is properly a *legislative determination*, not a *law enforcement* determination. The constitutional flaw in a vague criminal statute is that it "necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat." *Chicago v. Morales*, 527 U.S. 41, 60 (1999). Here, the unclear, vague, and conflicting nature of both the statute and the Technical Guidance forces on law enforcement officers the necessity of making that unwanted judgment, rather than providing the clarity that is necessary for laws that impinge on fundamental constitutional rights.

## II.   THE MAGAZINE BAN WILL NOT PROMOTE PUBLIC SAFETY.

As set forth in the Appellants' Opening Briefs, the ban imposed by C.R.S. § 18-12-302 on magazines holding more than 15 rounds should be held to directly violate the Second Amendment under the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). Sheriffs' Brief at 8-12, 15-16 (Case No. 14-1292); Nonprofit

Organizations' Brief at 22-23 (Case No. 14-1290).

If some form of heightened scrutiny is applied instead, the state must show that the ban is narrowly tailored to advance either a "compelling" governmental interest, or an "important" or "substantial" interest. The trial court stated that the General Assembly's purpose (the "governmental interest" under heightened scrutiny) was to "reduce the number and magnitude of injuries caused by gun violence, specifically in mass shootings." Op.32.

From a law enforcement perspective, the ban on magazines capable of holding more than 15 rounds will not reduce criminal violence or the magnitude of injuries either in ordinary crime or in mass shootings. The evidence of record shows that the ban will not achieve these purposes, and seasoned law enforcement officers across the country overwhelmingly believe that limitations on magazine capacity are futile in fighting crime. On the other hand, the magazine ban will have a detrimental effect, perhaps sometimes a fatal one, on the ability of ordinary citizens to defend themselves and their loved ones against criminal attacks.

### A.    The Magazine Ban Will Not Reduce Criminal Violence or Injuries.

The most obvious reason why the ban on magazines over 15 rounds will not reduce violent crime or injuries is that criminals who are willing to shoot people or kill them will not obey that law. It is implausible, to say the least, that a violent

individual who intends to engage in an armed robbery, armed home invasion, or premeditated murder will first stop to make sure that his handgun is properly fitted with a compliant 15 round magazine rather than the manufacturer's magazine that may hold 17 or 19 rounds.

An argument that the magazine ban will limit the number of magazines over 15 rounds that are available to criminals, because they would not be available from retail dealers in Colorado, runs aground on practical realities.  Only a small handful of states impose a magazine capacity limit and, with the exception of California and Hawaii,[2] they are all on the northeastern seaboard.  JA 2153.  The vast majority of states have no such restriction, and not one of the seven states adjoining Colorado has a magazine ban based on capacity.  Thus, it is a simple matter for anyone contemplating criminal violence, including mass shooters, to obtain larger magazines elsewhere.[3]

More importantly, evidence and experience suggest that limiting magazine capacity to 15 will not even affect the number of rounds fired in a criminal attack,

---

[2] Hawaii imposes a magazine capacity limit only for handguns, not long guns. Haw. Rev. Stat. Ann. § 134-8(c).

[3] This is assuming that the use of magazines over 15 rounds is important either for ordinary criminal violence or for mass shootings.  In fact, use of such magazines is important for neither, as discussed below.

much less cause a decrease in injuries or fatalities.[4]    A study of criminal attacks involving handguns in Jersey City, New Jersey, over a multi-year period in the 1990s, revealed that in approximately 60% of handgun assaults there was no injury to the victim. D.C. Reedy and C.S. Koper, "Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers," *Injury Prevention* 151, 152-53 (2003). When shots were actually fired, approximately half the incidents involved only one or two shots.  *Id.* at 154. The mean number of shots fired in all criminal attacks in which the gun was actually discharged (depending on type of handgun and method of determining number of shots) ranged from 2.30 to 3.68 shots.  *Id.*[5]    But most critically for the Colorado ban, *in only one out of 343 criminal attacks involving handguns were as many as 17 rounds fired*.[6]

_____

[4] It is important to understand that criminals may need to fire fewer rounds than citizens acting in self-defense. *See* Part I.C., below.

[5] A separate study of Philadelphia firearms homicides found only 2.7 shots fired per semi-automatic pistol killing in 1990, fewer than in the Jersey City study.  M.D. McGonigal, *et al.,* "Urban firearm deaths: a five-year perspective," *The Journal of Trauma* 532, 534 (1993).

[6] The authors estimated the "minimum" and "maximum" rounds fired per incident, because of conflicting evidence.  Only one incident, using a "maximum" estimation method for shots fired, may have involved 17 rounds.  No incidents had a number of shots fired higher than 17.  Accordingly, there was only one potential incident in which a 15 round magazine limit could conceivably have made a difference in criminal violence.  Even that is highly uncertain, because the unit of reporting was the "incident," and the authors do not disclose whether multiple assailants or

Appellate Case: 14-1290    Document: 01019373278    Date Filed: 01/23/2015    Page: 28

Limiting magazines to 15 rounds will also do nothing to impede crazed individuals who are determined to engage in a mass shooting.[7]  At trial, Professor Kleck identified 59 mass shootings in the United States between January 1, 1994, and July 13, 2013.   JA 12:2461, 2465.  In only 16 of those did the mass shooter even possess a magazine of more than 15 rounds. JA 12:2475-76.  However, in *13 out of those 16 incidents* the shooter was known to possess more than one gun. JA 12:2476.  In *14 of the 16 incidents* the shooter was known to have possessed more than one detachable magazine.  *Id.*  In *all 16 incidents* the criminal shooter possessed either multiple detachable magazines or multiple guns.  *Id.*

Professor Kleck concluded that "in incidents where the person had a large-capacity magazine, it was, essentially, irrelevant, because they could continue firing simply because they had multiple guns, with, basically, no perceptible interruption, or they could continue firing with only a very brief interruption for reloading detachable magazines in the few cases where they didn't have multiple guns." JA

---

multiple handguns were involved in any of the incidents, and do not state whether any of the assailants reloaded. As noted, handgun use by criminals is not necessarily representative of defensive use of firearms by law-abiding citizens.

[7] The trial court noted that one reason offered by the General Assembly for the ban was that "mass shootings often involve use of large-capacity magazines." However, the reason why such magazines may often be involved is that they are standard on many commonly possessed firearms.  *See Fyock v. City of Sunnyvale,* 25 F.Supp.3d 1267, 1275 (N.D. Cal. 2014) (referencing evidence that "magazines having a capacity to accept more than ten rounds make up approximately 47 percent of all magazines owned").

Appellate Case: 14-1290    Document: 01019375427    Date Filed: 01/23/2015    Page: 29

12:2476-77.[8]

Furthermore, mass shooters are the ones who we may be completely certain will not obey the law. The insane Newtown killer, Adam Lanza, shot his own sleeping mother in the head four times before killing twenty schoolchildren.[9] To believe that he would be deterred from such hideous actions by the threat of a misdemeanor violation (or by any other law) requires a degree of credulity that most people cannot accept.

## B. Law Enforcement Personnel Overwhelmingly Recognize that Magazine Bans Are Not Effective in Fighting Crime.

The national law enforcement organization PoliceOne conducted its Gun Policy & Law Enforcement survey between March 4 and March 13, 2013, receiving 15,595 responses from verified police professionals across all ranks and department sizes.[10] Respondents were asked, "Do you think a federal ban on manufacture and

---

[8] Mass shooters tend to plan their attacks carefully, and to stock up on guns and ammunition. As expert witness Ayoob noted regarding the Texas tower shootings in 1966, "Charles Whitman had climbed that tower with literally a footlocker full of guns and ammunition that he rolled up on a dolly on the elevator." JA 11:2318. The difference between a 15 round magazine and one of greater capacity is unlikely to be of significance to a mass shooter, but if it was he could simply bring more 15 round magazines, or acquire them outside Colorado or illegally inside Colorado.

[9] *See* L. Boyle, "Adam Lanza hated his mother he shot dead because he thought 'she loved the students at Sandy Hook more than him,'" *DailyMail.com* (Dec. 28, 2013, available at http://www.dailymail.co.uk/news/article-2530371/Adam-Lanza-shot-dead-teacher-volunteer-mother-thought-loved-students-Sandy-Hook-him.html

[10] PoliceOne, *Gun Policy & Law Enforcement Survey* (2013) (reported at

22

sale of ammunition magazines that hold more than ten rounds would reduce violent crime?"  PoliceOne Survey, Question 6.   The results were overwhelming: 95.7% (14,013) of the respondents said "no," only 2.7% (391) said "yes," and 1.6% (238) were unsure.  This extraordinary consensus by law enforcement professionals that even a *nationwide* ban on magazines with a *lower limit* will not reduce violent crime is in stark contrast to the lower court's assertion that "it is reasonable to infer that the restriction will, at a minimum, reduce the ready availability of large-capacity magazines to both criminals and law-abiding citizens."  Op.35.  The ban will certainly reduce availability to the law-abiding, but criminals will ignore or circumvent it.  Thus, the effect is to impair the rights of citizens for legitimate self-defense and other purposes; the effect on violent criminals will be nil.[11]

---

http://ddq74coujkv1i.cloudfront.net/p1_gunsurveysummary_2013.pdf  ("PoliceOne Survey").  A description of the study is at http://www.policeone.com/police/products/press-releases/6188461-policeone-com-releases-survey-of-15-000-law-enforcement-professionals-about-u-s-gun-control-policies/

[11] The lower court noted plaintiffs' argument that "criminals who are intent on committing gun violence will not obey the magazine restriction and will nevertheless unlawfully obtain large-capacity magazines."  Op.35. The court's response was, "*Hypothetically*, this may be true, but the Court *declines to speculate* about the *subjective* intentions and means of *unspecified* criminals involved in *unspecified* gun violence."  *Id.* (emphasis added).  The fact that violent criminals do not obey gun laws is hardly "hypothetical"—they routinely violate concealed carry laws and felon-in-possession laws, among many others.  If there is evidence that criminals who commit murder, aggravated assault, and armed robbery will scrupulously obey a magazine limit, it does not appear in the record in this case so

Indeed, there was heavy law enforcement opposition to HB 1224 (which became C.R.S. §§18-12-301–303), as evidenced by the fact that the County Sheriffs of Colorado ("CSOC") opposed the bill,[12] and 55 out of 62 Colorado sheriffs originally brought suit (Case No. 14-1292) to have it declared unconstitutional.

When magazine bans (often coupled with "assault weapon" legislation) have recently been imposed in a small number of other states, the reaction of rank and file law enforcement officers, as well as elected law enforcement officials, has been heavily negative, chiefly on grounds that such bans are ineffective in reducing crime.  The New York state legislature in 2013 banned "assault weapons" and imposed a ten round magazine limit on civilians, though not on law enforcement. *See* NY SAFE Act, S. 2230, 2013 Reg. Sess. (N.Y. 2013), amended by S. 2607D, 2013 Reg. Sess. (N.Y. 2013).  The Albany Police Officers Union wrote an open letter to the Governor and key legislators stating that it "condemns and opposes" the new law, that the law "violates fundamental constitutional rights," and that it "will not deter criminals or mentally ill individuals from plotting and carrying out bloodshed and violence."[13]  They forcefully urged that the Act "will not improve public safety.  Criminals and the mentally ill will not abide by it…." *Id.*

far as *amici* are aware.

[12] "County Sheriffs of Colorado Position Paper on Possible Gun Control Legislation," available at http://www.csoc.org/ppdocs/GunControlLegislation.pdf

[13] Available at http://www.nysrpa.org/files/SAFE/AlbanyPoliceUnionLetter.pdf

Appellate Case: 14-1290   Document: 01019734278   Date Filed: 01/23/2015   Page: 32

The New York State Sheriffs' Association and a number of individual sheriffs not only opposed the Act publicly, they submitted a brief in opposition to the Act in federal district court and on appeal. *New York State Rifle and Pistol Association v. Cuomo*, 1:13-cv-00291 (W.D.N.Y) (Dkt. No. 47-1); *Nojay v. Cuomo*, 14-36-CV(L) (2d. Cir.) (Dkt. No. 93).

In sum, front line police officers, sheriffs, and other law enforcement officers at every level across the country, recognize that banning commonly possessed firearms used by citizens for lawful purposes will accomplish nothing in reducing violent crime or injuries, but will only serve to empower criminals against the citizenry, and infringe on the Second Amendment rights of millions of honest individuals.

### C.     The Magazine Ban Impairs the Ability of Law-Abiding Citizens to Defend Themselves and Their Loved Ones Against Criminal Attack.

It is worth re-emphasizing that plaintiffs do not have to demonstrate a "need" for a particular firearm (or integral part) in order for it to be protected by the Second Amendment.  Thus, a balancing test, in which the court weighs the plaintiffs' "need" and the degree of infringement of their Second Amendment rights, against "governmental interests" in reducing those rights, goes against the Supreme Court's ruling in *Heller*.  *Heller*, 554 U.S. at 634-35 (rejecting "freestanding interest

balancing" approach).

Nevertheless, if a balancing test such as strict scrutiny or intermediate scrutiny is applied, the trial court's analysis of the 15 round limit is deeply flawed. One of the reasons is that the court assumes a parity of need for rounds, reloading, number of weapons, and number of opponents as between the criminal and the citizen acting in self-defense. *See, e.g.*, Op.34 (comparing effect of pause to reload on offensive and defensive shooters).

But in an armed confrontation with a law-abiding citizen, a criminal will ordinarily have far less need for a magazine over 15 rounds than will the citizen. The criminal picks the time and place of the attack, is already armed, and has the advantage of surprise. He can thus kill, disable, or control the victim with a minimum of rounds fired. If he anticipates a need for many rounds of ammunition, he can equip himself in advance with multiple loaded magazines or multiple firearms. Often there will be multiple assailants, who will outnumber the intended victim both in numbers and in number of firearms. With these advantages, the number of rounds that will fit in each magazine is a secondary consideration for criminals, at most.

The citizen defending against a criminal attack is at a severe disadvantage. First, unlike the criminal or criminals who planned the attack, the ammunition in a

26

single magazine is all that the law-abiding citizen is likely to have available to him. As explained by Mr. Ayoob, most people do not wear their gun on their person when they are at home. Instead, they typically will "have it stored in one or another fixed, static location." JA 11:2276. "They may have to go to into another room to get at where the gun is, they may have to go down the hall to get at where the gun is." JA 11:2276. All of this takes precious seconds.

> As Mr. Ayoob testified:

> They're not going to have time to strap on a gun belt with an ammunition pouch, and they're not going to have time to grab a spare magazine or speed loader. Essentially, what they have in that gun is going to be probably all they're going to have from the beginning to the end of [a] fight that occurs. So we tell them, for the home defense gun in particular, it makes sense to have higher cartridge capacity than some other applications.

JA 11:2277.[14]

Even if the citizen acting in self-defense should fortuitously have access to multiple magazines, he may easily lose his life if he has to stop to reload in the face of an armed intruder. An average, able bodied citizen with "some proper training fresh in their mind, they'll probably average around 4 to 6 seconds" to reload. JA 11:2291. Those who are more expert or dexterous, or who have more experience,

---

[14] Many citizens who possess a firearm for self-defense may not even own multiple magazines. Often, firearms that use a detachable magazine are sold by the manufacturer with only one magazine.

may be able to reload in 2 to 3 seconds.  *Id.*  In those seconds, the citizen may be killed at close range.

"[E]very second the defender cannot fire is a second of absolute helplessness. The longer the reload process takes, the longer they are helpless against an armed opponent. That becomes magnified in a situation where the hands are trembling, fine motor skill is being lost." JA 11:2289.  According to Mr. Ayoob, the tradeoff between reloading and having a magazine with sufficient capacity is that "we're balancing several seconds, multiple whole seconds of vulnerability for you and those within the mantle of your protection against the ability to return a shot and hopefully end the danger in a quarter of a second." JA 11:2294.

There is no data regarding how often a civilian defensive shooter has had to fire more than 15 rounds.  JA 11:2313.  Mr. Ayoob reviewed statistics showing that in New York City, about three percent of shootings by police involved the expenditure of more than 16 rounds, as did about five percent in Los Angeles.  JA 11:2314.  He believed it a "reasonable extrapolation" that citizens who are shooting at the same criminals might expend a similar number of rounds.[15]  When asked by counsel why the need was "significant" if it only occurred in three to five percent of

---

[15] He also described several instances known to him personally in which civilians successfully defended themselves by discharging a great number of rounds—well over 15—to defeat criminal attackers.  JA 11:2323-25.

gunfights, Mr. Ayoob replied:

> It is significant because in a life-or-death issue . . . it's not about the odds, it's about the stakes. I think the best analogy I could give is, probably everyone in this room has fire insurance on their home. If the judge would ask for a show of hands, okay, how many of you have ever had your house burn down, you probably wouldn't see more than one or two hands go up. Those people would be awfully glad they have the fire insurance.

JA 11:2314. He concluded, "[I]n those moments when you become the 3 percent, the 5 percent, it's like the . . . fire insurance, the cost of not being prepared for it is so absolutely catastrophic, it is simply unacceptable." JA 11:2315.[16]

Mr. Ayoob also described a number of additional specific factors that might make it critical for a private citizen to have a high round count. These included: instances when the attacker is firing from behind solid cover; the increase in the number of criminals wearing soft body armor; opponents who are running or moving quickly and are hard to hit; instances in which the intended victim has to shoot while moving, thereby decreasing accuracy; the need to defend against multiple attackers; and instances where a criminal is so "supercharged" by drugs or

---

[16] The Colorado law, of course, has an exception to the 15 round limit for law enforcement officers. C.R.S. § 18-12-302(2)(b). Most law enforcement officers will never engage in a shooting in their entire careers. So why are they allowed to possess and use magazines over 15 rounds? Because they very well *might* need them. And the consequences to police of not having adequate capacity when it is needed may be fatal, just as Mr. Ayoob testified regarding citizens acting in self-defense.

adrenaline that he remains an active threat even though shot multiple times.[17]  JA 11:2320-23.

Rather than advancing a governmental interest, the 15 round magazine ban impairs, perhaps fatally in some instances, the ability of the law abiding citizen to defend self and loved ones, and gives the advantage to the criminal attacker.

## CONCLUSION

For the reasons stated above, the decision of the District Court should be reversed.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Dan M. Peterson
Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
Telephone: (703) 352-7276
dan@danpetersonlaw.com

</div>

January 23, 2015                    Counsel for *Amici Curiae*

---

[17] Mr. Ayoob described an incident in which a heroin addict was robbing a liquor store.  He "took 33 rounds, 33 hits from 9 millimeter pistols. Stayed on his feet until finally one or two shotgun blasts put him down. We have case after case where these guys just turn into bullet sponges." JA 11:2322.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the attached Brief of Appellant complies with Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure. According to the word count feature of the word-processing system used to prepare the brief, it contains 6,929 words, exclusive of those matters that may be omitted under Rule 32(a)(7)(B)(iii).

I further certify that the attached brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6). It was prepared in a proportionately spaced typeface using 14-point Times New Roman font in Microsoft Word.

/s/ Dan M. Peterson
Dan M. Peterson

Counsel for *Amici Curiae*

Date: January 23, 2015

Appellate Case: 14-1290    Document: 01019375427    Date Filed: 01/23/2015    Page: 39

# CERTIFICATE OF SERVICE

I hereby I hereby certify that on January 23, 2015, an electronic PDF file of the foregoing Brief *Amicus Curiae* of Western States Sheriffs' Association *et al.* was served via ECF on the following:

| | |
|---|---|
| Matthew Grove | matt.grove@state.co.us |
| John T. Lee | jtlee@state.co.us |
| Molly Moats | Molly.Moats@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |
| Stephanie Scoville | stephanie.scoville@state.co.us |
| LeeAnn Morrill | leeann.morrill@state.co.us |
| Richard Westfall | RWestfall@halewestfall.com |
| Peter Krumholz | PKrumholz@halewestfall.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Brian S. Koukoutchos | bkoukoutchos@gmail.com |

Jonathan Michael Anderson          jmanderson@hollandhart.com

David C. Blake                     david.blake@state.co.us

Charles J. Cooper                  ccooper@cooperkirk.com

Virus scan certification: the digital form of this pleading submitted to the Court was scanned for viruses using Malwarebytes Anti-Malware Pro software, version 1.70.0.1100 (the most recent virus definition, v.2015.01.23.02, was downloaded on January 23, 2015) and, according to the program, the document is virus free.

ECF Submission: the undersigned certifies that this ECF submission is an exact duplicate of the seven hard copies to be delivered to the clerk's officer pursuant to 10th Cir. R. 31.5.

No privacy redactions were required for this brief.

/s/ Dan M. Peterson
Dan M. Peterson