No. 14-1290, 14-1292

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

COLORADO OUTFITTERS ASSOCIATION, et al.,

*Plaintiffs- Appellants*,

*v.*

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

*Defendant- Appellee.*

JIM BEICKER, Sheriff of Fremont County, et al.,

*Plaintiffs- Appellants*,

*v.*

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

*Defendant- Appellee.*

On Appeal from the United States District Court for the
District of Colorado (No. 1:13-cv-01300) (Krieger, J.)

**BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN
SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE**

PETER C. CANFIELD
JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309

GREGORY A. CASTANIAS
SPARKLE L. SOOKNANAN
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Telephone: (202) 879-3435
Email: ssooknanan@jonesday.com

*Counsel for Amicus Curiae*

Appellate Case: 14-1290   Document: 01019423108   Date Filed: 04/23/2015   Page: 2

# DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure,

Everytown for Gun Safety discloses that it has no parent corporations and is a

nonprofit entity that issues no stock.  Accordingly, no publicly held corporation

owns 10% or more of its stock.

<u>/s/ Sparkle L. Sooknanan</u>
SPARKLE L. SOOKNANAN
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC  20001
Telephone:  (202) 879-3435
Email: ssooknanan@jonesday.com

*Counsel for Amicus Curiae*

Appellate Case: 14-1290    Document: 01019423108    Date Filed: 04/23/2015    Page: 3

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................... i

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF *AMICUS CURIAE* .......................................................1

INTRODUCTION .................................................................................1

ARGUMENT ........................................................................................3

COLORADO'S BACKGROUND CHECK REQUIREMENTS DO NOT BURDEN CONDUCT PROTECTED BY THE SECOND AMENDMENT, AND WOULD PASS CONSTITUTIONAL MUSTER EVEN IF THEY DID ..................................3

I.     COLORADO'S EXPANDED BACKGROUND CHECK REQUIREMENTS ARE LONGSTANDING, PRESUMPTIVELY LAWFUL REGULATIONS THAT DO NOT VIOLATE THE SECOND AMENDMENT .......................4

II.    BACKGROUND CHECKS ARE PROVEN AS AN EFFECTIVE TOOL FOR REDUCING FIREARM VIOLENCE AND SAVING LIVES, AND ARE NOT UNDULY BURDENSOME .......................................................13

       A.    Requiring bakcground checks on all firearm transfers closes a significant loophold in federal law and provides law enforcement with a valuable crime-fighting tool ............................................14

       B.    Substantial evidence demonstrates that requiring background checks for transfers by unlicensed persons is effective in reducing gun violence and firearm crime ...................................................20

       C.    Colorado's expanded background check requirements are already providing public safety benefits without imposing meaningful burdens on gun buyers or unlicensed sellers ......................................24

CONCLUSION .....................................................................................30

ATTACHMENT A ................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*District of Columbia v. Heller,*
554 U.S. 570 (2008)..................................................................*passim*

*Drake v. Filko,*
724 F.3d 426 (3d Cir. 2013) ...............................................8

*Fyock v. Sunnyvale,*
779 F.3d 991 (9th Cir. 2015) ..............................................8

*Heller v. District of Columbia,*
670 F.3d 1244 (D.C. Cir. 2011)...........................................5

*NRA of Am. v. Bureau of Alcohol,*
700 F.3d 185 (5th Cir. 2012) ..............................................5

*Peterson v. Martinez,*
707 F.3d 1197 (10th Cir. 2013) .......................................5, 13

*United States v. Bena,*
664 F.3d 1180 (8th Cir. 2011) ............................................8

*United States v. Booker,*
644 F.3d 12 (1st Cir. 2011).................................................8

*United States v. Huitron-Guizar,*
678 F.3d 1164 (10th Cir. 2012) ......................................4, 13

*United States v. Marzzarella,*
614 F.3d 85 (3d Cir. 2010) .................................................5

*United States v. Reese,*
627 F.3d 792 (10th Cir. 2010) .....................................3, 13, 14

Appellate Case: 14-1290   Document: 01019423103   Date Filed: 04/23/2015   Page: 5

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*United States v. Rene E.*,
  583 F.3d 8 (1st Cir. 2009)..................................................................5

*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010) ...........................................................8

**STATUTES**

§ 18-12-112 of the Colorado Statutes ..........................................*passim*

18 U.S.C. § 922(d), (g)....................................................................15

47 Stat. 650 (1932).........................................................................11

1911 Colo. Sess. Laws 408 ...............................................................7

1911 N.Y. Laws 442 .........................................................................7

1913 Or. Laws 497....................................................................7, 11, 12

1918 Mont. Laws 6 ...........................................................................7

1919 N.C. Sess. Laws 397 ...........................................................8, 12

1921 Mo. Laws 691 .....................................................................8, 12

1923 Ark. Acts 379 ...........................................................................8

1923 Cal. Stat. 695 .....................................................................8, 10

1923 Conn. Pub. Acts 3707 ..............................................................10

1923 N.D. Laws 379 ..............................................................8, 10, 12

1923 N.H. Laws 138 ...................................................................10, 12

1925 Ark. Acts 1047 .........................................................................8

Appellate Case: 14-1290   Document: 01019423108   Date Filed: 04/23/2015   Page: 6

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

1925 Haw. Sess. Laws 790 ...................................................................10

1925 Ind. Acts 495 ...................................................................10, 12

1925 Mich. Pub. Acts 473 ...................................................................12

1925 Or. Laws 468 ...................................................................10

1927 Haw. Sess. Laws 209 ...................................................................12

1927 Mass. Acts 413 ...................................................................10

1927 Mich. Pub. Acts 887 ...................................................................10, 12

1927 N.J. Laws 742 ...................................................................10

1931 Pa. Laws 497 ...................................................................11, 12

1931 Tex. Gen. Laws 447 ...................................................................11

1935 S.D. Sess Laws 355 ...................................................................11, 12

1935 Wash. Sess. Laws 599 ...................................................................11, 12

1936 Ala. Laws 51 ...................................................................11, 12

Vol. 26 Del. Laws 28 (1911) ...................................................................6

Vol. 30 Del. Laws 55 (1919) ...................................................................6

Brady Handgun Violence Prevention Act of 1993, Pub. L. No. 103-
159, 107 Stat. 1536 ...................................................................15

## OTHER AUTHORITIES

ATF, *Firearms Trace Data-2013*,
https://www.atf.gov/content/About/statistics/firearms-trace-data-
2013 ...................................................................18

# TABLE OF AUTHORITIES
## (continued)

Page(s)

ATF, *Listing of Federal Firearms Licensees (FFLs) – 2015*, at
http://1.usa.gov/1ps0dJa..................................................................26

Colorado Bureau of Investigation, *InstaCheck Unit*,
http://1.usa.gov/1DkpIFj..................................................................24

Cook & Ludwig, *Guns in America: Results of a Comprehensive
National Survey on Firearm Ownership and Use* (May 1996),
http://bit.ly/1p862I4 ........................................................................16

Everytown for Gun Safety, *Online and Off the Record* 2-3 (Sept.
2014), http://bit.ly/1Bhinln ..............................................................17

Everytown for Gun Safety, *State Background Check Requirements
and Rates of Domestic Violence Homicide*,
http://every.tw/1Aj9HZj ....................................................................20

Everytown for Gun Safety, *State Background Check Requirements
and Rates of Firearm Homicide Against Law Enforcement*,
http://every.tw/1Aj9JAy ....................................................................20

Everytown for Gun Safety, *State Background Check Requirements
and Suicide*, http://every.tw/1Aj9CVz.................................................20

Federal Bureau of Investigation, *Criminal Justice Information
Services Division, NICS Operations Report*,
http://www.fbi.gov/about-us/cjis/nics/reports/2012-operations-
report ...............................................................................................27

Fuoco, Michael A. & Gurman, Sadie, *New Mexico man regrets
selling guns used in Western Psych shootings*, Pittsburgh Post-
Gazette, Mar. 31, 2012......................................................................17

GunBroker, *FFL SignUp*,
http://www.gunbroker.com/FFL/DealerServices.aspx ........................28

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Imlay, Charles V., *The Uniform Firearms Act*, 12 A.B.A. J. 767
(1926) .................................................................................................... 9

Larson, *Four Exceptions in Search of a Theory:* District of Columbia
v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371 (2009) .......................... 9

Miller, Kevin, *Many sales of firearms in Maine fall under the radar*,
Maine Sunday Telegram, Feb. 10, 2013 .............................................................. 19

Nat'l Conf. on Uniform State Laws, *Report of Comm. on Act to
Regulate the Sale & Possession of Firearms* (1930) .................................... 10, 11

Nat'l Instant Criminal Background Check System, *NICS Point of
Contact States & Territories*, http://www.fbi.gov/about-
us/cjis/nics/poc ...................................................................................................... 27

Open Letter from Chad J. Yoder, Chief, Firearms and Explosives
Industry Division, to All Federal Firearms Licensees (Jan. 16,
2013), https://www.atf.gov/files/regulations-
rulings/procedures/031513-open-letter-atf-procedure-2013-1.pdf ..................... 28

*Sportsmen Fight Sullivan Law*, 23 J. Crim. L & Criminology 665
(1932). ................................................................................................................... 11

U.S. Department of Justice, *Background Checks for Firearm
Transfers: 2012 Statistical Tables* (December 2014),
http://1.usa.gov/1DaX5UW .................................................................................. 15

U.S. Department of Justice, *Survey of Inmates in State and Federal
Correctional Facilities: Firearm Use by Offenders* (Feb. 28, 2007),
http://www.bjs.gov/content/pub/pdf/fuo.pdf ........................................................ 16

Webster *et al.*, *Effects of State-Level Firearm Seller Accountability
Policies on Firearm Trafficking*, 86 J. Urban Health 525 (2009) ...................... 21

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Webster *et al.*, *Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides*, 91 J. Urban Health 293 (2014)...............22, 23, 24

Webster & Wintemute, *Effects of Policies Designed to Keep Firearms from High-Risk Individuals*, Annual Review of Public Health (2015).........................................................................................................16, 21

Wintemute, *Background Checks for Firearm Transfers* (2013), http://www.ucdmc.ucdavis.edu/vprp/...............................................18, 21, 24, 28

Appellate Case: 14-1290   Document: 01019423103   Date Filed: 04/29/2015   Page: 10

## INTEREST OF *AMICUS CURIAE*[1]

Everytown for Gun Safety ("Everytown") is the largest gun violence prevention organization in the country, with more than 2.5 million supporters, including everyday Americans, gun violence survivors, and more than 1,000 current and former mayors, who are fighting for policies that will reduce gun violence and save lives. Everytown was formed when two of the country's leading gun violence prevention organizations—Mayors Against Illegal Guns and Moms Demand Action for Gun Sense in America—joined forces. Everytown's members—including the current mayors of ten Colorado cities and more than 57,000 other Colorado residents—are united in their understanding that respect for the Second Amendment can go hand-in-hand with common-sense gun laws.

## INTRODUCTION

Federal law requires licensed firearm dealers to conduct background checks before transferring firearms, but it imposes no such obligation on unlicensed gun owners who sell or transfer firearms. In November 2000, in the wake of a mass shooting at Columbine High School, Colorado's voters passed a ballot initiative requiring background checks for gun sales by unlicensed sellers at gun shows.

---

[1] All parties consent to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel, or any person, other than *Amicus* or its counsel, contributed money intended to fund the preparation or submission of this brief.

Appellate Case: 14-1290   Document: 01019423080   Date Filed: 04/29/2015   Page: 11

More than a decade later in 2013, after another mass shooting at a movie theatre in Aurora that left 12 dead and 70 injured, Colorado's legislators expanded the background check requirement, with certain exceptions, to all gun sales and transfers by unlicensed parties. Under the law, § 18-12-112 of the Colorado Statutes, an unlicensed person wishing to transfer a firearm must arrange for a licensed dealer to conduct a background check on the prospective recipient of the gun. All licensed dealers in Colorado are eligible to perform the checks and they may not charge more than $10 for the service.

Colorado expanded its background check requirement to promote public safety and reduce crime. The law simply subjects purchases from unlicensed sellers in the secondary market to the same background checks that have long been in effect for purchases at licensed dealers and gun shows. Appellants claim that this expansion of Colorado's background check requirement infringes their Second Amendment rights. It does not. The Second Amendment right to keep and bear arms "is not unlimited," and various "longstanding" regulations of conduct that fall outside the scope of the Second Amendment's protections are "presumptively lawful." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008). Background checks of the sort that § 18-12-112 requires are one such longstanding, presumptively valid condition on the sale of firearms that implements widely-accepted prohibitions on firearm ownership. Section 18-12-

112 thus falls outside the scope of the Second Amendment.  Even if § 18-12-112
did burden Appellants' Second Amendment rights, it would easily pass muster
under the appropriate constitutional scrutiny.

At no time in American history has keeping guns out of the hands of
dangerous persons like felons or the severely mentally ill been understood to
violate the Second Amendment.  Background checks are the cornerstone of gun
safety and our Nation's chosen method for stopping these prohibited individuals
from obtaining firearms.  This Court should affirm the district court's decision to
uphold § 18-12-112's background check provisions.[2]

## ARGUMENT

### COLORADO'S BACKGROUND CHECK REQUIREMENTS DO NOT BURDEN CONDUCT PROTECTED BY THE SECOND AMENDMENT, AND WOULD PASS CONSTITUTIONAL MUSTER EVEN IF THEY DID.

This Court evaluates Second Amendment challenges under a familiar two-
step inquiry.  The first question is "whether the challenged law imposes a burden
on conduct falling within the scope of the Second Amendment's guarantee."
*United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010) (internal quotation
marks omitted).  "If it does not, the court's inquiry is complete."  *Id.* at 800-01.  "If
it does, the court must evaluate the law under some form of means-end scrutiny."

---

[2] For the reasons presented by Appellee, *see* Appellee Br. at 46, *Amicus*
agrees that § 18-12-122's limitations on large capacity magazines also pass
constitutional muster, but *Amicus* limits this brief's focus to § 18-12-112's
background check requirements.

*Id.* at 801. Colorado's law expanding background checks survives at the first step. It is a "presumptively lawful regulatory measure[]" that regulates conduct falling outside the scope of the Second Amendment's protections, and is consistent with the right to keep and bear arms. *See Heller*, 554 U.S. at 626-27 & n.26. Even if it did burden conduct protected by the Second Amendment, § 18-12-112 would easily pass muster under the appropriate, intermediate level of scrutiny.

I.   **COLORADO'S EXPANDED BACKGROUND CHECK REQUIREMENTS ARE LONGSTANDING, PRESUMPTIVELY LAWFUL REGULATIONS THAT DO NOT VIOLATE THE SECOND AMENDMENT.**

The Second Amendment right to keep and bear arms is not unlimited. *Heller* declared that the "right [is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626; *see also United States v. Huitron-Guizar*, 678 F.3d 1164, 1166 (10th Cir. 2012) ("The right to bear arms, however venerable, is qualified by what one might call the 'who,' 'what,' 'where,' 'when,' and 'why.'"). More specifically, the Court in *Heller* held that several types of laws—including "prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms"—are "presumptively lawful regulatory measures" because of their longstanding acceptance as consistent with the Second Amendment. As the Court noted in *Heller*, nothing in its opinion

"should be taken to cast doubt on [these] longstanding prohibitions."  554 U.S. at

626-27 & n.26.

This Court and others have recognized that longstanding prohibitions and

regulations on the sale of firearms are presumptively valid under *Heller*, and

should be upheld under the Second Amendment without resort to means-end

scrutiny.  *See, e.g.*, *Peterson v. Martinez*, 707 F.3d 1197, 1211 (10th Cir. 2013)

(concealed carry laws are presumptively lawful because they "have a lengthy

history"); *see also United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010)

("[L]ongstanding limitations are exceptions to the right to bear arms" and "are

presumptively lawful because they regulate conduct outside the scope of the

Second Amendment."); *Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C.

Cir. 2011) ("[A] regulation that is 'longstanding,' which necessarily means it has

long been accepted by the public, is not likely to burden a constitutional right;

concomitantly the activities covered by a longstanding regulation are

presumptively not protected from regulation by the Second Amendment."); *NRA of

Am. v. Bureau of Alcohol*, 700 F.3d 185, 196 (5th Cir. 2012) ( "[A] longstanding,

presumptively lawful regulatory measure . . . would likely fall outside the ambit of

the Second Amendment . . . [and] would likely be upheld at step one of our

framework."); *United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) ("These

Appellate Case: 14-1292   Document: 01019423080   Date Filed: 04/29/2015   Page: 15

[longstanding] restrictions, as well as others similarly rooted in history, were left intact by the Second Amendment and by *Heller*.").

Like the longstanding measures upheld by this and other courts, background check requirements are longstanding, presumptively lawful conditions on the sale of firearms. Historically, background checks have been used to effectuate widely accepted prohibitions on firearm possession—including by felons and the mentally ill. Indeed, the earliest background check requirements date to the same period as the felon possession bans that *Heller* deemed presumptively lawful by virtue of their lengthy history—and, in most cases, were adopted in the very same legislation that enacted prohibitions on possession by felons and the mentally ill.

Background checks can be traced to early 20th century statutes; the earliest laws mandating investigations of gun buyers were adopted in 1911. That year, Delaware passed a law that forbid the sale of firearms to a minor or "intoxicated person." *See* Vol. 26 Del. Laws 28, 28-29 (1911). That same statute required an investigation into a gun purchaser's background and prohibited the sale of a firearm until "the purchaser ha[d] been positively identified." *See id.* at 29.[3] The statute also imposed licensing and extensive record keeping requirements on firearms dealers. *See id.* Later that same year, New York enacted the Sullivan

---

[3] In 1919, Delaware enhanced its identification provision by requiring that two witnesses positively identify a firearm purchaser before a sale could be completed. *See* Vol. 30 Del. Laws 55, 55-56 (1919).

Appellate Case: 14-1290    Document: 01019423108    Date Filed: 04/29/2015    Page: 16

Act, which required prospective purchasers of handguns to apply for a permit from law enforcement in order to possess a firearm, and prohibited gun dealers from selling to anyone without such a permit.  *See* 1911 N.Y. Laws 442, 442-45.  Also in 1911, Colorado enacted legislation requiring commercial gun dealers to keep detailed records on purchasers of firearms and to share these records with law enforcement.  *See* 1911 Colo. Sess. Laws 408, 409.  In 1913, Oregon enacted a law requiring a would-be handgun buyer to first acquire a permit to purchase; an applicant had to prove his good character by providing affidavits signed by two "reputable freeholders" testifying to the applicants "good moral character" before a magistrate would issue a permit.  *See* 1913 Or. Laws 497, 497.

In the ensuing years, several more states adopted legislation that provided standards to guide law enforcement investigations into gun purchasers' backgrounds.  In 1918, for example, Montana required registration of all firearms and prohibited certain sales unless law enforcement issued a permit after an investigation that concluded a gun buyer was "of good moral character and [did] not desire such fire arm or weapon for any unlawful purpose."  *See* 1918 Mont. Laws 6, 7.  One year later, North Carolina prohibited firearm sales until a clerk of the Superior Court "fully satisf[ied] himself by affidavits, oral evidence, or otherwise, as to the good moral character of the applicant therefor, and that such person . . . require[d] the possession of such weapon . . . for protection of the

home." *See* 1919 N.C. Sess. Laws 397, 398. A 1921 Missouri law required the

county sheriff to investigate a prospective purchaser's background prior to the

issuance of a permit to ensure that the person was "of good moral character and of

lawful age," and that granting the permit would "not endanger the public safety."

*See* 1921 Mo. Laws 691, 692. Arkansas, too, enacted a statute requiring

purchasers to apply for a permit from law enforcement to legally possess pistols

and revolvers; law enforcement only issued such permits after concluding the

applicant was a person "whose conduct, past record and occupation [was] such as

to prove . . . that he [was] a person of good character." *See* 1923 Ark. Acts 379,

380; repealed by 1925 Ark. Acts 1047, 1047.[4]

---

[4] Under *Heller*, regulatory measures dating to the early twentieth century may be sufficiently "longstanding" to be presumptively lawful; they "need not mirror limits that were on the books in 1791." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (Easterbrook, J.); *see also Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) ("early twentieth century regulations" may "demonstrate a history of longstanding regulation"); *Drake v. Filko*, 724 F.3d 426, 432 (3d Cir. 2013) ("pre-ratification presence" is not a prerequisite for regulation to qualify as longstanding); *United States v. Bena*, 664 F.3d 1180, 1182 (8th Cir. 2011); *United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011). The firearm regulations *Heller* identified as "longstanding" and "presumptively lawful"—"prohibitions on the possession of firearms by felons and the mentally ill . . . [and] conditions and qualifications on the commercial sale of arms"—are of distinctly "20th century vintage." *Skoien*, 614 F.3d at 639. The first state prohibitions on possession of firearms by felons arose in the early twentieth century, *see, e.g.*, 1923 Cal. Stat. 695, 696; 1923 N.D. Laws 379, 380, the first federal statute prohibiting some felons from possessing firearms was not passed until 1938, and all felons were not prohibited under federal law from possessing firearms until 1961. *See Skoien*, 614 F.3d at 640; *see also Booker*, 644 F.3d at 23-24. Likewise, the modern regulatory framework for commercial sales—requiring dealer licensing and recordkeeping—

Appellate Case: 14-1290    Document: 01019423108    Date Filed: 04/23/2015    Page: 18

In response to this trend of increasing firearm regulation, the United States Revolver Association, under the direction of its Vice President—and National Rifle Association President—Karl T. Frederick, drafted a model law to guide the legislative efforts of other states (the "USRA Model Act").  Among other things, the legislation prohibited the possession of pistols and revolvers by felons and non-citizens and barred the sale of handguns to minors; required sellers to transmit detailed sales records to local law enforcement; and imposed a one-day waiting period between the application to purchase a firearm and receipt of that firearm. The requirements that dealers send sale records to law enforcement and the one-day waiting period before a gun could be transferred to the buyer worked together to permit local law enforcement to conduct a brief background check investigation and prevent the purchase where required by law.  *See* Charles V. Imlay, *The Uniform Firearms Act*, 12 A.B.A. J. 767, 767 (1926).

Between 1923 and 1925, several states—including California, Connecticut, North Dakota, New Hampshire, Indiana, and Oregon—passed laws that, like the USRA Model Act, coupled early firearm prohibitions with background checks by

---

was not established until the early twentieth century alongside felon prohibitions and the earliest background checks, *see, e.g.*, 1923 Cal. Stat 695, 699-702. Regulations on the commercial sale of firearms did not exist at the time of the passage of the Second Amendment.  *See* Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1379 (2009).

Appellate Case: 14-1290    Document: 01019423108    Date Filed: 04/29/2015    Page: 19

law enforcement.  *See* 1923 Cal. Stat. 695, 696-97, 701; 1923 Conn. Pub. Acts 3707, 3707-10; 1923 N.D. Laws 379, 380-82; 1923 N.H. Acts 138, 138-39; 1925 Ind. Acts 495, 495-98; 1925 Or. Laws 468, 468-71.  Other states later strengthened existing laws requiring a law-enforcement-issued permit to purchase firearms. Michigan, for example, required applicants to demonstrate that they had not been convicted of a felony or adjudicated insane.  *See* 1927 Mich. Pub. Acts 887, 887-88.  And New Jersey limited purchase permits to people "of good character and . . . good repute in the community," and increased its waiting period from one day to seven days to facilitate background investigations.  *See* 1927 N.J. Laws 742. Others, including Hawaii and Massachusetts, created permit requirements like those in the Sullivan Act, under which prospective purchasers first had to obtain pre-approval from law enforcement before they were eligible to buy firearms.  *See* 1925 Haw. Sess. Laws 790, 793; 1927 Mass. Acts 413, 415-16.

In 1930, the National Conference of Commissioners on Uniform State Laws approved legislation based on the USRA Model Act, which expanded the waiting period to 48 hours to provide additional time for law enforcement to complete an investigation into the fitness of a prospective firearm purchaser (the "Uniform Firearms Act").  *See* Nat'l Conf. on Uniform State Laws, *Report of Comm. on Act to Regulate the Sale & Possession of Firearms* 563-67 (1930).  The Act tied its background check requirement to prohibitions on the sale of firearms to "any

person under the age of eighteen or to one [a seller] [had] reasonable cause to believe [had] been convicted of a crime of violence, or [was] a drug addict, an habitual drunkard or of unsound mind." *Id*. It required dealers to submit detailed purchaser information to law enforcement within six hours of an application so an investigation could be conducted within the allotted 48 hours. *Id*.; *see also Sportsmen Fight Sullivan Law*, 23 J. Crim. L. & Criminology 665 (1932).

The Uniform Firearms Act was adopted in some form by Pennsylvania, South Dakota, Washington, and Alabama, and enacted by Congress for the District of Columbia. *See* 1931 Pa. Laws 497; 1935 S.D. Sess. Laws 355; 1935 Wash. Sess. Laws 599; 1936 Ala. Laws 51; 47 Stat. 650 (1932). Texas, too, married prohibitions on gun ownership by unreliable or dangerous people with a background check requirement to enforce the prohibitions. It forbade the sale of pistols to minors and people in the "heat of passion" and required purchasers to obtain a "certificate of good character" from a justice of the peace or judge before they could purchase a pistol. *See* 1931 Tex. Gen. Laws 447, 447-48.

Like § 18-12-112, many of these historical background check laws applied to all transfers of firearms, including sales, loans, or gifts by unlicensed persons. Oregon's 1913 law made it unlawful for "any person" to "sell at retail, barter, give away or dispose of [any pistol or revolver] to any person whomsoever" unless that person had obtained a permit to purchase following a background investigation.

11

1913 Or. Laws 497, 497.  North Carolina's 1919 statute likewise made it "unlawful for any person, firm or corporation . . . to sell, give away or dispose of" any pistol unless the "purchaser or receiver" had a valid permit to purchase.  1919 N.C. Sess. Laws 397, 397.  Missouri's 1921 law was even more explicit, providing that "no person . . . shall directly or indirectly buy, sell, borrow, loan, give away, trade, barter, deliver or receive" any handgun unless the recipient had a permit.  1921 Mo. Laws 691, 692.  State laws incorporating the language of the USRA Model Act also applied to both dealers and unlicensed persons, and provided that "no person" could "sell, deliver, or otherwise transfer" a firearm without following the law's record keeping, law enforcement notification, and waiting period requirements.  *See, e.g.*, 1923 N.D. Laws 379, 381-82; 1923 N.H. Laws 138, 139-40; 1925 Ind. Acts 495, 497-98; 1925 Mich. Pub. Acts 473, 474.  Other state laws reached unlicensed persons by forbidding "any person [to] lend or give a firearm to another or otherwise deliver a firearm contrary to the provisions of [the state laws]."  1931 Pa. Laws 497, 501; *accord* 1935 S.D. Sess. Laws 355, 357; 1935 Wash. Sess. Laws 599, 603; 1936 Ala. Acts 51, 54.  Finally, in legislation adopted in 1927, both Hawaii and Michigan forbade the receipt of a pistol by sale, gift, or loan from anyone, including unlicensed persons, unless the recipient obtained a permit to purchase that required an inquiry into a purchaser's background.  *See* 1927 Haw. Sess. Laws 209, 211; 1927 Mich. Pub. Acts 887, 887-88.

Appellate Case: 14-1290   Document: 01019431080   Date Filed: 04/29/2015   Page: 22

As this history demonstrates, investigations into a prospective purchaser's background prior to the transfer of a firearm are at least as longstanding as the regulations found presumptively lawful by the Supreme Court in *Heller*. Background inquiries were regularly mandated by laws requiring a short waiting period between purchase and delivery, and were enacted alongside—and in order to effectuate—prohibitions on transferring firearms to felons, minors, and the mentally ill. Background check laws therefore "harmonize[] with the historical traditions associated with the Second Amendment guarantee," *Peterson*, 707 F.3d at 1211 (internal quotations omitted), and are presumptively valid under *Heller*. That should end the inquiry.

## II. BACKGROUND CHECKS ARE PROVEN AS AN EFFECTIVE TOOL FOR REDUCING FIREARM VIOLENCE AND SAVING LIVES, AND ARE NOT UNDULY BURDENSOME.

Even if this Court were to find that Colorado's background check law did burden rights protected by the Second Amendment, Appellants still could not overcome the presumption of constitutionality because the law easily satisfies intermediate scrutiny.[5] "To pass constitutional muster under intermediate scrutiny,

---

[5] This Court has previously applied intermediate scrutiny in Second Amendment challenges to firearm regulations, including in challenges to laws that categorically prohibit firearm possession; if intermediate rather than strict scrutiny is appropriate when analyzing outright prohibitions on firearm ownership, it is surely appropriate when considering a law, like § 18-12-112, that imposes at most a minimal burden on conduct protected by the Second Amendment. *See Huitron-Guizar*, 678 F.3d at 1169; *Reese*, 627 F.3d at 802.

the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *Reese*, 627 F.3d at 802 (internal quotations omitted).  As Appellee persuasively shows, the government interests in ensuring public safety and reducing crime are unquestionably important. *See* Appellee Br. at 38.  And expanding background checks to firearm transfers by unlicensed persons is substantially related to these important interests.

Requiring background checks for firearm transfers by unlicensed individuals closes a gaping loophole in federal law that is all too often exploited by criminals and other dangerous, prohibited persons, and provides law enforcement with a valuable crime-fighting tool by improving their ability to trace crime guns.  As a result, mandatory background checks for unlicensed transfers have proven effective in reducing violence and firearm-related crime across the country.  They have also proven effective in Colorado, and have not been unduly burdensome.  This Court should reject Appellants' challenge to this common-sense regulation.

### A. Requiring background checks on all firearm transfers closes a significant loophole in federal law and provides law enforcement with a valuable crime-fighting tool.

**1. Closing the Background Check Loophole.**  Under federal law, several categories of individuals are prohibited from purchasing or possessing a firearm—including, among others, felons and domestic violence misdemeanants, persons

Appellate Case: 14-1290   Document: 01019423103   Date Filed: 04/29/2015   Page: 24

subject to certain domestic violence restraining orders, and those who pose a

danger because of severe mental illness. *See* 18 U.S.C. § 922(d), (g). To help

keep firearms out of the hands of these prohibited individuals, federal law requires

licensed firearms dealers to conduct background checks on prospective firearm

transferees. *See* Brady Handgun Violence Prevention Act of 1993, Pub. L. No.

103-159, 107 Stat. 1536.

The requirement that licensed dealers conduct background checks has

proven effective in keeping guns from prohibited purchasers. From its inception in

March 1994 through December 2012, the Brady Act has subjected roughly 148

million applications for firearm transfers or permits to background checks, and has

denied more than 2.4 million applications because the potential purchasers were

legally ineligible. *See* U.S. Department of Justice, *Background Checks for

Firearm Transfers: 2012 Statistical Tables* (December 2014),

http://1.usa.gov/1DaX5UW.

But a major loophole in federal law allows prohibited persons to obtain

firearms without a background check. Because the federal requirement to conduct

background checks applies only to licensed dealers, unlicensed, private parties are

free to sell or transfer firearms without any checks at all. And while these parties

may not knowingly transfer a firearm to a prohibited recipient, they may otherwise

sell or give him a gun with no questions asked. This background check loophole

poses a significant threat to public safety, as millions of firearm transfers

nationwide take place every year between unlicensed parties. *See* Cook & Ludwig,

*Guns in America: Results of a Comprehensive National Survey on Firearm*

*Ownership and Use* (May 1996), http://bit.ly/1p862I4.[6]

　　Unsurprisingly, in states that have not closed this loophole, criminals and

other prohibited individuals turn to the unregulated market to obtain firearms

without background checks. *See* Webster & Wintemute, *Effects of Policies*

*Designed to Keep Firearms from High-Risk Individuals*, Annual Review of Public

Health (2015) ("Considerable evidence has demonstrated that criminals and

firearm traffickers regularly exploit weaknesses in federal firearm

laws. . . . [particularly] the Brady Act's exemption of background checks and

record keeping for firearm transfers by private gun owners."). A national survey of

state prison inmates revealed that roughly 80 percent of those who used a firearm

in a crime acquired it in a private transfer. *See* U.S. Department of Justice, *Survey*

*of Inmates in State and Federal Correctional Facilities: Firearm Use by Offenders*

(Feb. 28, 2007), http://www.bjs.gov/content/pub/pdf/fuo.pdf.

---

　　[6] As technology makes it easier for unlicensed sellers to find potential
buyers online, the unregulated market for firearms is growing exponentially. A
recent study noted that in the 20-month period from December 2011 to August
2013, the number of guns advertised for sale by unlicensed sellers on a popular
website, Armslist.com (http://www.armslist.com), grew sixfold from 12,294 to
83,204. *See* Webster & Wintemute, *Effects of Policies Designed to Keep Firearms*
*from High-Risk Individuals*, Annual Review of Public Health (2015).

The threat of dangerous, prohibited persons avoiding background checks and acquiring illegal guns from unlicensed sellers is not a theoretical concern. When Aaron Joe Newport tried to buy a gun from a licensed dealer and was denied because a background check revealed a prohibiting domestic violence conviction, he simply turned to the Internet to find an unlicensed seller. *See* Everytown, *Online and Off the Record* 2-3 (Sept. 2014), http://bit.ly/1Bhinln. At a parking lot meeting, without a background check, he bought a .40-caliber Springfield XD handgun and used it to shoot his ex-girlfriend, Monique Williams, in the head, killing her, before killing himself. *Id.*

John Schick was similarly prohibited from buying or possessing firearms—in his case, because he had been adjudicated mentally ill—and when he tried to purchase a gun from a licensed dealer, he failed the required background check. *See* Michael A. Fuoco & Sadie Gurman, *New Mexico man regrets selling guns used in Western Psych shootings*, Pittsburgh Post-Gazette, Mar. 31, 2012. But four months later, he found an unlicensed seller in New Mexico who sold him two handguns with no background check required. After buying the guns, he used them to kill one person and injure seven more at a psychiatric institute before being fatally shot by police. *Id.*

These are but two examples from a needlessly long list of tragedies that could have been averted if unlicensed sellers were required to conduct the same

background checks as licensed dealers.  Colorado closed the background check loophole to prevent tragedies like these.

**2. Helping Law Enforcement Fight Crime.**  Requiring background checks on gun sales or transfers by unlicensed persons also helps law enforcement to investigate firearm crimes.  When law enforcement agencies—federal, state, local, and foreign—recover a gun at a crime scene, they may submit the serial number of the weapon to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for tracing.  ATF, in turn, determines the chain of custody of the weapon by contacting the manufacturer, distributor, and licensed dealer who first offered the firearm for sale.  The dealer reviews its records to identify the first retail purchaser, and ATF can interview that purchaser to determine if he or she was involved in the crime or whether the gun had been previously lost, stolen, or transferred to another person.  In 2013, ATF received more than 245,000 firearm trace requests from law enforcement agencies in the United States.  *See* ATF, *Firearms Trace Data-2013*, https://www.atf.gov/content/About/statistics/firearms-trace-data-2013.

The ability of unlicensed persons to transfer firearms to other parties without any background check or recordkeeping impedes ATF's ability to trace weapons used in crimes, because more than 85 percent of the firearms submitted to ATF for tracing "are in the possession of someone other than their first retail purchaser when [the relevant crimes] are committed."  Wintemute, *Background Checks for*

*Firearm Transfers*, 23 (2013), http://www.ucdmc.ucdavis.edu/vprp/.  Unlicensed, undocumented gun transfers thus routinely hinder law enforcement investigations by creating missing links in the chain of custody.

There are countless examples; Darien Richardson's case is but one.  She was murdered during a home invasion on January 8, 2012.  The .45 caliber handgun used to kill her was traced to a Maine gun show, but because the gun was sold there between unlicensed individuals, the police declared it a cold case.  Because "[t]here's no documentation, no bill of sale, no background check," said Portland Police Chief Michael Sauschuck, "we have no idea where that weapon went after that (sale) [sic] or how many times it changed hands."  *See* Kevin Miller, *Many sales of firearms in Maine fall under the radar*," Maine Sunday Telegram, Feb. 10, 2013.

By helping to fill the blanks in the chain of custody, requiring background checks for transfers by unlicensed individuals can make ATF tracing more effective and help law enforcement solve crimes.  Closing the background check loophole helps law enforcement investigate crimes that do occur just as it helps to avert crime in the first instance by keeping guns out of the hands of dangerous, prohibited persons.

**B. Substantial evidence demonstrates that requiring background checks for transfers by unlicensed persons is effective in reducing gun violence and firearm crime.**

**1. The National Picture.** There is overwhelming evidence that background checks reduce gun violence and save lives. Currently, seventeen states[7] and the District of Columbia require a background check for all handgun transfers, including transfers by unlicensed persons. In states that require background checks for all handgun transfers, data from the Federal Bureau of Investigation and Centers for Disease Control and Prevention indicate that 46 percent fewer women are shot to death by their intimate partner, 48 percent fewer law enforcement officers are shot to death with handguns that do not belong to them, and there are 48 percent fewer gun suicides. *See* Everytown, *State Background Check Requirements and Rates of Domestic Violence Homicide*, http://every.tw/1Aj9HZj (analyzing FBI's 2008-2012 Supplementary Homicide Reports); *State Background Check Requirements and Rates of Firearm Homicide Against Law Enforcement*, http://every.tw/1Aj9JAy (analyzing FBI's 2000-2011 Law Enforcement Officers Killed in Action database); *State Background Check Requirements and Suicide*, http://every.tw/1Aj9CVz (analyzing Centers for Disease Control and Prevention's 2008-2012 Fatal Injury Reports). Further, there is 48 percent less gun trafficking

---

[7] These states are California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maryland, Massachusetts, Michigan, Nebraska, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, and Washington.

in cities where state law requires background checks on all handgun sales.  *See*

Webster *et al.*, *Effects of State-Level Firearm Seller Accountability Policies on*

*Firearm Trafficking*, 86 J. Urban Health 525 (2009).

A recent analysis by Johns Hopkins University that examined 28 studies

published between 1999 and 2014 on the effects of gun policy concluded that there

is "[m]ounting evidence" that "laws intended to increase the accountability of

firearm sellers to avoid risky transfers of firearms"—including those requiring

comprehensive background checks—"are effective in curtailing the diversion of

guns to criminals."  *See* Webster and Wintemute, *supra*.  Other studies have found

that "background checks and denial of purchases by prohibited persons reduce risk

of arrest [for subsequent firearm-related or violent crimes] among individuals who

are directly affected," that "comprehensive background check policies interfere

with the operations of criminal firearms markets and particularly with firearm

trafficking," and that "the adequacy of background checks performed under current

policies is related to firearm homicide rates."  Wintemute, *supra* at 25 (collecting

studies).

**2. The Missouri experience.**  Just as national data show how implementing

comprehensive background checks can reduce gun violence and improve public

safety, Missouri's experience shows that repealing a background check

requirement can have the opposite effect.  Beginning in 1921, Missouri required

Appellate Case: 14-1290    Document: 01019423103    Date Filed: 04/29/2015    Page: 31

gun buyers to obtain a permit before they could acquire a handgun; that permit was only awarded to applicants who passed a background check.  Missouri repealed that law effective August 28, 2007.  The effects of the repeal were felt immediately.

After repeal, Missouri's firearm homicide rate increased dramatically. Before repeal, the firearm homicide rate in Missouri was "relatively stable, fluctuating around a mean of 4.66 per 100,000 population per year."  Webster *et al.*, *Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides*, 91 J. Urban Health 293 (2014).  For the post-repeal period 2008-2010, the mean rose to 5.82 per 100,000.  *Id.*  And even "after controlling for changes in rates of unemployment, poverty, burglary, incarceration, and law enforcement officers along with other state laws," the repeal was associated with a 25 percent increase in firearm homicide rates.  *Id.*

The dramatic increase in firearm homicides in Missouri went against all of the national and regional trends.  Nationally, the mean homicide rate **declined** 5.5 percent during the same time that Missouri's rate skyrocketed.  *Id*.  And in the eight states bordering Missouri, the homicide rate attributable to firearms likewise decreased 2.2 percent during this time period.  *Id.*  Moreover, "there were no statistically significant changes" and certainly no significant upward changes, in the firearm homicide rate in any of these bordering states.  *Id.*

Appellate Case: 14-1290   Document: 01019423108   Date Filed: 04/29/2015   Page: 32

What is more, this increase in homicide rates in Missouri occurred **only** for homicides committed with guns; even while the gun homicide rate soared, the non-firearm homicide rate remained constant. "Regression analyses indicated that Missouri's repeal . . . was associated with no change in the age-adjusted non-firearm homicide rate." *Id.* In the end, researchers concluded that "the law was associated with an additional 55 to 63 murders per year in Missouri between 2008 and 2012 than would have been forecasted had [Missouri's background check law] not been repealed." *Id.* at 298.

The repeal in Missouri had troubling effects on more than just firearm homicides. *First*, "[t]he weakening of Missouri's gun laws may have also contributed to gun trafficking to border states that regulate handgun sales by all sellers": From 2006 to 2012, the number of crime guns originally sold in Missouri that were recovered by law enforcement in Illinois and Iowa—both of which require background checks on sales by unlicensed sellers—increased by 37 percent while the overall number of crime guns recovered decreased by 6 percent. *Id.* at 299. *Second*, within Missouri itself, the repeal "coincided with a sharp increase in the percentage of crime guns recovered by police in Missouri that had been originally sold by in-state retailers": from 56.4 percent in 2006 to 71.8 percent in 2012. *Id.* at 294. *Finally*, "there was a twofold increase in the percentage of guns

Appellate Case: 14-1290    Document: 01019423108    Date Filed: 04/23/2015    Page: 33

[in Missouri] that had unusually short intervals between the retail sale and the

recovery by police, an indicator of firearm diversion or trafficking." *Id.*[8]

 The nationwide and Missouri data confirm that requiring background checks

for gun transfers by unlicensed parties reduces crime and saves lives.

### C. Colorado's expanded background check requirements are already providing public safety benefits without imposing meaningful burdens on gun buyers or unlicensed sellers.

 Under Colorado's background check law, the Colorado Bureau of

Investigation ("CBI") conducts background checks of prospective purchasers in the

state. *See* Colorado Bureau of Investigation, *InstaCheck Unit*,

http://1.usa.gov/1DkpIFj. Preliminary data released by CBI suggests that the

expansion of Colorado's background check system is working. In its first 18

months, § 18-12-112 has blocked gun sales to hundreds of people legally ineligible

to purchase or possess a firearm. In that period, CBI conducted 14,663

background checks on gun transfers between unlicensed parties that took place at

---

[8] Relatedly, a national survey examining the effect of a comprehensive background check policy on firearm trafficking reviewed the patterns of crime guns that were originally sold by an in-state retailer that were recovered at a crime scene within a year of initial sale, and that were in possession of someone other than the original purchaser. The study revealed that 18 of the 20 cities with the lowest percentage of such trafficked guns were in states with comprehensive background check policies; of the 20 cities with the highest percentages, only 3 were in such states. Wintemute, *supra* at 26.

licensed dealers.  *See* Attachment A.[9]  CBI blocked a total of 198 of those

transactions—transactions that would otherwise have been completed, resulting in

the transfer of firearms to criminals and other prohibited individuals, including

people convicted of felony assault and sexual assault, people under restraining

orders, and people prohibited from possessing firearms due to severe mental

illness.  *Id.*[10]

There is another indicator that the new law is working.  An Everytown

analysis of gun advertisements posted online by unlicensed sellers in Colorado

found that they are now four times as likely to explicitly refer to a federally

licensed gun dealer or mention the phrase "background check" as are

advertisements posted in nearby states that do not require a background check for

unlicensed transfers.[11]  These results suggest that Colorado unlicensed sellers are

alerting potential purchasers to the new background check requirements,

presumably deterring additional prohibited individuals from even attempting to

purchase guns in Colorado.

---

[9] The 14,663 background checks were for unlicensed gun sales at sites other than gun shows.  *See* Attachment A.  CBI conducted an additional 6,172 checks for private sales at gun shows, bringing the total to 20,835 checks for all unlicensed sales.  *Id.*  Unlicensed sales at gun shows have been subject to background checks in Colorado since 2000.

[10] CBI blocked an additional 100 sales at gun shows, bringing the total to 298 for all unlicensed sales.  *See* Attachment A.

[11] To conduct this study, Everytown collected ads offering guns for sale or trade placed by self-described unlicensed sellers in Colorado and nearby states.

Finally, it is important to note that there is no evidence that the requirement to conduct a background check has imposed any substantial burdens on lawful transfers of firearms by unlicensed persons in Colorado.  As of December 2014, 485 licensed dealers had listed themselves on the website GunBroker.com as available and willing to facilitate transfers between unlicensed parties—about a quarter of the 1,987 total licensed dealers in the state.  Assuming that this list is exhaustive, the data indicate that 94.8 percent of Coloradans currently live within 10 miles of a gun dealer who is conducting background checks for unlicensed sellers.[12]  This statistic is a remarkable one, as it uses only dealers listing themselves on GunBroker.com, and is therefore likely a conservative estimate.  Presumably not every dealer willing to conduct background checks for unlicensed sellers advertises on this website.

That § 18-12-112 has not imposed significant burdens on the secondary market for firearms in Colorado is unsurprising:  national data indicate that background checks are not unduly burdensome anywhere.  Federally licensed

---

[12] To conduct this analysis, Everytown obtained address information from ATF on the nearly 500 licensed dealers currently offering to perform background checks.  *See* ATF, Listing of Federal Firearms Licensees (FFLs) – 2015, at http://1.usa.gov/1ps0dJa.  This data was overlaid on population by census block group ("CBG") over the period 2007-2011 and used to calculate the share of geographic area of each CBG that was within 10 miles of a dealer.  On the assumption that population density of each CBG is constant, the share of the geographic area of the CBG within 10 miles of a dealer approximates the share of the population of each CBG within 10 miles of a dealer.

dealers have been effectively conducting background checks using the National

Instant Criminal Background Check System (NICS) for two decades.  In so-called

"Point of Contact" states, like Colorado, dealers call a state law enforcement

agency that conducts NICS checks for all gun sales or permits;[13] in most states, a

firearms dealer simply contacts NICS directly, either online or by calling a hotline.

A NICS operator then runs a would-be purchaser's information through the

background check system; based on the results of the search, the NICS operator

may tell the dealer to proceed with or deny the sale. This process is simple and

quick: over 91 percent of NICS checks are completed in 90 seconds.  *See* Federal

Bureau of Investigation, *Criminal Justice Information Services Division, NICS*

*Operations Report*, http://www.fbi.gov/about-us/cjis/nics/reports/2012-operations-

report.  If potentially prohibiting criteria exist and NICS concludes that more

information about the buyer is required in order to make a determination, NICS

can also advise the dealer to delay the sale.  NICS then has three business days to

determine whether the buyer is prohibited from purchasing a gun.  If NICS cannot

---

[13] Besides Colorado, California, Connecticut, Florida, Hawaii, Illinois, Nevada, New Jersey, Oregon, Pennsylvania, Tennessee, Utah, and Virginia are Point of Contact — or "POC" states.  Eight states are "partial POC" states, meaning they run background checks on handgun sales or permits, while the FBI performs NICS checks for long gun purchases: Iowa, Maryland, Michigan, Nebraska, New Hampshire, North Carolina, Washington, and Wisconsin.  *See* Nat'l Instant Criminal Background Check System, *NICS Point of Contact States & Territories*, http://www.fbi.gov/about-us/cjis/nics/poc.

Appellate Case: 14-1290   Document: 01019423108   Date Filed: 04/29/2015   Page: 37

make a final determination within three business days, it is up to the dealer's

discretion whether to proceed with the transfer.

Requiring a background check for every gun transfer simply expands the

existing system to include transfers between unlicensed individuals.  When an

unlicensed seller and buyer want to transfer a firearm, they meet at a licensed

dealer who conducts the background check before the gun is transferred.  All gun

dealers are eligible to conduct these checks, *see* Open Letter from Chad J. Yoder,

Chief, Firearms and Explosives Industry Division, to All Federal Firearms

Licensees (Jan. 16, 2013), https://www.atf.gov/files/regulations-

rulings/procedures/031513-open-letter-atf-procedure-2013-1.pdf, and many dealers

take the additional step of listing themselves on the website GunBroker.com,

attesting that they are "willing to handle firearms transfers for buyers in [their]

state," *see* GunBroker, *FFL SignUp*, http://www.gunbroker.com/FFL/

DealerServices.aspx.  Many gun dealers appreciate the opportunity to conduct

these background checks even when the firearm is being sold by an unlicensed

person, because "[t]he increased foot traffic at participating retailers provides

opportunities to develop new customers."  Wintemute, *supra* at 12.  As one retailer

recalled, having gun purchasers visit their stores when buying from unlicensed

sellers creates business opportunities, since "'when they come in to do the paper,

everybody needs bullets and cleaning supplies.'"  *Id.*

Appellate Case: 14-1290   Document: 01019423103   Date Filed: 04/29/2015   Page: 38

As in the rest of the states that have extended background check requirements to unlicensed sellers, Colorado's law is already keeping firearms out of the hands of prohibited purchasers.  Colorado requires background checks on all firearm transfers to ensure compliance with the laws governing eligibility for firearm possession and purchase, and has implemented the requirement consistently with the Second Amendment and without burdening individuals' ability to acquire firearms in any meaningful way.

# CONCLUSION

The district court's decision should therefore be affirmed.


April 29, 2015                              Respectfully submitted,

                                            /s/ Sparkle L. Sooknanan
PETER C. CANFIELD                           GREGORY A. CASTANIAS
JONES DAY                                   SPARKLE L. SOOKNANAN
1420 Peachtree Street, N.E., Suite 800      JONES DAY
Atlanta, Georgia 30309                      51 Louisiana Ave. N.W.
                                            Washington, DC  20001
                                            Telephone:  (202) 879-3435
                                            Email: ssooknanan@jonesday.com

                                            *Counsel for Amicus Curiae*

Appellate Case: 14-1292    Document: 01019423403    Date Filed: 04/29/2015    Page: 40

## CERTIFICATES OF COMPLIANCE

1.      I hereby certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and Fed. R. App. P. 32(a)(7)(B) because it contains 6,829 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as counted using the word-count function on Microsoft Word 2007 software.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

3.      Pursuant to this Court's guidelines on the use of the CM/ECF system, I hereby certify that: a) all required privacy redactions have been made; b) the hard copies that have been submitted to the Clerk's Office are exact copies of the ECF filing; and c) the ECF submission was scanned for viruses with the most recent version of McAfee VirusScan Enterprise (last updated March 1, 2013) and, according to the program, is free of viruses.


April 29, 2015                                /s/ Sparkle L. Sooknanan
                                             SPARKLE L. SOOKNANAN

                                             *Counsel for Amicus Curiae*

Appellate Case: 14-1292   Document: 01019423080   Date Filed: 04/29/2015   Page: 41

## CERTIFICATE OF SERVICE

I hereby certify that, on the 29th day of April, 2015, I electronically filed the original of the foregoing document with the clerk of this Court by using the CM/ECF system, which served counsel of record at their designated electronic mail addresses.

I also certify that on the 29th day of April, 2015, I caused seven paper copies of the foregoing brief to be sent by for delivery within two business days, to the Clerk of Court, United States Court of Appeals for the Tenth Circuit, 1823 Stout Street, Denver, Colorado 80257.

April 29, 2015                       /s/ Sparkle L. Sooknanan
                                     SPARKLE L. SOOKNANAN

                                     *Counsel for Amicus Curiae*

# ATTACHMENT A

**BACKGROUND CHECKS CONDUCTED BY CBI JULY 2013-DECEMBER 2014**

| | Total checks | | | Private (total) | | | Private (gun show) | | | Private (non-gun show) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Approved | Denied | Total | Approved | Denied | Total | Approved | Denied | Total | Approved | Denied | Total |
| Jul. 2013 | 19,206 | 390 | 19,596 | 556 | 5 | 561 | 217 | 2 | 219 | 339 | 3 | 342 |
| Aug. 2013 | 26,203 | 513 | 26,716 | 1,003 | 11 | 1,014 | 425 | 5 | 430 | 578 | 6 | 584 |
| Sep. 2013 | 23,366 | 492 | 23,858 | 800 | 15 | 815 | 254 | 8 | 262 | 546 | 7 | 553 |
| Oct. 2013 | 25,106 | 525 | 25,631 | 1,043 | 13 | 1,056 | 398 | 7 | 405 | 645 | 6 | 651 |
| Nov. 2013 | 29,433 | 548 | 29,981 | 1,335 | 12 | 1,347 | 399 | 2 | 401 | 936 | 10 | 946 |
| Dec. 2013 | 34,724 | 640 | 35,364 | 1,389 | 17 | 1,406 | 632 | 12 | 644 | 757 | 5 | 762 |
| Jan. 2014 | 23,647 | 383 | 24,030 | 1,149 | 14 | 1,163 | 472 | 6 | 478 | 677 | 8 | 685 |
| Feb. 2014 | 27,505 | 669 | 28,174 | 1,260 | 31 | 1,291 | 439 | 10 | 449 | 821 | 21 | 842 |
| Mar. 2014 | 28,976 | 534 | 29,510 | 1,373 | 20 | 1,393 | 462 | 9 | 471 | 911 | 11 | 922 |
| Apr. 2014 | 24,254 | 453 | 24,707 | 1,205 | 15 | 1,220 | 365 | 7 | 372 | 840 | 8 | 848 |
| May 2014 | 22,805 | 446 | 23,251 | 1,310 | 17 | 1,327 | 383 | 3 | 386 | 927 | 14 | 941 |
| Jun. 2014 | 20,147 | 376 | 20,523 | 1,026 | 4 | 1,030 | 110 | 1 | 111 | 916 | 3 | 919 |
| Jul. 2014 | 21,548 | 404 | 21,952 | 1,184 | 25 | 1,209 | 296 | 10 | 306 | 888 | 15 | 903 |
| Aug. 2014 | 24,516 | 501 | 25,017 | 1,113 | 20 | 1,133 | 263 | 4 | 267 | 850 | 16 | 866 |
| Sep. 2014 | 23,268 | 440 | 23,708 | 1,141 | 16 | 1,157 | 171 | 3 | 174 | 970 | 13 | 983 |
| Oct. 2014 | 27,180 | 618 | 27,798 | 1,289 | 20 | 1,309 | 280 | 6 | 286 | 1009 | 14 | 1023 |
| Nov. 2014 | 28,930 | 585 | 29,515 | 1,241 | 15 | 1,256 | 262 | 2 | 264 | 979 | 13 | 992 |
| Dec. 2014 | 36,666 | 659 | 37,325 | 1,418 | 28 | 1,446 | 344 | 3 | 347 | 1074 | 25 | 1099 |
| **Total** | **467,480** | **9,176** | **476,656** | **20,835** | **298** | **21,133** | **6,172** | **100** | **6,272** | **14,663** | **198** | **14,861** |

SOURCE: COLORADO BUREAU OF INVESTIATION

33